# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00204-004 (BAH)** |
| **v.** | : | |
| | : | |
| **JACK JESSE GRIFFITH,** | : | |
| **AKA "Juan Bibiano"** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Despite being charged, arrested, and placed on pre-trial supervision, the defendant, Jack Jesse Griffith, has displayed virtually no remorse for his conduct and appears to have little patience for the criminal proceedings before the Court. For the reasons set forth herein, the government requests that this Court sentence Griffith to three months of incarceration and $500 in restitution.

## I.      Introduction

The defendant, Jack Jesse Griffith, and his three co-defendants participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Griffith pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained below, a custodial sentence is appropriate in this case because Griffith committed his January 6th crime in a manner that trivialized the severity

of the chaotic and dangerous attack, and his later self-promotion and commentary about his participation in the riot demonstrates continued pride in his actions. Griffith had many opportunities to remove himself from the disorder of January 6th but was all too happy to continue his participation. Following his arrest, his casual attitude toward these criminal proceedings demonstrated a lack of respect for this Court—worrying only that he did not want to appear too "cocky" that it was all going to go well for him. By minimizing the seriousness of his conduct, Griffith fails to recognize the harm he caused to his country, the law enforcement officers who were trying to defend it, and others who were working at the Capitol to carry out a Constitutionally mandated process for the peaceful transfer of power.

Griffith traveled from Tennessee to the Capitol with others after espousing extremist political views on social media. While people all over the world watched in shock, horror, and fear, Griffith smiled and yelled in excitement during the horrific attack. He recorded himself and his friend inside the Capitol. He later posted photos of himself inside the Crypt online.

Although Griffith is the first co-defendant in this case to plead guilty, he has also appeared to make light of his criminal proceedings before this Court. The views he shared in his Facebook chat after January 6th detailed more fully below show just how trivial these charges and proceedings are to him. He used his arrest as a badge of honor to fundraise, to promote his social media accounts, and to bring attention to a video game he is creating. Jack Griffith will not be deterred unless he is faced with a custodial sentence.

As this Court has already recognized, the defendant's conduct on January 6th, like the conduct of other defendants, took place in the context of a large and violent riot in which sheer numbers combined with violence to overwhelm law enforcement, allowing rioters to breach the Capitol and disrupt the proceedings. The riot would not have happened but for his actions and the

2

actions of so many others. Here, the defendant's participation in a riot that succeeded in delaying the Congressional certification, combined with his cavalier attitude about his criminal proceedings, renders a custodial sentence both necessary and appropriate.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 63 (Statement of Offense), at ¶¶ 1-9. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. The sheer number of people who chose to be a part of this attack on democracy overwhelmed the Capitol despite valiant attempts by law enforcement to fight them off. Even those who did not attack others, destroy property, or threaten members of congress themselves supported those who did by joining them. The presence and participation of each and every one of these people encouraged and enabled other rioters as they breached the grounds and the building.







With that backdrop we turn to the defendant's conduct and behavior on January 6th.

*Griffith's Role in the January 6, 2021 Attack on the Capitol*

Jack Jesse Griffith and his co-defendant and co-worker Eric Torrens drove from Tennessee to Washington, D.C. to attend the "Stop the Steal" rally. *See* ECF No. 63, ¶ 10. The "Stop the Steal" rally took place at the Ellipse. Griffith and Torrens entered the restricted Capitol grounds. *Id.* at ¶ 11. Griffith and Torrens spent time in the crowd nearby the inauguration stage on the west side of the U.S. Capitol building.



There, he could see members of the crowd repeatedly attacking law enforcement officers who were trying to protect the Capitol. Griffith did not stop; he did not leave.

Instead, Griffith and Torrens made their way to the stairs underneath the northwest scaffolding. Griffith continued up the northern set of stairs underneath the scaffolding to the northwest terrace, near the Senate wing of the building—a significant breach point on January 6th. *Id.*; ECF No. 67, Ex. 1.[1] Video evidence shows another angle of Griffith under the scaffolding. ECF No. 67, Ex. 2. Around 8 minutes and 55 seconds into the video, Griffith and Torrens nonchalantly watch the crowd with Griffith offers people something from inside a small package. The nearby narrator of the video says "I don't know what is going on with the Capitol police; honestly, it's a mad house; it's a fucking…it's a mad house." *Id.* The video shows the line of officers holding back the rioters at the west front with tear gas audibly exploding and billowing out. The video, ECF 67, Ex. 3 (21:17 – 21:31), captures Griffith and Torrens on the northwest terrace, looking out at the crowd with smiles. Griffith raises his fist in the air. Outside of the Capitol Griffith and Torrens posed for pictures:



---

[1] The government previously provided the Court with video exhibits as reported in its filing ECF No. 63. Those videos have been reviewed by the Court in association with co-defendant Torrens' plea; they have also been made available to the public as ordered by the Court (ECF No. 83).

Other rioters had broken open a door and two nearby windows on the Senate side of the building. ECF 63, ¶ 12. Griffith's entrance is captured on the selfie-style video that his co-defendant Matthew Bledsoe shared on social media. ECF 63, ¶ 12; ECF 67, Ex. 5. An alarm can be heard blaring in the background. Co-defendant Torrens says, "We're going in!" and Griffith screams in excitement. ECF 63, ¶ 12; ECF 67, Ex. 5 (screenshot from video below).



Griffith and his co-defendants entered through that door as others climb in through broken windows nearby. *Id.*



Once inside, Griffith and his co-defendants made their way to the Crypt. ECF 63, ¶ 13. Griffith spent time in various parts of the Crypt, which can be seen in surveillance footage. *Id.* While there Griffith posed for a photo inside the Crypt, with his fist raised in the air. ECF 63, ¶ 13.



After approximately ten minutes inside the Capitol, Griffith eventually moved back toward the same door he entered and ultimately exited the building.

On January 12, Griffith posted on Facebook that he, "even helped stormed [sic] the capitol today, but it only made things worse." ECF 63, ¶ 10.



On his Twitter account titled "Liberty Dragon," he posted, "All going to D.C. THE CAVALRY IS COMING!!!!" ECF 63, ¶ 10. On Twitter, he also tagged one of his co-defendants, Matthew Bledsoe: "Follow my bro I just met @theessentialmattbledsoe #WildProtest #washingtondc #MAGA." ECF 63, ¶ 10 (screenshot below).

https://www.facebook.com › permalink ▾

Liberty Dragon - IT'S A FIGHT!!! GOD BLESS MY ... - Facebook
All going to D.C. THE CAVALRY IS COMING!!! Follow my bro I just met @**theessentialmattbledsoe** #WildProtest #washingtondc #Maga See More · 88. Share.

Griffith was arrested on January 16, 2021. Below is a redacted screenshot of his arrest photo:



Following his arrest, Griffith made comments to a FOX 17 news crew that they captured on video. ECF 63, ¶ 14. Jackie DelPilar, 'I am not a domestic terrorist': Two Tenn. men released from custody after Capitol riots, https://fox17.com/news/local/two-tenn-men-charged-in-capitol-riots-released-from-federal-custody (last accessed October 7, 2021). Griffith states, "I am not a domestic terrorist. For all the people slandering, libeling, mislabeling my name. I'm a citizen. I had nothing to do with any violence, vandalism, and I love all my fellow citizens. And I hope you all check out my new Trump video game, End Game. Check me out on my social media. It's Liberty Dragon. Have an exuberant evening! Ching!" while wearing what appears to be a homemade jacket that says "Trump won MAGA" in puff paint.



*Griffith's Facebook Records and Internet Presence*

Following Griffith's arrest, on January 26, 2021, he discussed this criminal case

with one of his Facebook contacts, as follows:

Contact[2]   Man what have you been doing getting in trouble!

Griffith     Mannn. Trying to stop the steal lol. Trying to save the republic by lending courage
             to our lawmakers to do the right thing. They did not.

Contact      Hahaha! I heard your court date was on the 19th how did that all go?

Griffith     Mannn. It was pretty good. lol I'm not gonna be too cocky, but I'm pretty sure I'm
             good lol Just got ordered to have my ankle monitor removed too

Following Griffith's arrest, his Facebook account contains evidence of a fundraiser called

"Keep Liberty Dragon Free." The following screenshot shows how Griffith used a picture on

restricted Capitol grounds to raise money after his arrest:

---

[2] The government is redacting the contact's name due to the public nature of this filing.

11



## Keep Liberty Dragon Free



Buzz Feed News recently published an article about a Donald Trump video game create by Griffith and his recent social media posts. A Capitol Rioter Says He's Working On A Video Game Featuring Donald Trump Shooting "Dem Zombies" And "Antifa," Zoe Tillman, https://www.buzzfeednews.com/article/zoetillman/jan-6-capitol-rioter-donald-trump-shooter-video-game (last accessed October 7, 2021).  The video game suggests an attempt to bring to life a number of conspiracy theories.

The government is also providing the publicly available TikTok videos that Griffith has been posting, with his handle @thelibertydragon, during the pendency of this case to the Court as Exhibits 10 – 14. A brief description of the TikTok videos is below:

| Exhibit No. | Date Posted to TikTok | Comments |
|---|---|---|
| 10 | July 4, 2021 | This video relates to a July 2021 Trump rally that was held in Florida. Mr. Griffith appears to have added the text, "Trump WON!," and at the end of the video he remarks that, "We know they stole the election, but we are going to take our country back." |
| 11 | July 7, 2021 | In this video, Griffith appears to be using the green screen function to comment and appear in a selfie style video with the backdrop of a picture of Bill Cosby and a news article with the headline "Bill Cosby: 'Mainstream Media Are the Insurrectionists Who Stormed the Capitol,' 'Trying To Demolish the Constitution'. Griffith praises this theory and blames the mainstream media for his own actions on January 6th and for the insurrection as a whole. |
| 12 | July 11, 2021 | This is another video relating to the July 2021 Trump rally that was held in Florida. At the end, Griffith addresses his viewers again suggesting that Trump won the election. He says "I think we all know who won, okay? Just saying." |
| 13 | July 13, 2021 | This post shows a preview of the video game referenced in the Buzzfeed article. |
| 14 | August 5, 2021 | This post is another preview of the video game referenced in the Buzzfeed article. |

On Tiktok, there is a function that enables other TikTok account holders to comment on videos. TikTok notes when a creator of a video replies to commentators. Griffith has commented on some of his videos with this function. In particular, he commented on his July 11 post with "1776." A screenshot is here:



*The Charges and Plea Agreement*

On January 15, 2021, Griffith was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 1. On January 16, 2021, he was arrested in Tennessee and was released on pretrial bond. On March 10, 2021, Griffith and his co-defendants were indicted by a grand jury. ECF No. 23. Griffith was charged with the same four offenses. On July 29, 2021, he pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. ECF Nos. 62, 63. By plea agreement, Griffith agreed to pay $500.00 in restitution.

## III.   Statutory Penalties

The defendant is now scheduled to be sentenced on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.00. As discussed below, the defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct as we now discuss, this Court should note that each individual person who entered the Capitol on January 6th did so under the most extreme set of circumstances and played a role in the larger riot by encouraging others with their presence and straining law enforcement resources. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As a person who entered the Capitol, they would— at a minimum—have crossed through numerous barriers and barricades and heard the din of the mob. Depending on the timing and location of their approach, they also may have observed

extensive fighting with law enforcement and likely would have smelled chemical irritants in the air.

Make no mistake, no rioter was a mere tourist that day. These rioters did not go through a security screening. They did not receive an admission ticket or attend an introductory video about the history of our nation in the Capitol Visitors Center. They were not given instructions by a docent or staff member on what to do as a tourist in the Capitol. They did not move quietly through public areas of the Capitol listening to their docent or staff member sharing insights about the building and its history and its importance to the American people.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum and with an eye towards its larger consequences. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this offense are serious. Griffith traveled from Tennessee to D.C.—a lengthy and costly trip—to attend the "Stop the Steal" rally. Once there, he joined the crowds of people who overwhelmed law enforcement and helped make the violent attacks and

destruction possible. He walked to the restricted grounds of the Capitol where he was in a position to observe absolute chaos as people attacked law enforcement and climbed scaffolding.

In videos, he is smiling and taking pictures as if he is on an enjoyable holiday instead of participating in a mob attack on the heart of our democracy as Congress fulfilled its Constitutional obligations. As he approached the entrance into the Capitol building, he yelled with excitement, while he and his co-defendant took photos and videos which they would use to promote their crimes on social media. He displayed pleasure in the face of the blaring alarm and shattered glass.

While he entered through a door that had been broken open with an alarm blaring, others next to him were climbing through broken windows on either side. There is no question that he knew his actions were wrong and unlawful. Any reasonable person would have long-since gathered that the barriers were set up to show where the restricted grounds began, that the tear gas was not a welcome signal, and that this large group of people attacking officers was not an organized tour. He waved a flag as he went further into the Capitol building with the mob ending up in the Crypt. While in the Crypt, he posed for a picture, smiling, with his fist in the air. He appeared proud of himself and happy with his actions.

### B.  The History and Characteristics of the Defendant

Griffith's conduct after January 6th also demands a custodial sentence. He is seemingly unphased and maybe even amused by these proceedings as evidenced by what appears to be a smile behind his mask in his arrest photo, his arrogant Facebook chat with a friend, and his use of these proceedings to further his online presence by way of fundraising and video game promotion.

As set forth in the PSR, Griffith has no criminal history and has a history of employment. ECF No. 89 ¶¶ 29-35, 52-56. Griffith has been mostly compliant with his conditions of pre-trial release according to the compliance reports that have been filed in this case. His most serious

known violations relate to his failure to check in with his supervising officer on a few occasions. ECF No. 60-1.

While the PSR gives some insight into his history and characteristics, the videos from January 6, 2021, his social media, and his interviews paint a more dynamic picture of someone who does not appear to appreciate the gravity of his actions and of their effects. On January 6, 2021, he is captured on video laughing, smiling, and gleefully cheering during the riot. This casual happiness continues after January 6, 2021.

In his arrest photo above, he appears to have a huge smile under his mask while wearing a jacket with the words "TRUMP WON" printed on it. After his arrest, he used his participation and arrest as an opportunity to promote his social media accounts and his video game. These actions provide further evidence that the defendant does not appreciate the significance of the violent riot that took place on January 6 or his role in it.

During the pendency of this case, and even in the month that he pled guilty, Griffith was posting TikTok videos. The government does not share these videos with the Court to suggest in any way that Griffith is wrong for holding his political views, for sharing information on social media, or for creating this kind of violent video game. The videos are relevant to this sentencing, however, because they shed light on two elements concerning how he views his crime: (1) he is still blaming others for his actions, and (2) he is continuing to promote the incendiary false narrative that led to this riot in a manner that hails the January 6th attack as patriotic and may encourage others to repeat it.

With respect to the first point, in Exhibit 11 Griffith blames "mainstream media" for the insurrection and for his involvement in the insurrection when, of course, Griffith himself is to blame for his own actions and role in this dark day of our history. With respect to the second point,

Exhibits 10 and 12, show his continuing promotion of the falsehood that stoked the January 6th riot.   In Exhibit 10, Griffith says, "We know they stole the election back, but we are going to take our country back." In Exhibit 12, Griffith commented "1776" as shown in the screenshot above. During the insurrection, many rioters used this phrase to reference the American revolution and invite this dangerous rhetoric which, of course, is exactly what led to the attack of January 6th.

Furthermore, in his conversation with a contact on Facebook, he minimized his criminal proceedings by laughing and making light of the fact that he feels so comfortable with the court proceedings that he does not want to come off as "cocky." As the Court is aware, deterrence is a serious concern when national elections happen every four years, and Griffith's actions have demonstrated a very real need for specific deterrence in the form of a custodial sentence. At bottom, he should understand that his criminal charge and conviction are not simply fodder for him to promote his online persona and video game.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6th showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most January 6th riot cases including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr.

---

[3] Statement of Christopher Wray, Director, Federal Bureau of Investigation, Statement Before the Committee on Oversight and Reform U.S. House of Representatives At a Hearing Entitled "Examining the January 6 Attack on the U.S. Capitol" Presented June 15, 2021 (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf (last accessed October 7, 2021).

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). A sentence of probation or home confinement would be insufficient here.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6th was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.

Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See Hodgkins,* 21-cr-188-RDM Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future rioters and would-be mob participants— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that the Defendant accepted responsibility early by entering into this plea agreement. On the other hand, Griffith's conduct on January 6, 2021, and his statements to the media and on various social media sites afterwards clearly demonstrate the need for specific deterrence for this defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6th

in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.

The misdemeanor defendants will generally fall on the lesser end of that spectrum, but that in no way means that misdemeanor breaches of the Capitol on January 6, 2021 were minor crimes. A probationary sentence should not become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement.

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct has earned him a custodial sentence. The defendant came to D.C. and gleefully stormed the Capitol. Upon arrest and throughout the proceedings, he has failed to show appreciation of the seriousness of his actions. Instead, he has used the media attention to try and profit from his actions and his Trump video game and to generally promote his online persona.

While he has pleaded guilty, he still places blame on outsiders and does not appear to appreciate the consequences of his actions. Thus, this defendant should not be compared to those who obtained a home confinement or probationary sentence. Here, to avoid unwarranted sentencing disparities, the Court will eventually consider the sentence of his co-defendant Eric Torrens who will be sentenced on October 29. At this time, no unwarranted sentencing disparities exist.

### F.        Restitution

As noted above, the defendant agreed under the terms of the plea agreement to pay $500 in restitution. The Court did not order the government to address restitution in anticipation of the defendant's sentencing, but it did for co-defendant Torrens's upcoming sentencing. We submit this explanation to aid the Court.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims

of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).[5]

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[6] *See* 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1096-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the

---

[5] Several other criminal statutes authorize restitution for specific offenses. *See, e.g.*, 18 U.S.C. § 43(c) (damaging or interfering with an enterprise involving animals); 18 U.S.C. § 228(d) (child support violations; 18 U.S.C. § 1593 (peonage, slavery, and trafficking in persons); 18 U.S.C. § 2248 (sex crimes); 18 U.S.C. § 2259 (sexual exploitation of children); 18 U.S.C. § 2264 (domestic violence); 18 U.S.C. § 2327 (telemarketing fraud); 18 U.S.C. § 853(q) (amphetamine and methamphetamine offenses). None of those statutes are at issue in Griffith's case.

[6] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[7] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title

---

[7] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[8]

While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement. *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see United States v. Zerba*, 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice*, 2020 WL 220089, *5 (D.N.J. Jan. 15, 2020). As relevant to Griffith's case, the sentencing court under the VWPA "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). Under Section 3663(a)(3), a defendant may agree to pay restitution even where the offense of conviction falls outside of the statutes otherwise covered by the VWPA. *See United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008) (upholding restitution agreement under Section 3663(a)(3) where defendant was convicted under 26 U.S.C. § 7201). A defendant's agreement to pay restitution under Section 3663(a)(3) is a binding promise, *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005), and the sentencing court is not required to independently evaluate the defendant's ability to pay when restitution is made part of the plea agreement under that provision, *United States v. Allen*, 201 F.3d 163, 167-68 (2d Cir. 2000).

Application of these restitution principles to Griffith's case is straightforward. The defendant entered a guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). That offense of conviction does not trigger the MVRA because it does not fall within the "subset" of crimes covered under that statute. *See*

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

18 U.S.C. § 3663A(c)(1)(A); *Papagno*, 639 F.3d at 1096. Griffith's non-Title 18 offense of conviction also does not fall within the statutes covered by the VWPA. *See* 18 U.S.C. § 3663(a)(1)(A). Restitution here nonetheless properly falls within the scope of Section 3663(a)(3) because the plea agreement requires Griffith to pay $500 in restitution. *See Anderson*, 545 F.3d at 1078-79. The Court thus is authorized to impose restitution "to the extent agreed to by the parties" in the plea agreement. 18 U.S.C. § 3663(a)(3).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

The government and Griffith, pursuant to the plea agreement, have requested the Court to apportion liability for restitution for damages arising from the riot at the United States Capitol. For this case, the parties have agreed that the Court may impose restitution in the amount of $500. This amount fairly reflects the Griffith's role in the offense and the damages resulting from his conduct. This amount properly reflects the defendant's role, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel. In consideration of these factors, the

restitution amount reflected in the plea agreement fairly represents an apportionment of Griffith's liability and, therefore, is proper in this case.

Though not implicated in Griffith's case, the Court asked the government to explain how it reached the restitution amount reflected in the plea agreement, which notes that, as of May 17, 2021, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages. *See* Plea Agreement, ECF No. 62, ¶ 11. As noted above, determining the restitution amount is an "inexact science," *James*, 564 F.3d at 1246, that must be based on a "reasonable approximation of losses supported by a sound methodology," *Gushlack*, 728 F.3d at 196. The nearly $1.5 million figure quoted in the defendant's plea agreement represented loss estimates provided by Architect of the Capitol as of mid-May 2021. The government continues to investigate losses that resulted from the breach of the Capitol on January 6, 2021, a process that involves several facets. As a factual matter, the government is continuing to collect evidence concerning, *inter alia*, (1) the cost of damage to the Capitol Building and Grounds, both inside (*e.g.*, doors, windows, offices, office equipment, hallways, the Rotunda, the Crypt, etc.) and outside (*e.g.*, doors, windows, barricades, scaffolding, etc.); (2) the costs associated with the deployment of additional law enforcement units to the Capitol on January 6th; (3) the cost of broken or damaged law-enforcement equipment; (4) the cost of stolen property; and (5) costs associated with bodily injuries sustained by law-enforcement officers and other victims. As a legal matter, *some* of these costs (such as property damage and medical injuries) clearly fall within the scope of the restitution statutes as applied to *some* defendants (*e.g.*, defendants who broke a window or committed aggravated assault against an law enforcement officer). But other costs, including employees' work time, *see United States v. Wilfong*, 551 F.3d 1182, 1184 (10th Cir. 2008), and the proper method for assessing value of damaged or destroyed property, *see United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir.

1999), raise more challenging questions that should be resolved as they arise. To the extent a victim's losses in a particular case are "not ascertainable" at the time of sentencing, Section 3664 permits an extension of up to 90 days for a "final determination" of those losses. 18 U.S.C. § 3664(d)(5); *see Dolan v. United States*, 560 U.S. 605, 611 (2010) (allowing a sentencing court to order restitution after the 90-day deadline under some circumstances). None of these questions, however, arise in Griffith's case.

## V.      Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, those factors on balance support a sentence of incarceration. The government recommends that this Court sentence Jack Griffith to three months of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:      /s/ *Mitra Jafary-Hariri*
MITRA JAFARY-HARIRI
Assistant United States Attorney
Detailee
MI Bar No. P74460
211 W. Fort Street, Suite 2001
Detroit, MI 48226
mitra.jafary-hariri@usdoj.gov
(313) 226-9632

 /s/ *Jamie Carter*
Jamie Carter
Assistant United States Attorney
D.C. Bar No. 1027970
555 Fourth Street, N.W.
Washington, DC 20530
Jamie.Carter@usdoj.gov
(202) 252-6741