UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-204-04 |
| vs. | ) |
| | ) |
| JACK JESSE GRIFFITH, | ) October 28, 2021 |
| | ) 11:10 a.m. |
| Defendant. | ) Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES:**

FOR THE GOVERNMENT: JAMIE CARTER
                    555 4th Street, NW
                    Washington, DC 20530
                    (202) 252-6741
                    Email: jamie.carter@usdoj.gov

                    JAMES PEARCE
                    U.S. DEPARTMENT OF JUSTICE
                    950 Pennsylvania Ave NW
                    Washington, DC 20530
                    (202) 532-4991
                    Email: james.pearce@usdoj.gov

                    MITRA JAFARY-HARIRI
                    DOJ-USAO
                    211 W. Fort Street
                    Detroit, MI 48226
                    (313) 226-9632
                    Email: mitra.jafary-hariri@usdoj.gov

FOR THE DEFENDANT:  H. HEATHER SHANER
                    1702 S Street, NW
                    Washington, DC 20009
                    (202) 265-8210
                    Email: hhsesq@aol.com

ALSO PRESENT:       ROBERT WALTERS, U.S. Probation

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3      Criminal Case No. 21-204-04, United States of America versus

4      Jack Jesse Griffith.

5              Counsel and probation officer, please come forward

6      and state your names for the record.

7              MS. CARTER:  I apologize, Your Honor.

8              Do I come to the podium?  Or what do you prefer?

9              THE COURT:  Yes.  You may step forward to the

10     podium.  I'm sorry.  I just finished a trial this week so

11     it's, sort of, set up for trial.

12             MS. CARTER:  Good morning to the Court.

13             Jamie Carter on behalf of the United States.  I am

14     joined by James Pearce and Mitra Jafari-Hariri as well.

15             THE COURT:  All right.  And what was the

16     gentleman's name?

17             MS. CARTER:  James Pearce.

18             THE COURT:  James Pearce.

19             MS. CARTER:  Yes, Your Honor.

20             THE COURT:  Okay.  I think -- did Mr. Pearce enter

21     an appearance in the case?

22             MS. CARTER:  He did, Your Honor.

23             THE COURT:  All right.  Good.  Thank you.

24             Good morning.

25             MS. CARTER:  Good morning.

1              THE COURT:  Ms. Shaner, you can keep your mask on,

2     please.

3              MS. SHANER:  Good morning, Your Honor.

4              Heather Shaner on behalf of Jack Jesse Griffith.

5     He is before the Court.  His mother, Michele Olson, is also

6     in court should the Court --

7              THE COURT:  Can that person stand, please, so I

8     can see.  There are a number of people in the back.

9              All right.  Thank you.

10             All right.  Yes.

11             MR. WALTERS:  Good morning, Your Honor.

12             Robert Walters for probation.

13             THE COURT:  All right.  Thank you for being here,

14    Mr. Walters.

15             All right.  We're here this morning for the

16    sentencing of Jack Jesse Griffith.  This sentencing hearing

17    is being held in person; but I do want to let you-all know

18    that the public access line is being made available for

19    persons to listen to the proceedings remotely.

20             Anyone listening to the sentencing hearing over

21    the public teleconference line is reminded that, under my

22    Standing Order 20-20, recording and rebroadcasting of court

23    proceedings, including those held by videoconference, is

24    strictly prohibited.  Violation of these prohibitions may

25    result in sanctions, including removal of court-issued media

1   credentials, restricted or denial of entry to future

2   hearings, and any other sanctions deemed necessary by the

3   presiding judge.

4          All right.  So let me begin, as I do every

5   sentencing hearing, by reviewing the materials that I have

6   looked at in connection with sentencing.

7          Ms. Shaner.

8          MS. SHANER:  Your Honor, due to my hearing and the

9   masking, I am requesting that I have a headset so I can

10  understand everything.

11         THE COURT:  You may.

12         Testing, testing.

13         Ms. Shaner, is that better for you?

14         MS. SHANER:  Very good.  Very well.  Perfect.

15         THE COURT:  I rarely have people tell me I don't

16  speak loudly enough.

17         MS. SHANER:  It's only the mask, Your Honor.

18         THE COURT:  It's interesting, Ms. Shaner, because

19  I always take a vote of, you know, prospective jurors,

20  whether they prefer me to wear the see-through mask or this

21  mask.  And sometimes they want me to wear this one

22  (indicating) because they're able to follow my lips more

23  easily.  The last time I held a vote, they wanted me to keep

24  on my dark mask; so I don't know.  It's interesting.

25         In any event, let me go back to what I normally do

1    at sentencing hearings, which is review all of the papers

2    that I have looked at because I want to make sure that both

3    sides in the case have -- are all reading the same documents

4    I am, and that I haven't missed anything.

5           So, in connection with Mr. Griffith's sentencing,

6    I have received the presentence investigation report, and

7    the probation office's sentencing recommendation that were

8    docketed at ECF 89 and 90.

9           I have also reviewed the sentencing memorandum

10   from the government, docketed at ECF 92; and the

11   government's supplemental memorandum, docketed at ECF 109

12   and ECF 117; and, also, the 14 videos that are listed in the

13   government's report of video evidence, docketed at ECF 67;

14   as well as the government's notice of filing of items

15   incompatible with E-filing as to defendant's docketing at

16   ECF 93.

17          I have also reviewed the sentencing memoranda

18   submitted on behalf of the defendant, docketed at ECF 94;

19   the supplemental sentencing information regarding

20   Mr. Griffith, submitted under seal at ECF 100; the responses

21   by codefendant Eric Torrens to the government's sentencing

22   memorandum in his case, docketed at ECF 104, 110, 113, and

23   125, which was filed at around midnight last night, which

24   this defendant has adopted with the Court's permission at

25   ECF 106, 111, 114, and 126.  And I have also read two

1    letters from the defendant, docketed at 94-1 and 94-2.

2              So does the government have all of those

3    documents?

4              MS. CARTER:  The government does.

5              Thank you, Your Honor.

6              THE COURT:  And does the defense have all of those

7    documents?

8              MS. SHANER:  The defense does, Your Honor.

9              I have one additional attachment to the under seal

10   motion that I have given to the government this morning that

11   I would pass up to the Court.

12             THE COURT:  Okay.  Thank you, Ms. Shaner.

13             And will you docket that also so the record is

14   complete?

15             MS. SHANER:  Yes, I will.

16             THE COURT:  Thank you.

17             All right.  So, Mr. Griffith, let me just begin by

18   explaining to you how this sentencing hearing will proceed.

19   Please stand where you are.

20             Every judge does a sentencing hearing in a

21   different way.  The way I conduct my sentencing hearings is

22   I -- there will be three stages to this sentencing hearing.

23             The first step is to determine whether the

24   government or you, through your counsel, have any objections

25   to the factual or any other portions of the presentence

1   investigation report that the probation office has prepared

2   that you and your counsel have had an opportunity to

3   review -- but I will put that on the record shortly; and the

4   government has had an opportunity to review it as well.  If

5   there are any objections, I will resolve them at that point.

6        The second step of the hearing is to hear from,

7   first, the government, and then from your counsel, and then

8   lastly from you, if you wish to address me directly.

9        The last step requires the Court to explain the

10  reasons for the sentence I am about to impose and to impose

11  sentence.  So, by contrast to most cases in federal court,

12  there is usually a fourth stage where I have to decide how

13  the sentencing guidelines apply and what the sentencing

14  range is that is recommended under those guidelines in a

15  case like yours; but this is a petty offense, so the

16  sentencing guidelines do not apply.

17       You may be seated.

18       THE DEFENDANT:  Yes, Your Honor.

19       THE COURT:  And do you have any questions about

20  how the sentencing hearing will proceed?

21       THE DEFENDANT:  No, Your Honor.

22       THE COURT:  All right.  Okay.  So it's step one.

23       I understand, Ms. Carter, that the government has

24  no objection to any of the factual or other determinations

25  set out in the presentence investigation report; is that

1    correct?

2             MS. CARTER:  Yes, Your Honor.

3             THE COURT:  All right.  Thank you.

4             Ms. Shaner, have you and your client read and

5    discussed the presentence investigation report?

6             MS. SHANER:  Yes, we have, Your Honor.

7             THE COURT:  And does Mr. Griffith have any

8    objection to any of the factual statements or other

9    determinations set out in the PSR?

10             MS. SHANER:  He does not.

11             There has been one change, and that's a change in

12    his employment.  He is no longer working as a --

13             THE COURT:  And which paragraph of the PSR are you

14    referring to?

15             MS. SHANER:  Page 11, Your Honor, paragraph 53.

16             He has gotten a new job so he is no longer working

17    80 hours a week; he is working between 40 and 60 hours a

18    week.  He is, I believe, 13 an hour -- he is now being paid

19    $13 an hour.

20             THE COURT:  And where is that?

21             THE DEFENDANT:  16.  16 an hour.

22             THE COURT:  He's making $16 per hour, Ms. Shaner?

23             THE DEFENDANT:  Yes, Your Honor.

24             Yapp automotive.

25             MS. SHANER:  It's Yapp automotive in Gallatin,

1    Tennessee.

2              THE COURT:  Okay.

3              MS. SHANER:  And that's the only correction, Your

4    Honor.

5              THE COURT:  Okay.  Well, I don't think -- I think

6    at the time the PSR was done, this was correct information.

7    I think just updating it, it's not necessary to change the

8    presentence investigation report --

9              MS. SHANER:  I agree, Your Honor.

10             THE COURT:  -- for my information.  Thank you.

11             Unless you see it otherwise, Ms. Shaner?

12             MS. SHANER:  No, I agree with the Court.

13             THE COURT:  All right.  So, Mr. Griffith, please

14   stand.

15             Are you fully satisfied with your attorney in this

16   case?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  And do you feel that you have had

19   enough time to talk to Ms. Shaner about the evidence in your

20   case, the documents submitted in connection with your

21   sentencing?

22             THE DEFENDANT:  Yes, ma'am.  Thank you, Your

23   Honor.

24             THE COURT:  All right.  You may be seated.

25             All right.  Hearing no objection from either side,

1    the Court will accept the presentence investigation report

2    and the factual portions of it as undisputed and as my

3    findings of fact at sentencing, although, of course, I have

4    also looked at the video evidence submitted in the case.

5           I will now turn to the next part of the hearing

6    where I will hear from the parties as to how they would like

7    to supplement, if at all, their presentations in writing in

8    connection with all of their briefs, starting with the

9    government.

10          MS. CARTER:  Your Honor, we have briefed fairly

11   extensively in this case.  I know the Court has reviewed all

12   of the briefings, and I don't want to go back through them.

13          I would simply acknowledge the unprecedented

14   nature, again, of this circumstance, of this crime, and

15   where we find ourselves, and then inquire of the Court

16   whether or not the Court has any questions regarding the

17   factual section of our filings with regards to the

18   restitution specifically, as well as the statutory debate

19   over probation.

20          Mr. Pearce did most, if not all, of that briefing,

21   so he is available to the Court if the Court has questions

22   on that.

23          THE COURT:  Okay.  Well, I do have a few questions

24   for the government in this case.  So this is -- and I have

25   taken a number of pleas.  I've had any number of status

 1    conferences in connection with defendants arrested and

 2    charged in connection with the Capitol attack on

 3    January 6th.

 4           This is my first sentencing, so this is the first

 5    time I have had the opportunity to delve into some of these

 6    legal issues and to see the government's sentencing memos in

 7    connection with the sentencings of defendants arising from

 8    what happened on January 6th.

 9           So you-all are the lucky government team to help

10    me sort through what I am seeing.

11           I have to say, I did read, you know, the

12    government's briefing, and it uses very strong language.

13    And I am just going to quote some excerpts from the

14    government's brief saying that:  What happened an

15    January 6th was a chaotic and dangerous attack; it was an

16    attack on democracy; it was a criminal offense unparalleled

17    in American history; it represented a grave threat to our

18    democratic norms; it was one of the only times in our

19    history when the Capitol Building was literally occupied by

20    hostile participants.

21           It was an attack on the rule of law that showed --

22    and I quote again:  A blatant and appalling disregard for

23    our institutions of government and the orderly

24    administration of the democratic process.

25           This is very strong language about the seriousness

1    of the criminal conduct that occurred on January 6th for a

2    defendant who pleaded guilty to a petty offense,

3    misdemeanor.  It's -- and the government, despite all this

4    language, isn't even asking for the maximum sentence here,

5    but half that, of three months.

6              So how am I supposed to reconcile this

7    extraordinarily strong rhetoric with a petty offense charge?

8              MS. CARTER:  Yes, Your Honor.

9              THE COURT:  I mean, it just strikes me as somewhat

10   of a -- you know, it seems like a bit of a disconnect, isn't

11   there?  That it's a grave threat to our democratic norms, a

12   criminal offense unparalleled in American history; but I am

13   facing sentencing on a petty offense.

14             MS. CARTER:  Yes, Your Honor.

15             So I will say there is a wide range of defendants.

16   There is a wide range of participation in the riot.  The

17   riot itself, which I believe that language is referencing,

18   absolutely was unprecedented; absolutely was an attack on

19   our democracy; an attack on a constitutionally-mandated

20   process, the transfer of power, which is fundamental to how

21   our country runs.  Full stop on that.

22             That said, when we're approaching individual

23   criminal defendants who participated in a larger event like

24   this, we have to look at each person's characteristics and

25   weigh their participation, their characteristics, when we're

1    making these recommendations.

2              And when we were looking at Mr. Griffith in

3    particular, we tried to lay out each of the arguments that

4    we had on -- I believe it's our nine -- nine points that we

5    have tried to use to divide these cases up --

6              THE COURT:  I have seen that.  And let me just say

7    that there the -- there seems to be some -- the government's

8    brief is almost schizophrenic in some ways because, after

9    all that scorching rhetoric about what happened on

10   January 6th, the government goes on to describe the rioters

11   who got through the police lines and into the Capitol

12   Building as -- and I quote, "those who trespassed," at

13   page 22.

14             And the government goes on to say that for those,

15   quote, trespassers, punishment should be distinguished

16   between those trespassers who engaged in aggravating factors

17   or less serious aggravating factors.

18             So is it the government's view that the members of

19   the mob that engaged in the Capitol attack on January 6th

20   were simply trespassers in the Capitol Building that

21   paraded, picketed, and demonstrated with some acting more

22   disorderly than others?  Is that how the government is

23   viewing that despite its rhetoric that I excerpted at the

24   beginning?

25             MS. CARTER:  I believe it's a recognition that

1    certain members of the riot were not leading the riot; they

2    were not violent in the riot.  They were not doing the

3    destruction of property portion of the riot.

4           And while I am not trying to downplay the

5    seriousness of their participation and its effect on others,

6    and its effect on the ability to actually accomplish the

7    goals of the riot as a whole by overwhelming the police, by

8    distracting resources, by encouraging others with their

9    presence, they are nonetheless -- their actual behavior is

10   to enter the building, which is absolutely unacceptable -- I

11   am not arguing that it is --

12          THE COURT:  Well, you call it trespassing in the

13   memo --

14          MS. CARTER:  That's true.

15          THE COURT:  -- in the sentencing memo.  Is that

16   how the government views it, as just mere trespassing?

17          MS. CARTER:  It is trespassing.  I don't know that

18   I would call it "mere trespassing" due to the larger context

19   of the riot in which it's occurring.  I wouldn't call it

20   "mere trespassing."  It is trespassing.

21          THE COURT:  All right.  So in one of the

22   sentencing memos for one of defendant's codefendants,

23   docketed at ECF 104, which has been adopted by Mr. Griffith

24   here, that memo indicates that the petty offense charge here

25   of parading, demonstrating, or picketing in a Capitol

1    Building in violation of 40 U.S.C. Section 5104(e)(2)(G),

2    the petty Class B misdemeanor, is an offense often brought

3    for nonviolent protesters who stand up in a congressional

4    hearing to interrupt a hearing before they're escorted out

5    of the hearing room, and that the offenders usually get a

6    $50 ticket; isn't that correct?

7              MS. CARTER:  As far as my personal interaction

8    with protests in the Capitol, it has been in Superior Court

9    with a different charge, the equivalent of that in the D.C.

10   Code.

11             And I am familiar with some of those protesters,

12   which is a very different -- there were no protesters in the

13   Capitol during the riot.  I don't want my language to be

14   confused.  The protesters in prior incidents, which I have

15   been involved in, some of them have received diversion,

16   essentially, on the front end with that sort of a ticket.

17             THE COURT:  Well, I mean, I think he cites, you

18   know, examples of people actually charged with the parading,

19   demonstrating or picketing in a Capitol Building in

20   violation of 40 U.S.C. Section 5104(e)(2)(G), and gives

21   examples that they were basically charged -- for whatever

22   reason, the U.S. Attorney's Office decided to bring them

23   federally, with this federal charge, as opposed to in

24   Superior Court; and they basically got a $50 ticket.

25             So you are not disputing that, right?

1          MS. CARTER:  I am not disputing that has occurred,

2     no.

3          THE COURT:  All right.

4          All right.  So the government's sentencing memo

5     also spent some time talking about deterrence, general

6     deterrence, specific deterrence.  And, of course, deterrence

7     is really one of the major purposes of sentencing and,

8     therefore, is of significant concern to every sentencing

9     judge.  And deterrence of others is, in fact, required to be

10    considered in sentencing under 18 U.S.C. Section 3553(a)(2).

11         And the government urges the Court to consider

12    general deterrence here as the most compelling reason to

13    impose a sentence of incarceration, stressing the importance

14    of conveying -- and I quote from the government's memo at

15    page 21:  To future rioters and would-be mob participants,

16    especially those who intend to improperly influence the

17    democratic process, that their actions will have

18    consequences.

19         So is the government totally comfortable that

20    general deterrence is going to be served by letting rioters

21    who broke into the Capitol, overran the police, tore away

22    barriers, broke in the building through windows and doors,

23    are going to -- and now they're going to be able to resolve

24    their criminal liability with petty offense plea s; do you

25    believe that that is sufficient for general deterrence

1    giving them, basically, the most minimal of federal criminal

2    charges, a Class B misdemeanor, petty offense?

3           MS. CARTER:  So in a situation in which there has

4    been property damage done by a defendant or where they have

5    attacked an officer, assault on a federal officer, where

6    they are involved in varying, higher levels of behavior

7    within the riot in general, I believe those rioters are

8    going to be facing felony charges not misdemeanor charges.

9           Mr. Griffith did not attack an officer.  He was in

10    a position to see others do so.  He benefited from those

11    people doing so by them essentially clearing his way.  He is

12    not at that part of the crowd that's actually actively

13    attacking a police line.  He is not one of the people who

14    broke a window, broke a door, harmed a statue, whatever the

15    case may be.  He is not one of the people in the riot that

16    did those things.

17           So for him, in particular, I believe that the

18    sentence that we have recommended of three months is the

19    correct sentence.

20           THE COURT:  And nonetheless, you're recommending

21    for his codefendant, who is in a lot of the same videotapes,

22    two weeks.

23           MS. CARTER:  Yes, Your Honor.

24           THE COURT:  How do you explain that?

25           MS. CARTER:  The difference between Mr. Griffith

1    and Mr. Torrens, and the difference between our ultimate

2    recommendations, lies in Mr. Griffith's attempt to use his

3    crime as a means to self-promote, to promote his video game

4    that he's developing, to promote his online presence --

5            THE COURT:  So he has entrepreneurial tendencies.

6    Why does that make him -- why does that -- because of his

7    trying to be entrepreneurial, why does that mean he gets

8    three months -- a three-month recommended sentence rather

9    than two weeks?

10           MS. CARTER:  So in doing so --

11           THE COURT:  I'm trying to make sense of the

12   government's own position here, starting with the charge,

13   starting with the -- then the recommendations for what the

14   appropriate sentence is.  So, you know, I am really trying

15   to give you an opportunity to explain the government's

16   position so I can understand it.

17           MS. CARTER:  It speaks to lack of remorse, lack of

18   taking seriously the actions that he participated in; lack

19   of recommendation of the consequences for the riot and his

20   attempt to use it.  It's not an objection to a, sort of,

21   larger entrepreneurial sentence.

22           It's an objection to using a crime.  And it also

23   goes to his, as I said, lack of remorse and continued

24   posting up and until -- I believe it was just after his plea

25   when he was posting on the TikTok videos; and some of those

1    posts included, again, inflammatory language such as the

2    citation to 1776, and:  We're going to take our country

3    back -- words to that effect.

4         THE COURT:  All right.  So the government in lots

5    of other cases has recommended probation where the defendant

6    did not personally physically harm any police officer; did

7    not engage in any damage to the Capitol Building; did not

8    bring any dangerous weapon, broadly defined, to the Capitol;

9    did not engage in preplanning to engage in violence at the

10   Capitol.  The government's only recommended probation.

11        And the government has a footnote in its

12   sentencing memorandum that it repeats in its supplemental

13   filing, docketed at ECF 109, and I have seen in lots --

14   several other sentencing memos for January 6 defendants at

15   this point.  And the footnote says that -- acknowledges that

16   it's agreed in a number of plea agreements to recommend

17   probation, in these kinds of cases with the factors I have

18   just listed; but that a probationary sentence should not

19   become the default.

20        And I have to say, I have found this footnote a

21   bit of a puzzle to understand.  In particular, the

22   government refers to a fast-track program; and it cites to a

23   Ninth Circuit case from 2015, *United States v.*

24   *Rosales-Gonzalez*, for its fast-track reference.  And a

25   fast-track program is typically a formal program that allows

1    downward departures under the guideline, at 5K3.1, pursuant

2    to an early disposition program authorized by the Attorney

3    General of the United States and the United States Attorney

4    for the district in which the court resides.  See the

5    guideline at 5K3.1.

6            With this citation, and all of this briefing by

7    the government to this Ninth Circuit *Rosales-Gonzalez* case

8    to fast-track programs, I just want to be clear, has an

9    early disposition fast-track program been authorized by the

10   Attorney General and the U.S. Attorney for D.C. for

11   January 6 defendants who take early plea agreements?

12           MS. CARTER:  Your Honor, I am not aware of the

13   specifics of how our plea agreements have been run up the

14   chain.  I know they have been.  If the Court wants a

15   specific answer, I would have to inquire of a supervisor to

16   provide that.

17           THE COURT:  All right.  So you are not aware of a

18   formal fast-track program?

19           MS. CARTER:  No, Your Honor; but I wouldn't have

20   been involved necessarily.

21           This is my first sentencing and plea in one of

22   these cases.  And as with regards -- I believe it cites to

23   three particular cases, Ms. Morgan-Lloyd, Ms. Ehrke, and

24   Ms. Bissey; I was not involved, and I don't know.

25           THE COURT:  Okay.  Well, part of the purpose, I

1    guess, of this footnote 4 is to basically acknowledge that

2    the government has recommended probation in

3    January 6-related cases where the defendants have pled early

4    and they didn't, you know, personally, physically engage in

5    any assault on a police officer or damage the Capitol

6    Building; and it just seems to me that -- it is almost

7    suggesting that the government did this in some early pleas,

8    but it may not be doing that anymore.

9            But how am I supposed to understood that

10   footnote 4?  I think I started off by saying I really don't

11   understand what the point of footnote 4 is.  Explain the

12   point to that.

13           MS. CARTER:  Yes, Your Honor.

14           So acknowledging there were -- these specific

15   three pleas, I think, are specifically referenced inside the

16   footnote; that they received benefit of having pled,

17   essentially, the most early in the plea process, I believe,

18   was what we were attempting to get across to -- through that

19   footnote.

20           As far as whether or not they will --

21           THE COURT:  If I can just interrupt you.

22           I mean, pleading -- there are cases, of course,

23   where the defendant pled early in the plea negotiation

24   process.  And to my mind, you know, as I look at the docket

25   in this case, Mr. Torrens was -- well, you know, in the

1    Torrens' briefing it explains that Mr. Torrens was offered a

2    plea on July 14th, 2021, and accepted it on July 28th, 2021;

3    so it took him two weeks from plea offer to acceptance of

4    the plea offer.

5              And then -- and this same footnote is in the

6    government's sentencing memo in the Torrens sentencing,

7    which I have tomorrow, but it's all been adopted in this

8    case.

9              And I think Mr. Griffith accepted his plea offer

10   also within two weeks; so it's both the same for Mr. Torrens

11   and the same for Mr. Griffith.  It took them two weeks from

12   plea offer to say, yes, we're taking the deal; and yet the

13   government is asking for two weeks for Mr. Torrens, three

14   months for Mr. Griffith.

15             And when I look back at the other cases mentioned

16   in your footnote 4, as the sample of why probation was

17   recommended there by the government because those defendants

18   in those cases took early pleas -- let's start with

19   Morgan-Lloyd, who took from March 19th, the date on the plea

20   agreement, to May 27th to accept the plea; that was over two

21   months.

22             Bissey took from March 19th, the date on the plea

23   agreement, until June 14th to accept, or almost three

24   months.

25             Ehrke took from May 28th, the date on the plea

1    agreement, until June 21, three weeks to accept.

2          So each of those defendants in footnote 4, where

3    the government recommended probation, took more time to

4    accept the plea offers than either Mr. Torrens or

5    Mr. Griffith in this case who only took two weeks.

6          So I don't understand how that fits into the

7    government's fast-track early-plea suggestion as the reason

8    why they recommended probation in those cases and they're

9    recommending jail time for Mr. Griffith and Mr. Torrens.

10          So, as I said, I am puzzled by that footnote.

11          MS. CARTER:  So I don't necessarily think the

12    footnote is meant to say that that's the reason why we are

13    asking for jail time in these two cases, today's case and

14    tomorrow's, but rather to acknowledge that we're not

15    prevented from asking for jail time because we asked for a

16    different sentence in those other very early cases.

17          And by "early," I believe they mean within the

18    calendar -- the overarching calendar, not specific to when

19    the plea offer was offered and accepted, but earlier than

20    other pleas that have since taken place in the larger sense

21    of the riot cases in general.

22          THE COURT:  Well, you know, 18 U.S.C. Section

23    3553(a)(6) does require sentencing judge s to consider the

24    need for unwarranted sentencing disparities among defendants

25    with similar records who have been found guilty of similar

1    conduct.  And I think this means that I have to be concerned

2    about differences in the government's recommendations for

3    probation for similarly-situated defendants, and then this

4    evolving -- and what appears to me to be, sort of, an

5    evolving, changing position for defendants

6    sentenced under -- for petty offense Class B misdemeanor

7    with, essentially, similar conduct on January 6th where the

8    government now seems to be recommending jail time.

9             I mean, I -- and just saying that certain

10   defendants were offered a plea earlier in the government's

11   investigation, is that a reason for saying that they're not

12   similarly situated?

13            MS. CARTER:  I think the "similarly situated" is a

14   larger analysis than the actual timing of the plea in and of

15   itself.

16            As the Court is aware, we go into a great deal of

17   depth in reports that are -- the presentence investigation,

18   as well as our briefing; and we're considering individuals

19   at a level of depth that I don't think is necessarily

20   represented just on that one factor.  That is certainly one

21   factor, but it is one of many, many factors.

22            Of those three that Your Honor mentioned, when we

23   were looking -- when I was looking back at the varying, kind

24   of, factual differences -- for example, one of the things

25   that I would highlight with these defendants that wasn't

1    necessarily present in some of those cases would be actually

2    having evidence that they saw the line of officers being

3    attacked.

4              We have the video which was provided to the Court

5    showing them underneath the northwest scaffolding on the set

6    of stairs.  You can actually audibly hear the tear gas going

7    off.  You can see a line of officers being attacked to their

8    left as they're facing down that stairwell.

9              THE COURT:  You're talking about both Mr. Torrens

10   and Mr. Griffith's case?

11             MS. CARTER:  Correct.

12             THE COURT:  And in the case of the other

13   defendants, you know, Anna Morgan-Lloyd and the other

14   defendants, they didn't see all of that?

15             Is that what you are saying?

16             MS. CARTER:  I am saying that in my review of the

17   facts, not -- I will say this, I was not the prosecutor on

18   any of those cases.  And so the prosecutors individually may

19   have more knowledge of facts that I am aware of.

20             Based on our -- my overarching review, when Your

21   Honor asked us to very quickly put together the information,

22   I am not aware of them having specific video evidence,

23   having a specific interview, in the case of Mr. Torrens, in

24   which he admitted to having seen that, where we had specific

25   evidence that they saw and then benefited from that.

1        Do I think that a larger portion of the group

2    probably did and we just don't have the ability to show the

3    Court:  Here is this actually happening, it is on video.

4    Here is this statement, it has been recorded.  I think that

5    may be so.

6        But, in this particular instance, I think that

7    that's important, and it's one of the reasons that we made

8    our decision.  Not the reason, but one of the reasons that

9    we made our decision.

10        THE COURT:  All right.  Let me turn to the

11    restitution issue.  And I appreciate that the government has

12    provided an explanation that -- for the restitution amount

13    authorized in the case and making it clear that sentencing

14    judges, in these petty offenses arising out of January 6th,

15    have no authority to impose restitution beyond what the

16    government has worked out with the defendant.

17        And just to go through the reasoning of that, the

18    government acknowledges that there are these two general

19    restitution statutes that provide courts with the authority

20    to order criminal defendants to pay restitution to victims

21    of their criminal conduct; and I think the government agrees

22    that the government can be considered a "victim" of criminal

23    conduct eligible for restitution.  Is that correct?

24        MS. CARTER:  Yes, Your Honor.  I would ask to

25    change places with my colleague now, since we're getting

1    into --

2            THE COURT:  All right.  Mr. Pearce, step on up.

3            MR. PEARCE:  Yes, Your Honor.  That's correct.

4            We do acknowledge that the government, for

5    restitution purposes, can be a "victim."

6            THE COURT:  And I also understand that the

7    government acknowledges that:  Where there is an

8    identifiable victim, like here, the Capitol Building,

9    Congress perhaps, whatever you define who the "victim" is

10   here -- it's identifiable from January 6 events -- you'd

11   agree that the restitution amount can include the property

12   damage to the Capitol Building, right?

13           MR. PEARCE:  Correct.

14           THE COURT:  It could also include the costs

15   associated with the deployment of additional law enforcement

16   units to the Capitol, right?

17           MR. PEARCE:  That's somewhat less clear.  And then

18   there is at least the *Wilfong* case out of the Tenth Circuit

19   that holds that.  There is not a whole lot of other

20   additional case law that addresses that, but there is at

21   least one case for that -- for that proposition.

22           THE COURT:  Okay.  Certainly the cost of broke or

23   damaged law enforcement equipment that occurred that day?

24           MR. PEARCE:  I think that's right, yes.

25           THE COURT:  The cost of stolen property?

1          MR. PEARCE:  Of stolen property, yeah, I think

2     that's correct as well.

3          THE COURT:  The costs associated with bodily

4     injuries --

5          MR. PEARCE:  Certainly, that's --

6          THE COURT:  -- sustained by law enforcement

7     officers that day?

8          MR. PEARCE:  That's right.

9          THE COURT:  But these two general restitution

10    statutes, which are called the Victim and Witness Protection

11    Act of 1982 and the Mandatory Victims Restitution Act of --

12    which was issued later, do not apply to petty offenses under

13    40 U.S.C. Section 5104(e)(2)(6), except to the extent agreed

14    to by the parties; is that right?

15         MR. PEARCE:  That's correct.  And that's

16    3663(a)(3) that allows the parties to reach an agreement

17    outside of -- otherwise covered Title 18, and some other

18    offenses.

19         THE COURT:  So every other offense with which

20    Mr. Griffith was charged in the indictment pending in this

21    case, except the one that the government agreed to let him

22    plead to, would have allowed for the Court to estimate the

23    restitution amount and order restitution; is that correct?

24         MR. PEARCE:  I am not sure that's correct because

25    I believe he was charged with one other Title 40 offense.

1    But I -- if that's not correct, then I can say -- he may

2    have been charged with (e)(2)(D), as in Delta --

3              THE COURT:  You are right.

4              I think he was charged with one other Title 40.

5    But he was also charged with Title 18, Section 1752(a)(1)

6    and 18 U.S.C. Section 1752(a)(2), which are -- I think

7    other -- they're Class A misdemeanors.  And so he would have

8    been -- the Court would have had the authority, had he

9    entered a plea to those, to calculate or estimate the amount

10   of restitution to be paid; is that right?

11             MR. PEARCE:  So certainly, yes.

12             THE COURT:  Right.

13             MR. PEARCE:  Title 18 falls under the coverage of

14   the Victim and Witness Protection Act.  Still, the parties

15   could have joined a plea agreement under Section (a)(3) of

16   that statute and reached an agreement; but that would have

17   at least fallen under the scope of the victim and

18   witness protection --

19             THE COURT:  Right.  So just to be absolutely

20   clear, my hands are tied in terms of the restitution amount.

21   I can't do anything other than what's in the plea agreement.

22             MR. PEARCE:  That is correct.

23             The statute of conviction provides the basis for

24   restitution.  The statute of conviction does not provide for

25   it as a matter, statutorily speaking; but, of course, we

1    have the statutory authority, under the plea agreements, to

2    provide for the $500 that the parties agreed to.  So, yes,

3    the Court's hands are tied in this case.

4            THE COURT:  Right.

5            So the government says that the $500 restitution

6    amount -- and I quote:  Fairly reflects the defendant's role

7    in the offense, the damages resulting from his conduct.  And

8    that this $500 amount -- and I quote from the government's

9    brief:  Considers the various legal and factual issues

10   associated with calculating the actual losses for property

11   damage and incurred by law enforcement agencies, additional

12   costs for security personnel and bodily injury sustained by

13   law enforcement personal.

14           And I am just privy to what is published in news

15   reports about what those costs may be.  And I have to say,

16   based on what I am understanding from news reports, I do

17   find the government's explanation somewhat baffling.  So I

18   just want to understand how this fairly reflects the cost.

19           MR. PEARCE:  Certainly.

20           THE COURT:  And I'm looking, first, at what

21   Congress has publicly identified in appropriating money in

22   the Emergency Security Supplemental Appropriations Act of

23   2021, which was signed into law July 30th, 2021, to include

24   $520 million to compensate the National Guard for having to

25   protect the Capitol after the attack; two, $33 million to

1    the Capitol Police for its response during the attack, and

2    necessary increase in protection to the Capitol after the

3    attack; three, $9 million appropriated to reimburse the

4    Capitol Police's local law enforcement partners for mutual

5    aid provided in response to the attack.

6           Those costs alone come to about $562 million, and

7    that's not even dealing with the medical costs to over a

8    hundred law enforcement officers that had to respond to the

9    January 6th attack.

10          So as I do the math, let's say there are about 600

11   defendants arrested in connection with January 6th, and each

12   of them are charged the $500 in restitution that the

13   government says fairly reflects the restitution amount

14   owed -- it comes to a total of about $300,000 in restitution

15   which -- compared to the $562 million in the Emergency

16   Security Supplemental -- Emergency Security Supplemental

17   Appropriations Act -- that's barely a drop in the bucket.

18          So how does the government explain that the $500

19   restitution amount fairly reflects the restitution loss

20   here?

21          MR. PEARCE:  Certainly.  And I think the most

22   helpful way that I can answer for the Court is to address

23   both, sort of, the $500 million figure, approximate, that

24   the Court gave, and then also talk for a moment about

25   restitution in each of these individual cases.  And I will

1    start with the first group.

2              We are continuing to investigate the extent to

3    which costs associated with what happened on January 6th

4    would fall within the scope of restitution.

5              The Court posed this question earlier about the

6    costs of additional personnel called to the scene; that

7    poses both the factual question of what precisely that cost

8    was; a number of the costs that you just listed as part of

9    the congressional bill that was passed, involved things for

10   post-January 6th protection of the Capitol.  That is clearly

11   going to fall outside of the scope of what is

12   restitutionary -- right?

13             I mean, if you're calling people to protect

14   something after an event, that's not caused by the event

15   itself.

16             THE COURT:  Oh, I think that I have heard the

17   government argue in other cases involving restitution

18   amounts that the -- what a victim was required to do to

19   remedy the situation, even going to court to testify and

20   losing loss of income, happening after the date of the

21   offense conduct can be subject to restitution.

22             MR. PEARCE:  So there is a specific statutory

23   provision that provides for somebody having to go to court

24   and to testify.  There is no such statutory provision that

25   says:  For general protection of an area following some kind

1  of attack on the Capitol or otherwise that, therefore, that

2  comes within the scope of restitution.

3          I mentioned the *Wilfong* case earlier.  To my

4  knowledge, that's the only case that really, in detail,

5  raises the possibility of seeking restitution for the

6  deployment of resources.  I believe that was a bomb threat

7  case where the defendant calls in a bomb threat, and then

8  there are people who need to evacuate, and there is

9  restitution for the lost wages associated with that.

10          Other than that, it's somewhat unchartered

11  territory.  And so, you know, I think we're exploring

12  legally whether that is something that's possible to press

13  for.  But some of those costs associated, again, with

14  post-January 6 protection is not, I think, consistent with

15  what courts have done as a matter of restitution law.

16          Now, to be clear, we are continuing to try to

17  identify costs.  The number that was quoted in

18  Mr. Griffith's plea agreement, the approximately

19  $1.5 million, was a damage estimate given by the Architect

20  of the Capitol in mid-May.  We continue to be working very

21  closely with the Architect of the Capitol with another -- a

22  number of other components within the Capitol Building.

23  It's not only the Architect of the Capitol, but very other,

24  sort of, subcomponents that have their own restitutionary

25  costs.  We're trying to assemble that; that number may look

1    different moving forward.  I don't think it is likely to get

2    to the $500 million mark that Your Honor quoted.  Possibly

3    for the reasons, like I said, you know, the protection

4    post-January 6th; it's not likely to fall within the fold.

5              But this is not meant to be the, sort of --

6    necessarily the final figure.  The restitution, you know,

7    although there is the provision for a Court to estimate --

8    and certainly we have done an estimation early on --

9    ultimately, it's about making victims whole.  And so we need

10   to collect all of this information and ensure that victims

11   are made whole.

12             And I think that's a segue to, kind of, the second

13   part of the question, which is:  How does $500 for 600

14   defendants possibly get close to it?

15             THE COURT:  Because it doesn't even get close to

16   the 1.5 million.

17             MR. PEARCE:  Absolutely correct.  That's

18   absolutely correct.  And it's not that every single Capitol

19   riot defendant is facing a $500 restitution.

20             We're going about this in a couple of different

21   ways.  First of all --

22             THE COURT:  Has the government in a plea agreement

23   required more than a $500 restitution amount, or is that the

24   maximum restitution amount that the government has asked for

25   in a plea agreement to date?

1          MR. PEARCE:  To date, the government has asked for

2     $2,000 in Mr. Fairlamb -- I can't remember his first name --

3     plea agreement.  He pleaded guilty to obstruction under 1512

4     and a violation of Section 111, sort of, the assaulting --

5     the assault statute; and so he is being held accountable for

6     $2,000 of restitution.

7          And that is, essentially, the approach that we are

8     using that is, sort of, the first phase of the restitution

9     question, which is basically this:  To the best of our

10    information, we've figured out how many individuals we

11    believe were unlawfully inside of the Capitol Building.  We

12    then had, at that point, the $1.5 million approximate

13    number.  And we then -- we -- and it was somewhere between

14    2,000 to 2,500 people, we believe, were unlawfully present.

15    And I am not going to go, for investigative reasons, into,

16    sort of, how we figured that out.  That math equaled about

17    $700 per individual going into the building.

18          We then decided -- as a matter of trying to

19    approximate as best as possible -- that for those

20    individuals who ultimately are convicted of a misdemeanor,

21    that they are subject to a $500 -- just as a matter of their

22    participation in the events of January 6th -- restitutionary

23    amount.

24          For individuals convicted of a felony, they are

25    required, under plea agreements, to pay a $2,000 restitution

1    amount that -- reflective of the language Your Honor quoted

2    earlier -- generally reflects their culpability in the

3    events of that day.  That is step one.

4         If we have specific evidence that a given

5    defendant damaged property, stole property, caused injury to

6    an officer, right, that's a separate restitution amount for

7    that specific conduct; and that is in addition to the $500

8    or $2,000.

9         Now, there is no evidence that Mr. Griffith --

10   that we are aware of -- that he stole property, that he

11   damaged property, that he was responsible for injury to a

12   law enforcement officer, in which case he is not being held

13   separately accountable under either the Mandatory Victims

14   Restitution Act, if it's a crime of violence or if it's

15   property damage, or under the other VWPA for just causing

16   bodily injury of some sort of assault or otherwise.

17        But, in those cases, those defendants are going to

18   be held accountable for that amount specific to officers,

19   specific to property, et cetera.

20        THE COURT:  All right.  Usually, when a defendant

21   is ordered to pay restitution or perform community service

22   as part of a sentence -- and that has been -- you know, a

23   number of my colleagues have ordered community service,

24   compliance with those sentencing terms is generally

25   supervised by the probation office; but the defendant has to

1    be sentenced to a term of probation or supervised release

2    for the probation office to exercise that supervision

3    authority.

4           And, in this case, the government is recommending

5    a term of incarceration of three months, payment of $500 in

6    restitution, and is not recommending any probationary period

7    to -- which could be used with the probation office

8    supervising a schedule of payments.

9           Why is that?

10           MR. PEARCE:  So I suppose the legal answer and

11    then the, sort of, recommendation answer, legally -- and I

12    think we put this in one of our supplemental filings -- the

13    Court can still, of course, order a restitution payment

14    without there necessarily being some form of supervision in

15    place, be it either probation or supervised released; but

16    supervised release is not available here.

17           Of course, the payment of restitution is a regular

18    condition, both a mandatory and potentially discretionary

19    condition of probation, and it is a way to ensure

20    that restitution --

21           THE COURT:  But the government is not recommending

22    any probationary term here.

23           MR. PEARCE:  It is true.  And I think that the

24    basis for that is the belief that incarceration is the

25    appropriate sentence for the reasons that are set out in our

1    sentencing memorandum.

2            THE COURT:  I have to tell you, every single

3    criminal case I have, whether it's a criminal fine imposed

4    or there is restitution imposed, the government asks for

5    probation or supervised release, and they ask for a length

6    of time for supervision and probation to -- enough time for

7    the probation office to make sure the restitution or fine is

8    paid, hopefully in full.

9            This is the first time I have ever had the

10   government ask for a restitution payment and not ask for a

11   term of probation because supervised release, of course, is

12   not allowed to be imposed here because it is a petty

13   offense --

14           MR. PEARCE:  That's right.

15           THE COURT:  -- without -- where the government

16   doesn't ask for probation to be involved in ensuring

17   compliance with that term of the sentence; and I am

18   really -- none of the papers submitted by the government has

19   explained why that is here.

20           MR. PEARCE:  Well -- and to be clear, this is not

21   the approach we're necessarily taking in every single one of

22   these cases; in some of the cases we are.  I mean, I do

23   think that --

24           THE COURT:  Has the government in any case arising

25   out of January 6th where it has recommended a term of

1    incarceration also recommended a term of probation?

2              MR. PEARCE:  I do not believe so, no.  And I --

3              THE COURT:  Is that because the government is

4    concerned about the legality of a split sentence for a petty

5    offense despite what you said in your position -- position

6    papers?

7              MR. PEARCE:  No.  I mean, the position that we

8    have taken is the position that we believe is correct, is

9    consistent with the plain language of 3561(a)(3), is the

10   position that the Fourth Circuit adopted in the unpublished

11   *Posley* opinion; but, no, it is a close question.

12             I mean, I think the briefing on the other side is

13   not bad.  We think we are right.

14             We think the clearer way to do it, although my

15   understanding is as a practical or logistical matter this is

16   not happening very often, is that ordering intermittent

17   confinement as a special condition of probation -- and I am

18   not saying -- we haven't made this recommendation in this

19   case.  I am just identifying what I think is clearer

20   legally is --

21             THE COURT:  And how long do you think an

22   appropriate legal term of intermittent confinement would be?

23             MR. PEARCE:  I mean, I think in our

24   supplemental --

25             THE COURT:  Three months?

```
1              MR. PEARCE:  I'm sorry?

2              THE COURT:  Do you think three months is a legally

3       acceptable term of intermittent confinement?

4              MR. PEARCE:  Probably not.

5              THE COURT:  No, it's not.

6              MR. PEARCE:  Yeah, I agree.  I mean, that --

7              THE COURT:  Do you think two weeks would be a

8       legally acceptable term of intermittent confinement?

9              MR. PEARCE:  I do.  I think that's consistent with

10      the legislative history; and I think that that is -- I mean,

11      the case law on this is quite sparse, but I think 30 days

12      plus is too much.  I think clearly a night, a weekend, or

13      one to two weeks would be consistent with what Congress was

14      trying to do and would qualify as intermittent.

15             THE COURT:  And an intermittent confinement is,

16      typically, two weeks now, then two weeks in a month, so it's

17      going in and out of jail; that's what intermittent

18      confinement is typically considered for short intervals.

19             And during a time where, in the criminal justice

20      system, we're all concerned about keeping our jails and

21      facilities protected from transmission of the COVID virus,

22      do you think intermittent confinement with people going in

23      and out of jail is a -- is a -- from a safety perspective

24      preferable to a term of continuous confinement?

25             MR. PEARCE:  As a practical logistical matter, no,
```

1    I don't think so.  And that's why I wanted to distinguish

2    between, sort of, the legal position and the practical one.

3            I mean, frankly, the probation office -- or the

4    probation officer here, I believe, has reached out to

5    colleagues in the Middle District of Tennessee and informed

6    the parties just before the sentencing hearing that, sort

7    of, the question of is there -- is intermittent confinement

8    a possibility there; and I think the answer is it's somewhat

9    unclear, but they are -- like my understanding in this

10   district -- not doing it not for a legal reason, but for the

11   kinds of practical health concerns, which I think are fully

12   legitimate that -- the same reasons that it's not happening

13   here.

14           THE COURT:  Well, let me just say -- when I was

15   considering what are my sentencing options here for a

16   Class B misdemeanor, I don't think it's any secret to say

17   that federal judges rarely deal with Class B petty offense

18   misdemeanors; this is not our normal diet of criminal

19   conduct, offense conduct.

20           So, I mean, the first question I asked is:  What

21   are my options for sentencing under a Class B petty offense

22   misdemeanor?  And -- because it was very peculiar to me, to

23   be honest, Mr. Pearce, that the government was requiring, as

24   part of the plea agreement, a $500 restitution, was

25   recommending jail time, but nothing -- no probation -- no

1    probationary period.

2           And let me just ask you right off, have you -- has

3    the government presented its position that a split sentence,

4    meaning -- a split sentence, Mr. Griffith, for those of you

5    who are not legal -- don't have JD degrees like the rest of

6    us do -- a split sentence is a shorthand way of describing a

7    sentence that's part prison and part probation, sort of, a

8    combination of the two.

9           So has the government presented its position, that

10   it has done for me, that even though a split sentence is

11   prohibited for felonies in Class A misdemeanors, that a

12   split sentence is permissible for petty offenses?

13          Has the government presented that position to any

14   of my colleagues on this court?

15          MR. PEARCE:  No.  We would've -- the government

16   defended it in *Posley*, but we have not presented it to any

17   of your colleagues.

18          THE COURT:  And that might help explain why none

19   of my colleagues has imposed a split sentence in one of

20   these Class B petty offense misdemeanor cases, or perhaps

21   they have looked at the issue and decided it's legally

22   questionable.

23          MR. PEARCE:  I think those are both perfectly

24   plausible potential explanations.

25          THE COURT:  And you would agree with me that it's

1    a -- given the briefing that has been adopted in this case

2    and has been filed in connection with the codefendant,

3    Mr. Torrens' case, that this is a case -- this is a question

4    of first impression in this circuit.

5              MR. PEARCE:  I believe that's correct, yes.

6              THE COURT:  So is the -- did the government plan,

7    when it was offering all of these petty offense Class B

8    misdemeanor to Title 40 offenses, that it wanted to make new

9    law in this circuit on whether a split offense was

10   acceptable here?

11             MR. PEARCE:  No.  No, we didn't.  And that

12   probably explains why we haven't recommended it.

13             I mean, of course, we have laid out this position

14   in response to Your Honor's request that we brief it, and

15   we've looked at it.  We've done what the government does;

16   and we have presented to the Court what we think, legally,

17   is the best argument, which is that it is a permissible

18   sentence.

19             I think it's fair to say that -- it's an open

20   question in this Circuit given the unpublished Fourth

21   Circuit case -- it's probably an open question everywhere as

22   a matter of -- and so there is a lot of unprecedented things

23   in connection with January 6th.  It's an unprecedented

24   event.  But we are not typically looking to press forward

25   and take positions that are going to take on potential

 1    litigation.

 2              THE COURT:  Well, that's how you look at it.  From

 3    where I sit, my hands are tied with respect to restitution.

 4              The government in its plea agreement and by its

 5    choice to have a plea agreement with a petty Class B

 6    misdemeanor has tied my hands when it comes to restitution,

 7    as you would agree, right?

 8              MR. PEARCE:  That's correct.

 9              THE COURT:  And then when it comes to my

10    sentencing options for a petty offense Class B misdemeanor,

11    you have plunged us into a situation where the full panoply

12    of sentencing options with a period of incarceration and a

13    period of supervision -- it wouldn't be called "supervised

14    release," it would be called "probation" -- to ensure, in

15    the normal course, where the probation office ensures that

16    there is compliance with the terms of payment of

17    restitution, as required as part of the sentence, there is a

18    big legal question.  There is a dark cloud whether I even

19    have that sentencing option, right?

20              MR. PEARCE:  Yes, with the caveat that

21    incarceration, as a term of probation, I think is a clean

22    way to do it; acknowledging that for reasons over which we

23    exert no control, COVID and health concerns, that that poses

24    its own logistical and practical problems.

25              THE COURT:  Right.

1          So -- but -- not to jump ahead to tomorrow; but in

2     Mr. Torrens' case, the government is recommending a two-week

3     period of incarceration, $500 in restitution, and no

4     probationary period either.  So even in situations where the

5     government's recommended incarceration period is -- could

6     qualify for intermittent confinement as a condition of

7     probation, the government still is not recommending

8     probation, right?

9          MR. PEARCE:  We did not in that case.  That's

10    correct.

11         THE COURT:  So let's look at the arguments that

12    have been raised in Document 125, which was the brief filed

13    around midnight last night, and has been adopted by

14    Mr. Griffith, arguing against a split sentence as being

15    allowable for Class B misdemeanors.  And that brief argues

16    that the phrase "that is not a petty offense," which is

17    the -- you know, a phrase used in Section 3561(a)(3), only

18    modifies a different offense because of the use of that

19    determiner word "a" in the preceding phrase.

20         And according to this brief, this argument, and I

21    quote, "The insertion of the determiner 'A' cuts off the

22    reach of the post-positive modifier under the post-positive

23    modifier canon."

24         So the government hasn't addressed that argument.

25    So what is the government's response to that argument?

1          MR. PEARCE:  I mean, it's the same argument that

2     we made in the reply brief, which is the reading of the

3     phrase -- and I don't have the specific language in front of

4     me -- but it's something like the same or a different

5     offense.  There is really no way to read that other than as

6     one full unit.  Because if you were to say "the same," that

7     is not a petty offense, it's just --

8          THE COURT:  Couldn't it easily say "a same or

9     different offense that is not a petty offense," and then it

10     would be clear that same or different offense that is not a

11     petty offense means you could have a split sentence so long

12     as you weren't dealing with an offense that was a petty

13     offense?

14          But here they did -- there is that insertion of

15     the determiner "a" which does change the meaning somewhat;

16     and that's the argument in terms of, you know, statutory

17     construction.

18          MR. PEARCE:  I understand.

19          And, still, I just don't think you can -- I mean,

20     so I guess two responses; one is the one that I just started

21     to articulate.  It is not possible, unlike the other

22     examples that are referred to in the brief, to read the

23     phrase other than as a whole, "the same or a different

24     offense," because there is no "the same offense or a

25     different offense" -- right?

1    Then you might have an argument that you apply the

2    rule of the last antecedent -- right? -- it just modifies a

3    different offense.  And the kinds of cases where that --

4         THE COURT:  And that's the defense's argument?

5         MR. PEARCE:  That's the defense's argument.

6         And the kinds of cases where that is applied are

7    typically things where you've got maybe a series of

8    different things and then, at the end, you have got

9    something that is identifiably different.

10        I mean, I think that is what's going on -- and

11   this is, sort of, the second argument -- in the *Pritchett*

12   case that is cited on the next page of the Scalia and

13   Garner's book, the D.C. Circuit case where you are modi- --

14   having it attached to just the end of a list of things of,

15   like, wardens and guards, and something, and then all of

16   the --

17        THE COURT:  And then it inserts the determiner

18   "to" as opposed to the determiner "a" but --

19        MR. PEARCE:  Well, it's comma, right?

20        I think the comma is -- you know, I think we have

21   a much harder argument where we have got a comma, where

22   we've got something -- I mean, here we have got a phrase

23   that is not understandable without reading it all together.

24        You don't have "the same offense, or other offense

25   that is not a petty offense."  That, I think, we lose.

1      That, I think -- that is the rule of the last antecedent.

2              It's clear that Congress has intended to just have

3      "that is not a petty offense" applied to a different

4      offense -- right? -- but that's not the statute that is there.

5              The statute that is there is the same or

6      different -- how do you break that apart?  I think that the

7      natural way to read that would be to say "that is not a

8      petty offense" modifies the entire phrase.

9              And, for whatever it's worth, albeit not with a

10     ton of analysis, that is what the only Court of Appeals to

11     have considered this issue has decided, the *Posley* case.  It

12     just -- and I believe it's unquestionably -- as a matter of

13     statutory authority, this is permissible.

14             All of the other cases that the defendant cites --

15     not in the filing last night, but earlier on -- that address

16     that, it either states the general rule, which we all

17     acknowledge, or it deals with the question that we were

18     talking about earlier, which is how much time is too much to

19     count as intermittent?

20             You know, that raises its own question; but that's

21     fully distinct from whether on a continuous sentence and a

22     probationary -- excuse me -- a sentence of continuous

23     incarceration and probation are permissible for a petty

24     offense.

25             THE COURT:  Right.  Well -- okay.  So it still

1      makes me somewhat concerned that even though the government

2      is politely responding -- although maybe it has no

3      choice but -- to my request for analysis on this issue, I

4      just wonder how fulsome the government's support is for the

5      position it's articulating to the Court when -- in zero

6      cases has the government proposed, where it is proposing or

7      recommending a sentence of imprisonment, a period of

8      probation for these petty offenses.  You appreciate my

9      puzzlement and concern about that?

10              MR. PEARCE:  I think that's a fair question.

11              I mean -- and I think it circles back to something

12     that we discussed earlier, which is this is an open question

13     in this circuit and elsewhere.  And so I think getting

14     behind and fulsomely adopting something where there is

15     admittedly some question -- I mean, we are not looking to

16     take on challenging questions across the board.  I think

17     this is the right -- we think this is the right analysis;

18     but, you know, we haven't recommended that here.

19              Again --

20              THE COURT:  And so I just want to be clear that,

21     even though in every single other criminal case where the

22     government has asked for restitution and restitution has

23     been awarded, where the government has also asked for a

24     period of probation or supervision to ensure compliance with

25     restitution payments, the government here is not making an

1      exception for January 6 defendants because you think these

2      defendants are more trustworthy than every other criminal

3      defendant where you have asked for a period of supervision

4      or probation to ensure payment with restitution?

5              MR. PEARCE:  No, absolutely not.  It has nothing

6      to do with an assessment of the trustworthiness or

7      non-trustworthiness of the defendants.

8              I think it is probably fair to say that the amount

9      of restitution perhaps comes into play when a defendant,

10     like Mr. Griffith, is being held to a $500 restitution

11     amount.  I think that looks a lot different than a defendant

12     who is being held to many multiples of that.

13             THE COURT:  How about $2,000?

14             MR. PEARCE:  $2,000, or it could go upwards --

15             THE COURT:  But for $2,000 you are going to be

16     in --

17             MR. PEARCE:  You will be on supervised release,

18     right?

19             THE COURT:  -- you're going to be in -- excuse me.

20     Don't interrupt me.

21             MR. PEARCE:  I'm sorry.

22             THE COURT:  -- you are going to be in a situation

23     for felonies where you're asking for $2,000 where supervised

24     release can be imposed?

25             MR. PEARCE:  Correct.

1            THE COURT:  Right.

2            All right.  Well, this is an interesting

3    sentencing situation where I have the government

4    articulating a position that it is not recommending to be

5    adopted on what the options are for penalties.  And I have

6    the defendant much more consistently arguing that only

7    probation here is appropriate, while the government is

8    insisting that a period of incarceration is required, and

9    briefing up until midnight the night before the sentencing;

10   when there is some lack of clarity, certainly in how much

11   the government really supports the position it has

12   articulated that a split sentence is allowable for a petty

13   offense Class B misdemeanor.

14           I -- in all my years on the bench, I have never

15   been in this position before.  And it's all due to the

16   government, despite calling this the crime of the century,

17   resolving it with a Class B petty offense.

18           Is there anything else you want to add,

19   Mr. Pearce?

20           MR. PEARCE:  No, Your Honor.

21           THE COURT:  Did the government's position on a

22   split sentence being allowable for petty offenses -- was

23   that developed prior to the offer of -- plea offers to

24   Class B misdemeanors in the January 6th cases or was that a

25   position that was developed in response to my request?

1          MR. PEARCE:  As I mentioned, the government

2    defended that position in *Posley* over a decade ago; but I am

3    not aware of the government having taken that position

4    elsewhere, either in this court or elsewhere.

5          THE COURT:  And so if a split sentence is imposed

6    in any of these cases, is the government going to stick to

7    its position before the D.C. Circuit?

8          MR. PEARCE:  I would expect so, Your Honor.  We

9    defend government positions.

10          If we were to lose at the D.C. Circuit, that would

11    obviously involve, as Your Honor probably knows, internal

12    deliberation as to whether to seek any further review; but

13    this is the government's position, and we would defend it.

14          THE COURT:  All right.

15          MR. PEARCE:  Thank you.

16          THE COURT:  Thank you.

17          Ms. Shaner.

18          MS. SHANER:  Good afternoon, Your Honor.

19          THE COURT:  Good afternoon.

20          Oh, my goodness.  It has gotten -- time speeds

21    along.

22          MS. SHANER:  I am going to speak very briefly.

23          We are requesting that the Court grant

24    United States' sentencing recommendation for a period of

25    probation.

1        The defendant exhibited remorse immediately after

2    he returned to his hotel after he watched the events; and he

3    posted:  Yes, we went in.  We just made things worse.

4        Mr. Griffith is not a political activist.

5    Mr. Griffith was not registered to vote in November, and, in

6    fact, he did not vote for or support Trump.  His demeanor on

7    some of the videos, his exuberance, is, in part, based on

8    his impulsivity, which is a result of his ADHD.  His

9    internet addiction, throughout his teen years and now, is

10   also partially based on his ADHD.

11       According to the FBI reports on Mr. Griffith's

12   internet use, he never, before January 6th or after, was on

13   any political platform.  According to the FBI, he was on

14   Twitter, Facebook, Instagram, YouTube, Snapchat, and

15   Pinterest; they were all canceled after he entered a plea.

16       He did post on TikTok, which is a creative social

17   outlet.  His post had minimal political content; and, in

18   fact, in his trying to sell his game, he calls Trump "the

19   Cheeto Mussolini."

20       Mr. Griffith was cooperative with --

21       THE COURT:  Ms. Shaner, tell me about that game.

22       MS. SHANER:  I'm sorry?

23       THE COURT:  I said tell me about that game.

24       I mean, I have read some articles that the

25   defendant has promoted that game, and that it involves

 1    violence against democrats.  I don't know.  What is this

 2    game about?

 3              MS. SHANER:  It's not any different than any of

 4    the horrible internet video games that exist; the only

 5    difference is the monsters are Antifa or those considered

 6    left wing, and the superhero is Trump.  And it was something

 7    that was developed years ago and is not completed.

 8              And Jack tried, in July, to advertise it a little

 9    because the people who had invested were not getting any

10    money back, and he just wanted to try to pay them back

11    because he owed them money.  And it was an impulsive act to

12    post in July, which he called me about and was upset that he

13    had done it afterwards.  He was having a low period, and

14    that's when he posted.

15              If the Court listens to the chatter, you hear him

16    saying -- they're talking about Trump's voice and how cool

17    it is.  And he says -- refers to Trump as "the Cheeto

18    Mussolini."

19              Mr. Griffith was arrested ten days after

20    January 6th.  He was cooperative with the FBI; he gave them

21    his phone.  He gave them the codes to get into the phone.

22    He admitted, in his initial statement to the FBI, exactly

23    what he had done.  He said his actions, though they were

24    nonviolent -- and he personally did not participate in any

25    vandalism -- that his going in and his staying in there,

1    even though it was just for a couple of minutes, was stupid

2    and wrong.

3              THE COURT:  And what was the total number of

4    minutes he was in the building?

5              MS. SHANER:  I'm sorry, Your Honor.  I didn't hear

6    you.

7              THE COURT:  What was the total number of minutes

8    he was in the building?

9              MS. SHANER:  I believe he was in there for under

10   ten minutes; and he was just in the crypt area.

11             If the Court were to grant the recommendation of

12   U.S. Probation and sentence him to probation with community

13   service -- Mr. Griffith and I have been discussing what

14   would be of greatest benefit for his community.  He has

15   worked in many food service places and restaurants; and he

16   worked for years at Walmart, which is the biggest grocery

17   distributor in Gallatin, Tennessee.  He would like, if

18   permitted by the Court and probation, to create a food bank

19   in Gallatin where he could use his experiences in food

20   service and in restaurants to help distribute food to

21   individuals who are not getting enough food at this time.

22             He also indicated that there is limited access to

23   libraries in Gallatin; and that he would be interested in

24   putting together a collection and book redistribution for

25   the teenagers in Gallatin.

1          His mother has come from Texas and is available to

2     answer any questions the Court might have about the

3     information I filed under seal, and Mr. Griffith is also

4     prepared to come up and answer any questions or concerns of

5     the Court.

6          THE COURT:  Well, Ms. Shaner, let me just say, I

7     mean, you wrote quite eloquently about all of the excuses

8     for Mr. --

9          MS. SHANER:  I'm sorry.  I am not... okay.

10         THE COURT:  You wrote quite eloquently about all

11    the excuses for Mr. Griffith's conduct on January 6th.  You

12    call it "simply impulsive behavior," which you've repeated

13    here.

14         You have talked about defendants you have

15    represented for their conduct on January 6th and say that:

16    None are informed intentional political actors and, on

17    balance, they're vulnerable politically unsophisticated

18    individuals.  And you, sort of, suggest that, oh, my

19    goodness, now with your reports that he is considering

20    community service efforts he might undertake, you know, that

21    he is a person who wants to give back to his community as

22    opposed to attack the Capitol Building as part of a mob.

23         I -- I have to say this defendant, after he was

24    arrested, made a number of comments that only confirmed his

25    mindset when he came to D.C. on January 6th.

1          This is not a person who strikes me as somebody

2     who was so uneducated or unsophisticated.  I mean, he's got

3     his high school degree.  He went on to higher education.  He

4     intentionally made his way from Tennessee to D.C. on

5     January 6th; and he described his action as:  The calvary is

6     coming.  He said he wanted to storm the Capitol, which he

7     then did.

8          So it was not impulsive conduct; and so it's hard

9     for me to accept your description that this was "impulsive"

10    as opposed to totally consistent with his plan, his

11    intentional travel, and what he did when he got here.

12         And he evidenced the same mindset even after his

13    arrest, in talking about a stolen presidential election in

14    November 2020.  So that mindset that motivated his conduct

15    on January 6th is what has prompted the government to say

16    that not just general deterrence, but specific deterrence

17    for this defendant is required in this case.

18         So I -- you know, I have a hard time accepting

19    that his conduct on January 6th was simply "impulsive" or

20    "uninformed."

21         And I have to say, you know, there have been other

22    January 6th defendants who, at the time of sentencing, have

23    expressed remorse, that they have gained some civic literacy

24    by reading books; and then, as soon as they're sentenced to

25    a probationary period, they downplay their criminal conduct

 1   on January 6th.  Because, you know what, judges are just

 2   human; we can get played.

 3           MS. SHANER:  Your Honor --

 4           THE COURT:  But no one likes that.

 5           MS. SHANER:  I don't blame you.

 6           I assume you are referring to Anna Lloyd who went

 7   on Laura Ingraham.

 8           THE COURT:  That is precisely what I am talking

 9   about.

10           MS. SHANER:  The day she did that she contacted

11   counsel and sent a letter to counsel to give to Judge

12   Lamberth.  She was played by Laura Ingraham.

13           Laura Ingraham asked her all of the questions that

14   Judge Lamberth had asked her about what she saw and what she

15   personally did.

16           Laura Ingraham asked her 40, 50 questions.  She

17   was able to say no, she didn't see any specific act of

18   violence; but then she learned about it.  She didn't see any

19   specific acts of vandalism, but then she learned about it.

20   She also talked about counsel and what I had advised her.

21   She also talked about the books she read.  She also talked

22   about her genuine remorse and why she cried in front of

23   Judge Lamberth.

24           Laura Ingraham, on air, then asked her four

25   questions without any follow-ups.  Did you participate in

1    any acts of violence?  No.

2              Did you break anything?  No.

3              Did you personally see any vandalism?  Not at the

4    time.

5              Did you personally commit -- see any acts of

6    violence?  Not at the time.

7              Then she asked her about books.  And when she

8    started to say that the books were good and educational, she

9    cut her off and ended the interview.

10             It wasn't a lack of remorse; it was her stupidity

11   to go on that forum.  And if the Court wants, I can send the

12   Court the letter that she wrote immediately after she was

13   played by Laura Ingraham.

14             Many forums have asked her to go on and explain

15   that; she was just so overwhelmed by what happened and with

16   the social media feeding on her that she did not want to be

17   interviewed.

18             I can tell you that during that time period I was

19   getting lots of hostile telephone calls from the far right

20   for brainwashing my clients.

21             I also got a telephone call from a librarian, in

22   Florida who wanted to give me additional books to give my

23   clients.  That librarian reached out to Ms. Lloyd and sent

24   her a packet of ten books, which Ms. Lloyd did not open

25   initially because she was afraid it contained a bomb because

60

1      she was getting a lot of hate mail.

2            When she verified that it was from a librarian she

3      opened it, and she has formed a relationship with that

4      librarian in Florida.  She has read the books.

5            She also completed her 120 hours of community

6      service within a month.  She also paid her restitution

7      within a month.  She was played.  And the only reason I did

8      not -- she didn't want to go back on the air and correct

9      what happened to her on air.

10           I have spoken to Mr. Feuer at the *New York Times*,

11     and he wants to interview her; but it's all too raw for her

12     right now, and she does not want to be interviewed.

13           Several of my clients who have expressed remorse

14     have been interviewed by the FBI and are being interviewed

15     by the house committee.  Ms. Lloyd at this time does not

16     want to because it's too upsetting to her.

17           My other clients are; Mr. Griffith would make

18     himself available.

19           I believed Ms. Lloyd was generally remorseful.  I

20     was shocked when the government sent me the video on FOX.

21     I was angry.  I felt humiliated.  I felt betrayed.  And

22     then, after I talked to her, I realized that it is very

23     difficult for an individual to appear on FOX News or even on

24     the other networks where they are really less interested in

25     the truth than they are interested in creating sensation and

```
 1    entertainment.
 2            All of the media reached out to me to be on there.
 3    And it's -- unless you can control what happens to you when
 4    you go on social media, and especially on TV, it's not a
 5    good idea, even for someone who is very smart and thinks
 6    they know what they're doing.  And, certainly, for Anna
 7    Lloyd it was a stupid, horrible idea.
 8            So that's what happened.
 9            THE COURT:  Thank you.
10            If you don't mind, I will send these pages of the
11    transcript to Judge Lamberth.
12            MS. SHANER:  That's fine.  And I can also send
13    Judge Lamberth her letter; I just haven't because he never
14    questioned it since it occurred.
15            THE COURT:  All right.  Is there anything further?
16            MS. SHANER:  No, Your Honor.  Thank you.
17            THE COURT:  Okay.  Mr. Griffith, this is your
18    opportunity to speak directly to me if you wish, and you can
19    stand up at the podium.
20            THE DEFENDANT:  Yes, Your Honor.  Thank you.
21            I would like just to, if I may, read some of this
22    letter I wrote because I think it's a good outline and, if
23    you would, ask me some questions or anything like that.
24            Your Honor, I write this letter as a response to
25    the government request for incarceration.
```

1          I recognize truly that many of the points the

2     prosecutor made are fair and valid, and the perception that

3     I was not remorseful --

4          THE COURT:  Can you just slow down just a little

5     bit, Mr. Griffith, because I have a court reporter --

6          THE DEFENDANT:  Okay.  I'm sorry about that.

7          THE COURT:  -- who needs to take down everything

8     that you say.

9          THE DEFENDANT:  Yes, ma'am.  Okay.

10         I honestly never planned on doing anything extreme

11    or even of entering the building.

12         As ridiculous as it may sound, it was more of a

13    celebration because the people were thinking that maybe one

14    member of Congress and one member of the Senate would get

15    together and they would object to a stay (sic), and would go

16    into four hours of debate.

17         Our actions on that day flew in the face of the

18    entire plan, and I do accept responsibility for entering

19    that building.  I should have never been in there.  I should

20    have never entered that building.  But I did not plan on

21    ever going inside of, illegally, any government building.  I

22    did not go to D.C. to participate in any violence or

23    vandalism --

24         THE COURT:  Slow down.

25         THE DEFENDANT:  Yes, ma'am.  Sorry.

1           THE COURT:  That's all right.

2           THE DEFENDANT:  -- and I disavow 100 percent, in

3     the strongest degree, all those people who committed any

4     acts of violence.

5           I want to distinguish myself from them; and every

6     time I speak out publicly, I do, and I do not think it's

7     okay.  And I won't go on any news station that interviews

8     me -- if they do -- if I go anywhere, I will not be

9     misquoted because I will be clear and direct in my complete

10    disavowment (sic) of all of those violent actions, and even

11    in going inside the building.  And I know it was a mistake,

12    and I will never do anything like that again.

13          I'm sorry.  Let me get back to this.

14          I did not realize just how scared and in danger

15    the Capitol Police were that day.  While I was inside the

16    building, the Capitol Police seemed very friendly.  And I

17    was under the impression that our presence was only a minor

18    inconvenience which was, of course, wrong.  Looking back on

19    the day, I realize that they were, in fact, crippled by fear

20    and wildly outnumbered and probably just acting like that to

21    appease us.

22          I realize that my behavior on January 6th was

23    incredibly impulsive and completely inappropriate, and

24    wrong.  Although I may not have personally participated in

25    any violence or vandalism, the fact that I can be smiling

1    and gleeful and cheering on as our republic is under attack

2    is truly disgraceful.

3           I am ashamed of the way that I acted, Your Honor;

4    the behavior was unbecoming, and totally unacceptable from

5    someone who is known as being such a positive person in my

6    community.

7           I should have never been there that day; and as

8    time passed, the gravity of the situation sunk in.  I

9    realize that I needed to take a huge step from politics.

10   After months of working constant overtime just to make ends

11   meet after losing my job, I finally got a job that I really

12   like.  It also pays a lot more per hour, so I no longer have

13   to work so much just to pay rent.  I just beat my eviction,

14   thank God.

15          Things are starting to look up in my life.  I now

16   have time to think and reflect.  I only eat healthy foods; I

17   run at least six miles daily.  I am much more focused on

18   improving myself, my personal goals, instead of being so

19   obsessed with politics.

20          My mind used to be muddied, cluttered by extremist

21   politics.  I feel free now, more free to focus on my own

22   hopes and dreams as a musician and entertainer, a game

23   developer, et cetera.

24          With some mercy from the Court, I hope to keep my

25   newfound freedom.  On top of that, I found someone who I

1    believe to be the love of my life.  Although our bond is

2    new, we have been there for each other through a lot of

3    difficulties.  I can't say I have ever felt this way about

4    someone else.  I know that's digressing, but she inspires

5    me.  She keeps me grounded, and she is not that into

6    politics; so I kind of needed that safe space.

7        I know that due to my demeanor and my upbeat

8    personality that it seems as though I don't take things as

9    seriously as I should, but I truly do.  I have always been

10   known as being the most positive person in the room, someone

11   that will do anything to make someone else smile.  I was

12   also always the peacemaker in my family.

13       And I would just like to say that I beg mercy from

14   the Court, and I do accept responsibility for my actions;

15   and I have learned my lessons, I truly have.

16       Even from the beginning, I will admit that maybe I

17   was acting a little bit arrogant in the beginning; I will

18   concede that.  And it took a lot to learn just, like, from

19   the beginning.  My ex, she said goodbye because she didn't

20   want to deal with that behavior; and I can't say that I

21   blame her.

22       And without my presence and the presence of

23   thousands of others, I know that there would not have been

24   an attempted coup; and I know I added on to that, and I

25   apologize for doing so.  I know that people were watching

1    around the world in terror as it happened.

2            Not only have I learned my lessons, but I am

3    grateful to have learned these lessons, Your Honor.  And

4    I am ashamed, in part, that my personal growth has come at

5    the expense of others and had partly put our country in

6    danger.  But I am glad that I have learned my lessons.  I

7    have grown and matured as a person.

8            THE COURT:  But Mr. Griffith, let me interrupt you

9    for a second.  You say you have learned some lessons.

10           So, tell me, what are the lessons you have learned

11   from this experience?  Because I will tell you, your

12   post-arrest statements continuing to talk about this great

13   lie that the 2020 presidential election was stolen suggests

14   that you still believe that conspiracy theory.  So what are

15   the lessons, actually, that you have learned?

16           THE DEFENDANT:  Your Honor, I have not been

17   posting anything similar to that in a while.  And I will say

18   that regardless of what anybody did or doesn't believe, it

19   is never, in any situation, appropriate to act in the way

20   that I behaved.  Regardless of how you personally feel about

21   the situation; and violence is never appropriate in

22   political discourse, and I completely disavow (sic) that.

23           And even for some of the people that still believe

24   in that, it doesn't matter what you believe because those

25   actions were not appropriate on that day.  And I know, Your

1    Honor, that I should have never been there; and I know I

2    should have not entered that building.

3           And I did not truly realize the ramifications of

4    everything because, when I was inside the building, the

5    police officers were close to us, they're talking with us;

6    they were giving people directions back to the place.

7           So, Your Honor, when I got back to my Airbnb in

8    Washington, D.C., I put my own pictures up on my own social

9    media, on my Facebook.  I had no idea what -- the full level

10   of everything that happened.  And then the next day I woke

11   up and I found out that people died, people got killed,

12   people got hurt.

13          Your Honor, I had no idea it was that deep.  I saw

14   tear gas; I heard alarms blaring.  But I did not know the

15   level of violence that was there; I did not.  Had I known, I

16   would never have put my pictures up because I would have

17   never wanted to be associated with such chaotic behavior.

18          THE COURT:  All right.  You may continue.

19          THE DEFENDANT:  Thank you, Your Honor.

20          I am not a violent person, Your Honor; and I do

21   not feel like I am a danger to society.  I will never do

22   anything remotely -- of course -- to my actions on

23   January 6th, and I do not think that those actions were

24   okay.

25          And to someone who has just finally started to get

1    their life together, I beg to be spared from the cold lonely

2    nights in a prison cell.

3              THE COURT:  All right.

4              THE DEFENDANT:  Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Griffith.  It's not

6    always easy for defendants who are not accustomed to public

7    speaking to stand up in court and talk.

8              THE DEFENDANT:  Yes, ma'am.  I usually like public

9    speaking; but this is really hard, so...

10             THE COURT:  All right.  So, Ms. Shaner, do you

11   want to stand up with your client?

12             All right.  I am going to explain the sentence I

13   am about to impose, and then impose sentence in this case.

14             After considering the voluminous sentencing

15   memoranda, the presentence investigation report, the

16   probation department's sentencing recommendation, hearing

17   argument, I must now consider the relevant factors set out

18   by Congress in 18 U.S.C. Section 3553(a) to ensure that I

19   impose a sentence sufficient, but not greater than

20   necessary, to comply with the purposes of sentencing.

21             These purposes include the need for the sentence

22   imposed to reflect the seriousness of the offense, to

23   promote respect for the law, and to provide just punishment

24   for the offense.  The sentence should also deter criminal

25   conduct, protect the public from future crimes by you,

1     Mr. Griffith, and promote rehabilitation.

2              Pursuant to 18 U.S.C. Section 3553(a), I must

3     consider specifically the nature and circumstances of the

4     offense; your history and characteristics, Mr. Griffith; the

5     types of sentences available; and the need to avoid

6     unwarranted sentence disparities among defendants with

7     similar records who have been found guilty of similar

8     conduct, and the need to provide restitution to any victims

9     of the offense.

10             I will begin with the restitution amount owed by

11    this defendant.  As we have discussed with the government

12    during the course of this hearing, given that the statute of

13    conviction is not covered by the two general restitution

14    statutes codified at 18 U.S.C. Sections 3663 and 3663(a),

15    the Court has no authority to determine any restitution

16    amount, and is limited by what the government has agreed to

17    in the plea agreement.

18             As I discussed earlier, the plea agreement

19    provides for a restitution judgment of $500, which this

20    Court will order pursuant to 18 U.S.C. Section 3663(a)(3).

21             Regarding the nature and circumstances of the

22    offense, I want to begin by correcting the view expressed in

23    codefendant Torrens' sentencing memo which this defendant

24    has adopted with the Court's permission.

25             In the codefendant's memo it states that, quote:

1    The courts sentence the offender, not the offense.

2    Ms. Shaner, I don't know if you actually agree with every

3    sentence in the motions you have adopted, but let me just

4    make clear that that statement makes a clever quip but is

5    fundamentally flawed.

6         While sentencing must be particularized to each

7    defendant, Congress has mandated that the court must

8    consider the nature and circumstances of the offense, as

9    well as ensure that the sentence imposed sufficiently

10   reflects the seriousness of the offense, promotes respect

11   for the law, and provides just punishment for the offense.

12        Among other relevant factors under Section

13   3553(a), these statutory directives make it a must that a

14   sentencing court consider far more than just the specific

15   history and characteristics of the individual defendant

16   standing before the Court.

17        At sentencing, the seriousness of the offense

18   conduct and the harm it caused must be considered.  Which

19   brings me to the statute of conviction here, the Class B

20   petty offense misdemeanor of parading, demonstrating, or

21   picketing in a Capitol Building, in violation of 40 U.S.C.

22   Section 5104(e)(2)(G).

23        As the government has conceded during our

24   questions, this is an offense that is more typically charged

25   against nonviolent protesters who may attempt to interrupt a

1        congressional hearing, who get off with a $50 ticket,

2        never -- some of them never even appearing in court; but

3        this is the charge the government chose to resolve this

4        case.  But though this offense is classified as a "petty

5        offense," the nature and circumstances of the offense

6        conduct on January 6th are far more serious than its petty

7        offense status would suggest.

8              Among the consequences of the government's choice

9        to resolve this case with a Class B misdemeanor petty

10       offense is that the government has essentially tied the

11       sentencing judge's hands on restitution, has essentially

12       tied the judge's hands on clear sentencing options that are

13       normally available to the Court in dealing with federal

14       felony offenses or even Class A misdemeanors.

15             So what does the government say about the offense

16       conduct in this case?  I have already repeated -- I won't

17       repeat entirely all of the scorching language the government

18       uses to describe the Capitol attack on January 6th:

19       Chaotic, dangerous, attack on democracy, criminal offense

20       unparalleled in American history, representing a grave

21       threat to our democratic norms; frankly -- truthfully, one

22       of the only times in our history when the Capitol Building

23       was literally occupied by hostile participants; blatant,

24       appalling disregard for our institutions of government;

25       orderly administration of the democratic process; and then,

1     as I pointed out in the questioning, the government goes on

2     in its sentencing memo to call the defendant and others in

3     the mob who entered -- not just went through the security

4     perimeter outside the Capitol Building, but went further.

5     They went into the Capitol Building as trespassers engaged

6     in picketing, parading, and demonstrating in the Capitol

7     that turned disorderly.

8              This is a muddled approach by the government.  And

9     no wonder, in the same sentencing memo that the government

10    has presented in this case and in many others, that it calls

11    people who entered the Capitol trespassers at the same time

12    it's using this scorching strong language to describe what

13    happened -- no wonder parts of the public in the

14    United States are confused about whether what happened on

15    January 6th at the Capitol was simply a petty offense of

16    trespassing with some disorderliness or shocking criminal

17    conduct that represented a grave threat to our democratic

18    norms.  No wonder.

19             Having watched every video submitted by the

20    government in connection with charges brought against

21    multiple defendants, in connection with January 6th, and all

22    of the cases presented to me, let me make my view clear.

23             The rioters attacking the Capitol on January 6th

24    were not mere trespassers engaging in protected First

25    Amendment conduct or protest; they were not merely

1    disorderly.  As countless videos show, the mob that attacked

2    the Capitol was violent.  Everyone participating in the mob

3    contributed to that violence.  To his credit, Mr. Griffith

4    appears to recognize that fact.

5              Isn't that right, Mr. Griffith?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  By their sheer numbers, their

8    intentional focus on getting inside the Capitol Building --

9    Mr. Griffith didn't, but others used physical force,

10   chemical sprays, any type of object they could get their

11   hands on or brought, to push past police lines, through

12   smashed doors and windows, with alarms blaring in the

13   background; tear gas being circulated both by the mob and by

14   law enforcement trying to defend the Capitol.

15             And the results were pretty dire for the people

16   inside -- I mean, the Vice President, members of Congress

17   being evacuated, staffers hiding under desks behind locked

18   doors -- because they were terrorized.

19             This caused significant damage to our faith that

20   no matter our political party or views about what is best

21   for this country that we, as Americans, believe in the

22   constitutional process of a peaceful transition of power

23   after an election.  The damage to the reputation of our

24   democracy which is usually held up around the world -- but

25   that reputation suffered because of January 6th.

1            But I go back to this defendant's own words; he

2    posted them on Facebook on January 12th, after January 6th,

3    where he said he helped storm the Capitol; he proudly said

4    that.  He tried to "stop the steal" by forcing lawmakers to

5    do the right thing, in his view.  And then, even after he

6    was arrested in July 2021, Mr. Griffith posted a video on

7    TikTok in which he stated:  We know they stole the election,

8    but we are going to take our country back.  Those are

9    beginning to be fighting words that's chilling to those of

10   us who watched unfold the Capitol attack on January 6th.

11           This was plainly this defendant's mindset on

12   January 6th when he stormed the Capitol to interfere with

13   the democratic process and prevent the peaceful transition

14   of power on that day.  In his own words, he said:  It felt

15   like a giant party.

16           Mr. Griffith says he grew up as a military brat

17   which gave him the privilege of traveling around the world,

18   and he says this experience showed him that the freedoms he

19   has here do not exist everywhere in the world; and he also

20   says that he has an abiding love for this country.

21           Well, Mr. Griffith, I am an army brat too.  And I

22   have to say it has been a privilege living on military bases

23   around the world; and I do find your words so difficult to

24   reconcile with your actions on January 6th.  I mean, it's

25   just inconceivable to me that an army brat would participate

1    in that.

2            You approached the Capitol as part of a mob.  You

3    saw the crowd attacking law enforcement.  You entered the

4    Capitol through a door that had been broken in; there was

5    broken glass; there were alarms blaring; and then you

6    celebrated those actions.  You smiled.  You took videos.

7    You screamed in excitement with your codefendant.  There are

8    photos of you showing your fist raised while inside the

9    Capitol and waving an American flag.  You did take advantage

10   that the opportunity the mob presented to overwhelm the

11   police lines and enter the Capitol -- this is no mere

12   trespass.  This is no mere peaceful or disorderly protest.

13   This facilitated a riot that did end up disrupting the

14   electoral count vote.

15           The circumstances and the nature of this offense

16   conduct and the need for the sentence to reflect the

17   seriousness of this offense conduct and promote respect for

18   the law is -- makes the government's recommendation of a

19   custodial sentence not unreasonable; but there are other

20   factors I have to consider too.

21           Regarding your history and your characteristics,

22   you have no criminal history.  You have earned your high

23   school diploma, as I have mentioned before.  You have taken

24   college courses.  You have a steady history of employment;

25   and you have a good job, it sounds like, now.

1      So it's hard to reconcile that also with enjoying

2    the fruits of life in America and to our democracy with an

3    embrace of specious theories that are being used to

4    delegitimize our country's democratic elections; and it's

5    those theories which led to your actions and the others --

6    members of the mob -- on January 6th.

7      And I just want to be clear, as Mr. Griffith said

8    actually quite articulately, this has nothing to do with

9    your own political beliefs or even if you still believe --

10    despite all of the evidence to the contrary -- that the 2020

11    presidential election was somehow stolen, to quote you.

12      You can believe what you want; you can say what

13    you believe.  But what you say, in the context of the

14    conduct on January 6th, also provides a window into your

15    mindset that day.  And given the fact that that mindset led

16    you to engage in criminal conduct on January 6th, it also

17    provides important clues to this Court as to the need for

18    general and specific deterrence to stop such criminal

19    conduct from occurring again.  And, for that, I do look at

20    everything that you have said to give me a clue as to your

21    mindset, starting with your comments on January 12th, two

22    weeks after the Capitol attack, lamenting the failure of the

23    mob to stop the peaceful transfer of power.

24      Even now, you know, in your letter to the Court

25    you say you stood on the steps outside the Capitol doors

1    thinking that you were participating in a peaceful protest

2    and you claim you didn't witness any serious violence or

3    injuries or any destruction; but the statement of facts, in

4    connection with the plea, indicates that you observed

5    members of the crowd attacking law enforcement repeatedly as

6    they tried to keep the crowd away from the building.

7           You entered the door that was broken, with glass

8    on the floor; you heard alarms blaring.  This is not an

9    impulsive act; you knew you were not supposed to be there.

10          You were chanting in one video, Exhibit 2, with

11   you and your codefendants milling around the Capitol stairs

12   and chanting while the cops deployed tear gas in the

13   background.

14          Another video I have already mentioned, Exhibit 3,

15   showing you smiling and waving as someone yells:  Help break

16   the doors.

17          Another video shows you entering the Capitol

18   Building through this door with the splintered and broken

19   glass.

20          You were not a good guy or a patriot on

21   January 6th.  I think -- what you have indicated in your

22   statement to me here today and in your letter to the

23   Court -- you recognize now that what you did was engage in

24   criminal conduct.

25          I was concerned when you posted a video blaming

1     the media for your actions, saying:  If it wasn't for the

2     fake media, mainstream media, denying all the evidence,

3     gaslighting us, people would not have even felt the need to

4     go down there, with myself included; suggesting -- that was

5     in a video, Exhibit 11 -- trying to blame somebody else,

6     other people, the media, for your actions on January 6th.

7              You are not a lemming, Mr. Griffith; you can think

8     for yourself.  You don't -- I mean, you have to be

9     accountable and take responsibility for your own actions.

10    Don't blame the media.

11              THE DEFENDANT:  I do, Your Honor.

12              THE COURT:  Some of these clues and windows into

13    the mindset of Mr. Griffith do raise a red flag about the

14    need for deterrence.

15              The defendant's sentencing memo paints him as

16    someone who was manipulated by others, particularly by

17    content on social media, saying he was a pawn.  One of the

18    vulnerable individuals identified and persuaded through the

19    internet that it was their patriotic duty to come to

20    Washington to support former President Trump; and the

21    defendant has clearly had a problem getting caught up in

22    conspiracy theories and extremist conduct.  But to call him

23    a "pawn," to my mind, minimizes the intentionality of his

24    conduct on January 6th and after January 6th where he was --

25    minimized his culpability and seemed to be proud of what had

1    happened or in his role in it on January 6th, and regretful

2    that it had not been more successful.  God forbid if it had

3    been more successful.

4         It is clear -- I think as the defendant says he

5    now understands -- that it is not a minor inconvenience to

6    law enforcement tasked with protecting the Capitol Building

7    to have a mob persist in jumping over barriers, removing

8    barriers, climbing, breaking doors to get in.

9         It's not a minor inconvenience for police officers

10   inside the Capitol Building to try and funnel the mob, angry

11   as it was, shouting -- not this defendant, but others --

12   treason.  Where are the members of Congress?  Where is the

13   Vice President?  It's not a minor inconvenience for the

14   Capitol Police to try and manage that mob and get them away

15   from members of Congress, the Vice President, and members of

16   the staff.  None of that was a minor inconvenience.

17        The need for the sentence imposed to deter

18   criminal behavior and protect the public from further crimes

19   of the defendant are critical considerations for every

20   sentencing judge.  And the seriousness of the criminal

21   conduct we witnessed on January 6th only highlights the need

22   for deterrence in the form of a sufficient sentence to deter

23   the defendant and others from engaging in this kind of

24   conduct in the future.  And it's hard to tell, Mr. Griffith,

25   whether your remorse expressed today is going to stick or

1    whether it is a serious moment because you are awaiting

2    sentencing.

3              THE DEFENDANT:  Your Honor, may I say something?

4              THE COURT:  Yes.

5              THE DEFENDANT:  I just wanted to say that I never

6    wanted it to be successful in that way.  I never wanted

7    it -- on that day -- even that day, what I thought was going

8    to happen was when one member of Congress and one member of

9    the Senate gets together and goes to four hours of debate;

10   that's what I thought was going to happen on that day.

11             I never even wanted anything violent to happen.  I

12   just wanted to say I never wanted that to be successful.  I

13   don't believe in that; that was not the right thing to do.

14             THE COURT:  But you understand that deterrence is

15   something that this Court has to be concerned about?

16             THE DEFENDANT:  I do, Your Honor.

17             THE COURT:  Deterrence that other people won't

18   think that every time the person they voted for in any

19   election, presidential or school board, doesn't win, that

20   they have recourse to gather in a mob to try and change the

21   course of that election.

22             Deterrence is so much more critically important

23   here because the peaceful transition of power, in every

24   election we have, is part of our social contract set up in

25   the structure of our Constitution, allowing for free and

1    fair elections; that's how we give elected officials a

2    legitimate mandate to exercise their authority over the rest

3    of us.

4            The January 6th mob, of which you were a part,

5    demanded a transfer of authority by force basically, even if

6    you personally didn't participate in force.

7            It is each branch's coequal responsibility to

8    safeguard the rights and liberties promised in our

9    Constitution.  And when determining what sentence to impose

10   here, the importance of deterring future malcontents from

11   attacking the legitimate structures and proceedings this

12   country has set up to protect those rights and liberties,

13   weighs heavily in this Court's considerations.

14           Regarding the types of sentences available, under

15   a petty offense Class B misdemeanor, you are subject to a

16   maximum term of imprisonment of six months.  There is no

17   supervised release available for petty offenses which are

18   defined in 18 U.S.C. Section 19, pursuant to 18 U.S.C.

19   Section 3583(b)(3); but you are subject to 5 years'

20   probation for a Class B misdemeanor, pursuant to 18 U.S.C.

21   Section 3561(c)(2).

22           The real question here that the government has

23   expressed its position to this Court on is that this Court

24   has available to it, under 18 U.S.C. Section 3561(a)(3), the

25   option of both a term of probation and a term of

1    incarceration.

2            But, as the government says, it hasn't offered

3    that position to any other judge on this Court; it hasn't

4    taken that position anywhere else in the country apparently,

5    other than in a Fourth Circuit case from a decade ago; and

6    it certainly hasn't taken that position in practice in all

7    of the Class B misdemeanor cases in this court where it has

8    offered -- recommended -- when it has recommended a prison

9    term; only the prison term, and no probationary period.

10   Quite an abnormal occurrence in a case where the government

11   is also seeking restitution; and it is the probation office

12   that normally, during a probationary supervised release

13   period, is responsible for monitoring compliance with that.

14   I am not sure how this Court would do that because I am not

15   a probation officer; I don't do what they do.

16           Nevertheless, the government has recommended a

17   term of three months' incarceration here for a defendant who

18   didn't physically harm anybody, who didn't physically damage

19   anything in the building, who was in the Capitol Building

20   about ten minutes --

21           Is that right, Mr. Griffith?

22           THE DEFENDANT:  Yes, ma'am.  It was a little bit

23   under --

24           THE COURT:  About ten minutes.

25           -- and when the government has, in other contexts,

1    only recommended a period of probation.

2              It is an important factor, in Section 3553(a)(6),

3    that the Court consider the need to avoid unwarranted

4    sentencing disparities.  And the government, while

5    recommending 3 months' incarceration here, says that there

6    are some differences in this case that make it different

7    from those cases where it has recommended a period of

8    probation, mostly because the defendant made statements

9    after January 6th.

10             I do think that the message should be clear, that

11   defendants who join a mob to aggressively breach police

12   lines and barriers to break into the Capitol, to stop the

13   Vice President and a joint session of Congress from doing

14   their constitutionally mandated duty of certifying a

15   presidential election, are not trespassers; they are

16   criminals.  But as with any criminal defendant, whether jail

17   time is warranted turns on a consideration of all of the

18   factors set out in Section 3553(a); and I do agree with the

19   government that a probationary sentence should not become

20   the default.  But at the same time, given the government's

21   prior recommendations of probation in circumstances with

22   defendants similarly situated, I am going to impose a

23   probationary sentence here.

24             So based on my consideration of these and other

25   factors, I will now state the sentence to be imposed.

1           Pursuant to the Sentencing Reform Act of 1984, and

2     in consideration of the provisions of 18 U.S.C. Section

3     3553, it is the judgment of the Court that you, Jack Jesse

4     Griffith, are hereby sentenced to a term of 36 months, which

5     is 3 years, of probation as to Count 5 of the indictment.

6           In addition, you are ordered to pay a special

7     assessment of $10 in accordance with 18 U.S.C. Section 3013.

8           While on supervision, you shall abide by the

9     following mandatory conditions, as well as the standard

10    conditions of supervision, which are imposed to establish

11    the basic expectations for your conduct while on

12    supervision.

13          The mandatory conditions include:  One, you must

14    not commit another federal, state, or local crime; two, you

15    must not unlawfully possess a controlled substance; three,

16    you must refrain from any unlawful use of a controlled

17    substance.  You must submit to one drug test within 15 days

18    of placement on supervision, and at least two periodic drug

19    tests thereafter as determined by the Court.  Four, you must

20    make restitution in accordance with your plea agreement in

21    18 U.S.C. Section 3663.

22          The Court authorities supervision and jurisdiction

23    of this case to be transferred to the U.S. District Court

24    for the Middle District of Tennessee.

25          You shall comply with the following special

1    conditions:  You are ordered to make restitution to the

2    Architect of the Capitol in the amount of $500.  The Court

3    determines you do not have the ability to pay interest and,

4    therefore, waives any interest or penalties that may accrue

5    on the balance.  You must pay the balance of any restitution

6    owed at a rate of no less than $25 each month.

7            You must pay the financial penalty in accordance

8    with the schedule of payments sheet of the judgment.  You

9    must also notify the Court of any changes in economic

10   circumstances that might affect the ability to pay this

11   financial penalty.

12           Having assessed the defendant's ability to pay,

13   payment of the total criminal monetary penalties is due as

14   follows:  Payment in equal monthly installments of $25 over

15   a period of 20 months to commence after the date of this

16   judgment, with payments suspended for the period that

17   defendant is in the custody of the Bureau of Prisons.

18           You must provide the probation officer access to

19   any requested financial information, and authorize the

20   release of any financial information until the restitution

21   obligation is paid in full.  The probation office may share

22   financial information with the U.S. Attorney's Office.  You

23   must not incur new credit charges or open additional lines

24   of credit without the approval of the probation officer.

25           You must submit your computers, as defined in

1   18 U.S.C. Section 1030(e)(1), or other electronic

2   communication or data storage devices or media, to a search.

3   You must warn any other people who use these computers or

4   devices capable of accessing the internet that the devices

5   may be subject to searches pursuant to this condition.  A

6   probation officer may conduct a search pursuant to this

7   condition only when reasonable suspicion exists that there

8   is a violation of a condition of supervision, and that the

9   computer or device contains evidence of this violation.  Any

10  search will be conducted at a reasonable time and in a

11  reasonable manner.

12          You must allow the probation officer to install

13  computer monitoring software on any computer, as defined in

14  18 U.S.C. Section 1030(e)(1), you use.  And to ensure

15  compliance with the computer monitoring condition, you must

16  allow the probation officer to conduct initial and periodic

17  unannounced searches of any computers, as defined in

18  18 U.S.C. Section 1030(e)(1), subject to computer

19  monitoring.

20          These searches shall be conducted to determine

21  whether the computer contains any prohibited data prior to

22  installation of the monitoring software, whether the

23  monitoring software is functioning effectively after its

24  installation, and whether there have been attempts to

25  circumvent the monitoring software after its installation.

1    You must warn any other people who use these computers that

2    the computers may be subject to searches pursuant to this

3    condition.

4              You should not access, view, or use any online

5    social media, chat services, blogs, instant messages, SMS,

6    MMS, digital photos, video sharing websites, emails, or

7    other interactive online or electronic communication

8    applications or sites without the approval of the probation

9    officer.

10             Restitution -- I am just looking for something here.

11             Restitution payments shall be made to the Clerk of

12   the Court for the United States District Court, District of

13   Columbia, for disbursement to the following victim:  Victim

14   name, Architect of the Capitol; amount of the loss, $500.

15   Send it to the Office of the Chief Financial Officer;

16   attention Kathy Sherrill, CPA --

17             I need to find something.

18             -- Ford House Office Building, Room H2-205B,

19   Washington, D.C. 20515.

20             The Court finds you do not have the ability to pay

21   a fine and, therefore, waives imposition of a fine in this

22   case.

23             The financial obligations are immediately payable

24   to the Clerk of the Court for the U.S. District Court, 333

25   Constitution Avenue, Northwest, Washington, D.C. 20001.

1          Within 30 days of any change of address, you shall

2     notify the Clerk of the Court of the change until such time

3     as the financial obligation is paid in full.

4          The probation office shall release the presentence

5     investigation report to all appropriate agencies, which

6     includes the U.S. Probation Office in the approved district

7     of residence in order to execute the sentence of the Court.

8     Treatment agencies shall return the presentence report to

9     the probation office upon the defendant's completion or

10    termination from treatment.

11         The defendant shall also be subject, as a special

12    condition of probation, to 90 days of home detention.  Under

13    all of the terms that are normally applicable to home

14    detention, he shall only leave his home -- I am trying to

15    find that document -- he shall only leave his home for

16    purposes of work, religious services, or medical services.

17         Pursuant to 18 U.S.C. Section 3742, you have a

18    right to appeal the sentence imposed by this Court if the

19    period of imprisonment is longer than the statutory maximum

20    or the sentence departs upward from the applicable

21    sentencing guideline range.  If you choose to appeal, you

22    must file any appeal within 14 days after the Court enters

23    judgment.

24         As defined in 28 U.S.C. Section 2255, you also

25    have the right to challenge the conviction entered or

1   sentence imposed if new and currently unavailable

2   information becomes available to you or on a claim that you

3   received ineffective assistance of counsel in entering a

4   plea of guilty to the offense of conviction, or in

5   connection with sentencing.  If you are unable to afford the

6   cost of an appeal, you may request permission from the Court

7   to file an appeal without cost to you.

8            Are there any objections to the sentence imposed

9   that are not already noted on the record from the

10  government?

11           MS. CARTER:  No, Your Honor.

12           THE COURT:  And for the defense?

13           MS. SHANER:  No, Your Honor.

14           THE COURT:  Okay.  You may be seated.

15           Does the government have a motion to dismiss open

16  counts of the indictment against this defendant?

17           MS. CARTER:  Yes, Your Honor.

18           With regard to counts -- I believe it's 2, 3, and

19  4, with regards to Mr. -- may I?

20           Court's indulgence.

21           THE COURT:  It is 2, 3, and 4.

22           MS. CARTER:  Yes, Your Honor.

23           With regards to Mr. Griffith, the government moves

24  to dismiss those --

25           THE COURT:  Okay.  That motion is granted.

1          All right.  Anything further today from the

2    government?

3          MS. CARTER:  No, Your Honor.  Thank you.

4          THE COURT:  Anything further?  Yes.

5          I know I did not use your formal language for the

6    location monitoring.  What would you like to correct?

7    Because I can't -- I couldn't find that document.

8          MR. WALTERS:  Typically, in a location monitoring

9    case, we would usually put the equipment on them directly

10   here immediately.  Because he is going to be going back to

11   Tennessee, I would just ask your permission to allow a

12   little leeway for them -- for him to get settled, to get his

13   officer there in Tennessee before the equipment is put on --

14         THE COURT:  Yes.

15         MR. WALTERS:  -- so it would probably be the first

16   of next week.

17         THE COURT:  Yes.  I am going to sign off on the

18   transfer order today, and so they'll take care of doing

19   that.

20         MR. WALTERS:  Thank you.  Yes, ma'am.

21         THE COURT:  All right.  Thank you.

22         If there is nothing further, you are all excused.

23         (Whereupon, the proceeding concludes, 1:29 p.m.)

24                         *  *  *  *  *

25

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 30th day of October, 2021.

/s/ Elizabeth Saint-Loth, RPR, FCRR

Official Court Reporter

## $

**$10** [1] - 84:7
**$13** [1] - 8:19
**$16** [1] - 8:22
**$2,000** [8] - 35:2, 35:6, 35:25, 36:8, 50:13, 50:14, 50:15, 50:23
**$25** [2] - 85:6, 85:14
**$300,000** [1] - 31:14
**$33** [1] - 30:25
**$50** [3] - 15:6, 15:24, 71:1
**$500** [19] - 30:2, 30:5, 30:8, 31:12, 31:18, 31:23, 34:2, 34:13, 34:19, 34:23, 35:21, 36:7, 37:5, 41:24, 45:3, 50:10, 69:19, 85:2, 87:14
**$520** [1] - 30:24
**$562** [2] - 31:6, 31:15
**$700** [1] - 35:17

## '

**'A'** [1] - 45:21

## /

**/s** [1] - 91:18

## 1

**1.5** [3] - 33:19, 34:16, 35:12
**100** [2] - 5:20, 63:2
**1030(e)(1** [3] - 86:1, 86:14, 86:18
**104** [2] - 5:22, 14:23
**106** [1] - 5:25
**109** [2] - 5:11, 19:13
**11** [2] - 8:15, 78:5
**110** [1] - 5:22
**111** [2] - 5:25, 35:4
**113** [1] - 5:22
**114** [1] - 5:25
**117** [1] - 5:12
**11:10** [1] - 1:5
**120** [1] - 60:5
**125** [2] - 5:23, 45:12
**126** [1] - 5:25
**12th** [2] - 74:2, 76:21
**13** [1] - 8:18
**14** [2] - 5:12, 88:22
**14th** [2] - 22:2, 22:23
**15** [1] - 84:17

**1512** [1] - 35:3
**16** [2] - 8:21
**1702** [1] - 1:20
**1752(a)(1** [1] - 29:5
**1752(a)(2** [1] - 29:6
**1776** [1] - 19:2
**18** [21] - 16:10, 23:22, 28:17, 29:5, 29:6, 29:13, 68:18, 69:2, 69:14, 69:20, 81:18, 81:20, 81:24, 84:2, 84:7, 84:21, 86:1, 86:14, 86:18, 88:17
**19** [1] - 81:18
**1982** [1] - 28:11
**1984** [1] - 84:1
**19th** [2] - 22:19, 22:22
**1:29** [1] - 90:23

## 2

**2** [3] - 77:10, 89:18, 89:21
**2,000** [1] - 35:14
**2,500** [1] - 35:14
**20** [1] - 85:15
**20-20** [1] - 3:22
**20001** [1] - 87:25
**20009** [1] - 1:20
**2015** [1] - 19:23
**202** [3] - 1:11, 1:14, 1:21
**2020** [3] - 57:14, 66:13, 76:10
**2021** [7] - 1:4, 22:2, 30:23, 74:6, 91:16
**20515** [1] - 87:19
**20530** [2] - 1:10, 1:14
**21** [2] - 16:15, 23:1
**21-204-04** [2] - 1:3, 2:3
**211** [1] - 1:17
**22** [1] - 13:13
**2255** [1] - 88:24
**226-9632** [1] - 1:18
**252-6741** [1] - 1:11
**265-8210** [1] - 1:21
**27th** [1] - 27:20
**28** [1] - 88:24
**28th** [2] - 22:2, 22:25
**29** [1] - 1:4

## 3

**3** [5] - 77:14, 83:5, 84:5, 89:18, 89:21
**30** [2] - 40:11, 88:1
**3013** [1] - 84:7
**30th** [2] - 30:23, 91:16

**313** [1] - 1:18
**333** [1] - 87:24
**3553** [1] - 84:3
**3553(a** [4] - 68:18, 69:2, 70:13, 83:18
**3553(a)(2)** [1] - 16:10
**3553(a)(6** [2] - 23:23, 83:2
**3561(a)(3** [3] - 39:9, 45:17, 81:24
**3561(c)(2)** [1] - 81:21
**3583(b)(3** [1] - 81:19
**36** [1] - 84:4
**3663** [2] - 69:14, 84:21
**3663(a** [1] - 69:14
**3663(a)(3** [1] - 28:16
**3663(a)(3)** [1] - 69:20
**3742** [1] - 88:17

## 4

**4** [7] - 21:1, 21:10, 21:11, 22:16, 23:2, 89:19, 89:21
**40** [9] - 8:17, 15:1, 15:20, 28:13, 28:25, 29:4, 43:8, 58:16, 70:21
**48226** [1] - 1:17
**4th** [1] - 1:10

## 5

**5** [2] - 81:19, 84:5
**50** [1] - 58:16
**5104(e)(2)(6** [1] - 28:13
**5104(e)(2)(G** [2] - 15:1, 15:20
**5104(e)(2)(G)** [1] - 70:22
**53** [1] - 8:15
**532-4991** [1] - 1:14
**555** [1] - 1:10
**5K3.1** [2] - 20:1, 20:5

## 6

**6** [5] - 19:14, 20:11, 27:10, 33:14, 50:1
**6-related** [1] - 21:3
**60** [1] - 8:17
**600** [2] - 31:10, 34:13
**67** [1] - 5:13
**6th** [50] - 11:3, 11:8, 11:15, 12:1, 13:10, 13:19, 24:7, 26:14, 31:9, 31:11, 32:3,

32:10, 34:4, 35:22, 38:25, 43:23, 51:24, 53:12, 54:20, 56:11, 56:15, 56:25, 57:5, 57:15, 57:19, 57:22, 58:1, 63:22, 67:23, 71:6, 71:18, 72:15, 72:21, 72:23, 73:25, 74:2, 74:10, 74:12, 74:24, 76:6, 76:14, 76:16, 77:21, 78:6, 78:24, 79:1, 79:21, 81:4, 83:9

## 8

**80** [1] - 8:17
**89** [1] - 5:8

## 9

**9** [1] - 31:3
**90** [2] - 5:8, 88:12
**92** [1] - 5:10
**93** [1] - 5:16
**94** [1] - 5:18
**94-1** [1] - 6:1
**94-2** [1] - 6:1
**950** [1] - 1:13

## A

**a)(3** [1] - 29:15
**a.m** [1] - 1:5
**abide** [1] - 84:8
**abiding** [1] - 74:20
**ability** [7] - 14:6, 26:2, 85:3, 85:10, 85:12, 87:20, 91:7
**able** [3] - 4:22, 16:23, 58:17
**abnormal** [1] - 82:10
**absolutely** [7] - 12:18, 14:10, 29:19, 34:17, 34:18, 50:5
**accept** [8] - 10:1, 22:20, 22:23, 23:1, 23:4, 57:9, 62:18, 65:14
**acceptable** [3] - 40:3, 40:8, 43:10
**acceptance** [1] - 22:3
**accepted** [3] - 22:2, 22:9, 23:19
**accepting** [1] - 57:18
**access** [4] - 3:18, 55:22, 85:18, 87:4
**accessing** [1] - 86:4

**accomplish** [1] - 14:6
**accordance** [3] - 84:7, 84:20, 85:7
**according** [3] - 45:20, 53:11, 53:13
**accountable** [4] - 35:5, 36:13, 36:18, 78:9
**accrue** [1] - 85:4
**accurate** [1] - 91:4
**accustomed** [1] - 68:6
**acknowledge** [5] - 10:13, 21:11, 23:14, 27:4, 48:17
**acknowledges** [3] - 19:15, 26:18, 27:7
**acknowledging** [2] - 21:14, 44:22
**Act** [7] - 28:11, 29:14, 30:22, 31:17, 36:14, 84:1
**act** [4] - 54:11, 58:17, 66:19, 77:9
**acted** [1] - 64:3
**acting** [3] - 13:21, 63:20, 65:17
**action** [1] - 57:5
**Action** [1] - 1:2
**actions** [15] - 16:17, 18:18, 54:23, 62:17, 63:10, 65:14, 66:25, 67:22, 67:23, 74:24, 75:6, 76:5, 78:1, 78:6, 78:9
**actively** [1] - 17:12
**activist** [1] - 53:4
**actors** [1] - 56:16
**acts** [4] - 58:19, 59:1, 59:5, 63:4
**actual** [3] - 14:9, 24:14, 30:10
**add** [1] - 51:18
**added** [1] - 65:24
**addiction** [1] - 53:9
**addition** [2] - 36:7, 84:6
**additional** [7] - 6:9, 27:15, 27:20, 30:11, 32:6, 59:22, 85:23
**address** [4] - 7:8, 31:22, 48:15, 88:1
**addressed** [1] - 45:24
**addresses** [1] - 27:20
**ADHD** [2] - 53:8, 53:10
**administration** [2] - 11:24, 71:25
**admit** [1] - 65:16
**admitted** [2] - 25:24, 54:22
**admittedly** [1] - 49:15

**adopted** [9] - 5:24, 14:23, 22:7, 39:10, 43:1, 45:13, 51:5, 69:24, 70:3
**adopting** [1] - 49:14
**advantage** [1] - 75:9
**advertise** [1] - 54:8
**advised** [1] - 58:20
**affect** [1] - 85:10
**afford** [1] - 89:5
**afraid** [1] - 59:25
**afternoon** [2] - 52:18, 52:19
**afterwards** [1] - 54:13
**agencies** [3] - 30:11, 88:5, 88:8
**aggravating** [2] - 13:16, 13:17
**aggressively** [1] - 83:11
**ago** [3] - 52:2, 54:7, 82:5
**agree** [8] - 9:9, 9:12, 27:11, 40:6, 42:25, 44:7, 70:2, 83:18
**agreed** [6] - 19:16, 28:13, 28:21, 30:2, 69:16
**agreement** [17] - 22:20, 22:23, 23:1, 28:16, 29:15, 29:16, 29:21, 33:18, 34:22, 34:25, 35:3, 41:24, 44:4, 44:5, 69:17, 69:18, 84:20
**agreements** [5] - 19:16, 20:11, 20:13, 30:1, 35:25
**agrees** [1] - 26:21
**ahead** [1] - 45:1
**aid** [1] - 31:5
**aided** [1] - 1:25
**air** [3] - 58:24, 60:8, 60:9
**Airbnb** [1] - 67:7
**alarms** [4] - 67:14, 73:12, 75:5, 77:8
**albeit** [1] - 48:9
**allow** [3] - 86:12, 86:16, 90:11
**allowable** [3] - 45:15, 51:12, 51:22
**allowed** [2] - 28:22, 38:12
**allowing** [1] - 80:25
**allows** [2] - 19:25, 28:16
**almost** [3] - 13:8, 21:6, 22:23
**alone** [1] - 31:6

**ALSO** [1] - 1:22
**Amendment** [1] - 72:25
**AMERICA** [1] - 1:2
**America** [2] - 2:3, 76:2
**American** [4] - 11:17, 12:12, 71:20, 75:9
**Americans** [1] - 73:21
**amount** [21] - 26:12, 27:11, 28:23, 29:9, 29:20, 30:6, 30:8, 31:13, 31:19, 34:23, 34:24, 35:23, 36:1, 36:6, 36:18, 50:8, 50:11, 69:10, 69:16, 85:2, 87:14
**amounts** [1] - 32:18
**analysis** [4] - 24:14, 48:10, 49:3, 49:17
**angry** [2] - 60:21, 79:10
**Anna** [3] - 25:13, 58:6, 61:6
**answer** [7] - 20:15, 31:22, 37:10, 37:11, 41:8, 56:2, 56:4
**antecedent** [2] - 47:2, 48:1
**Antifa** [1] - 54:5
**apart** [1] - 48:6
**apologize** [2] - 2:7, 65:25
**appalling** [2] - 11:22, 71:24
**appeal** [5] - 88:18, 88:21, 88:22, 89:6, 89:7
**Appeals** [1] - 48:10
**appear** [1] - 60:23
**appearance** [1] - 2:21
**APPEARANCES** [1] - 1:9
**appearing** [1] - 71:2
**appease** [1] - 63:21
**applicable** [2] - 88:13, 88:20
**applications** [1] - 87:8
**applied** [2] - 47:6, 48:3
**apply** [4] - 7:13, 7:16, 28:12, 47:1
**appreciate** [2] - 26:11, 49:8
**approach** [3] - 35:7, 38:21, 72:8
**approached** [1] - 75:2
**approaching** [1] - 12:22
**appropriate** [8] - 18:14, 37:25, 39:22,

51:7, 66:19, 66:21, 66:25, 88:5
**appropriated** [1] - 31:3
**appropriating** [1] - 30:21
**Appropriations** [2] - 30:22, 31:17
**approval** [2] - 85:24, 87:8
**approved** [1] - 88:6
**approximate** [3] - 31:23, 35:12, 35:19
**Architect** [3] - 33:19, 33:21, 33:23, 85:2, 87:14
**area** [2] - 32:25, 55:10
**argue** [1] - 32:17
**argues** [1] - 45:15
**arguing** [3] - 14:11, 45:14, 51:6
**argument** [12] - 43:17, 45:20, 45:24, 45:25, 46:1, 46:16, 47:1, 47:4, 47:5, 47:11, 47:21, 68:17
**arguments** [2] - 13:3, 45:11
**arising** [3] - 11:7, 26:14, 38:24
**army** [2] - 74:21, 74:25
**arrest** [2] - 57:13, 66:12
**arrested** [5] - 11:1, 31:11, 54:19, 56:24, 74:6
**arrogant** [1] - 65:17
**articles** [1] - 53:24
**articulate** [1] - 46:21
**articulated** [1] - 51:12
**articulately** [1] - 76:8
**articulating** [2] - 49:5, 51:4
**ashamed** [2] - 64:3, 66:4
**assault** [4] - 17:5, 21:5, 35:5, 36:16
**assaulting** [1] - 35:4
**assemble** [1] - 33:25
**assessed** [1] - 85:12
**assessment** [2] - 50:6, 84:7
**assistance** [1] - 89:3
**associated** [7] - 27:15, 28:3, 30:10, 32:3, 33:9, 33:13, 67:17
**assume** [1] - 58:6
**attached** [1] - 47:14
**attachment** [1] - 6:9
**attack** [20] - 11:2,

11:15, 11:16, 11:21, 12:18, 12:19, 13:19, 17:9, 30:25, 31:1, 31:3, 31:5, 31:9, 33:1, 56:22, 64:1, 71:18, 71:19, 74:10, 76:22
**attacked** [4] - 17:5, 25:3, 25:7, 73:1
**attacking** [5] - 17:13, 72:23, 75:3, 77:5, 81:11
**attempt** [3] - 18:2, 18:20, 70:25
**attempted** [1] - 65:24
**attempting** [1] - 21:18
**attempts** [1] - 86:24
**attention** [1] - 87:16
**attorney** [1] - 9:15
**Attorney** [4] - 20:2, 20:3, 20:10
**Attorney's** [2] - 15:22, 85:22
**audibly** [1] - 25:6
**authorities** [1] - 84:22
**authority** [9] - 26:15, 26:19, 29:8, 30:1, 37:3, 48:13, 69:15, 81:2, 81:5
**authorization** [1] - 91:11
**authorize** [1] - 85:19
**authorized** [3] - 20:2, 20:9, 26:13
**automotive** [2] - 8:24, 8:25
**available** [11] - 3:18, 10:21, 37:16, 56:1, 60:18, 69:5, 71:13, 81:14, 81:17, 81:24, 89:2
**Ave** [1] - 1:13
**Avenue** [1] - 87:25
**avoid** [2] - 69:5, 83:3
**awaiting** [1] - 80:1
**awarded** [1] - 49:23
**aware** [7] - 20:12, 20:17, 24:16, 25:19, 25:22, 36:10, 52:3

---
**B**
---

**background** [2] - 73:13, 77:13
**bad** [1] - 39:13
**baffling** [1] - 30:17
**balance** [2] - 56:17, 85:5
**bank** [1] - 55:18

**barely** [1] - 31:17
**barriers** [4] - 16:22, 79:7, 79:8, 83:12
**based** [5] - 25:20, 30:16, 53:7, 53:10, 83:24
**bases** [1] - 74:22
**basic** [1] - 84:11
**basis** [2] - 29:23, 37:24
**beat** [1] - 64:13
**become** [2] - 19:19, 83:19
**becomes** [1] - 89:2
**BEFORE** [1] - 1:7
**beg** [2] - 65:13, 68:1
**begin** [4] - 4:4, 6:17, 69:10, 69:22
**beginning** [5] - 13:24, 65:16, 65:17, 65:19, 74:9
**behalf** [3] - 2:13, 3:4, 5:18
**behaved** [1] - 66:20
**behavior** [8] - 14:9, 17:6, 56:12, 63:22, 64:4, 65:20, 67:17, 79:18
**behind** [2] - 49:14, 73:17
**belief** [1] - 37:24
**beliefs** [1] - 76:9
**below** [1] - 91:12
**bench** [1] - 51:14
**benefit** [2] - 21:16, 55:14
**benefited** [2] - 17:10, 25:25
**BERYL** [1] - 1:7
**best** [5] - 35:9, 35:19, 43:17, 73:20, 91:6
**betrayed** [1] - 60:21
**better** [1] - 4:13
**between** [6] - 8:17, 13:16, 17:25, 18:1, 35:13, 41:2
**beyond** [1] - 26:15
**big** [1] - 44:18
**biggest** [1] - 55:16
**bill** [1] - 32:9
**Bissey** [2] - 20:24, 22:22
**bit** [5] - 12:10, 19:21, 62:5, 65:17, 82:22
**blame** [4] - 58:5, 65:21, 78:5, 78:10
**blaming** [1] - 77:25
**blaring** [4] - 67:14, 73:12, 75:5, 77:8
**blatant** [2] - 11:22,

71:23
**blogs** [1] - 87:5
**board** [2] - 49:16,
80:19
**bodily** [1] - 28:3,
30:12, 36:16
**bomb** [3] - 33:6, 33:7,
59:25
**bond** [1] - 65:1
**book** [2] - 47:13, 55:24
**books** [7] - 57:24,
58:21, 59:7, 59:8,
59:22, 59:24, 60:4
**brainwashing** [1] -
59:20
**branch's** [1] - 81:7
**brat** [3] - 74:16, 74:21,
74:25
**breach** [1] - 83:11
**break** [4] - 48:6, 59:2,
77:15, 83:12
**breaking** [1] - 79:8
**brief** [9] - 11:14, 13:8,
30:9, 43:14, 45:12,
45:15, 45:20, 46:2,
46:22
**briefed** [1] - 10:10
**briefing** [8] - 10:20,
11:12, 20:6, 22:1,
24:18, 39:12, 43:1,
51:9
**briefings** [1] - 10:12
**briefly** [1] - 52:22
**briefs** [1] - 10:8
**bring** [2] - 15:22, 19:8
**brings** [1] - 70:19
**broadly** [1] - 19:8
**broke** [5] - 16:21,
16:22, 17:14, 27:22
**broken** [4] - 75:4,
75:5, 77:7, 77:18
**brought** [3] - 15:2,
72:20, 73:11
**bucket** [1] - 31:17
**Building** [22] - 11:19,
13:12, 13:20, 15:1,
15:19, 19:7, 21:6,
27:8, 27:12, 33:22,
35:11, 56:22, 70:21,
71:22, 72:4, 72:5,
73:8, 77:18, 79:6,
79:10, 82:19, 87:18
**building** [15] - 14:10,
16:22, 35:17, 55:4,
55:8, 62:11, 62:19,
62:20, 62:21, 63:11,
63:16, 67:2, 67:4,
77:6, 82:19
**Bureau** [1] - 85:17

# C

**calculate** [1] - 29:9
**calculating** [1] - 30:10
**calendar** [2] - 23:18
**calvary** [1] - 57:5
**canceled** [1] - 53:15
**canon** [1] - 45:23
**capable** [1] - 86:4
**Capitol** [63] - 11:2,
11:19, 13:11, 13:19,
13:20, 14:25, 15:8,
15:13, 15:19, 16:21,
19:7, 19:8, 19:10,
21:5, 27:8, 27:12,
27:16, 30:25, 31:1,
31:2, 31:4, 32:10,
33:1, 33:20, 33:21,
33:22, 33:23, 34:18,
35:11, 56:22, 57:6,
63:15, 63:16, 70:21,
71:18, 71:22, 72:4,
72:5, 72:6, 72:11,
72:15, 72:23, 73:2,
73:8, 73:14, 74:3,
74:10, 74:12, 75:2,
75:4, 75:9, 75:11,
76:22, 76:25, 77:11,
77:17, 79:6, 79:10,
79:14, 82:19, 83:12,
85:2, 87:14
**care** [1] - 90:18
**Carter** [2] - 2:13, 7:23
**CARTER** [34] - 1:9,
2:7, 2:12, 2:17, 2:19,
2:22, 2:25, 6:4, 8:2,
10:10, 12:8, 12:14,
13:25, 14:14, 14:17,
15:7, 16:1, 17:3,
17:23, 17:25, 18:10,
18:17, 20:12, 20:19,
21:13, 23:11, 24:13,
25:11, 25:16, 26:24,
89:11, 89:17, 89:22,
90:3
**Case** [1] - 2:3
**case** [56] - 2:21, 5:3,
5:22, 7:15, 9:16,
9:20, 10:4, 10:11,
10:24, 17:15, 19:23,
20:7, 21:25, 22:8,
23:5, 23:13, 25:10,
25:12, 25:23, 26:13,
27:18, 27:20, 27:21,
28:21, 30:3, 33:3,
33:4, 33:7, 36:12,
37:4, 38:3, 38:24,
39:19, 40:11, 43:1,
43:3, 43:21, 45:2,

45:9, 47:12, 47:13,
48:11, 49:21, 57:17,
68:13, 71:4, 71:9,
71:16, 72:10, 82:5,
82:10, 83:6, 84:23,
87:22, 90:9
**cases** [31] - 7:11, 13:5,
19:5, 19:17, 20:22,
20:23, 21:3, 21:22,
22:15, 22:18, 23:8,
23:13, 23:16, 23:21,
25:1, 25:18, 31:25,
32:17, 36:17, 38:22,
42:20, 47:3, 47:6,
48:14, 49:6, 51:24,
52:6, 72:22, 82:7,
83:7
**caught** [1] - 78:21
**caused** [4] - 32:14,
36:5, 70:18, 73:19
**causing** [1] - 36:1
**caveat** [1] - 44:20
**celebrated** [1] - 75:6
**celebration** [1] - 62:13
**cell** [1] - 68:2
**century** [1] - 51:16
**certain** [2] - 14:1, 24:9
**certainly** [10] - 24:20,
27:22, 28:5, 29:11,
30:19, 31:21, 34:8,
51:10, 61:6, 82:6
**CERTIFICATE** [1] -
91:1
**certificate** [1] - 91:9
**certify** [1] - 91:4
**certifying** [1] - 83:14
**cetera** [2] - 36:19,
64:23
**chain** [1] - 20:14
**challenge** [1] - 88:25
**challenging** [1] -
49:16
**change** [8] - 8:11, 9:7,
26:25, 46:15, 80:20,
88:1, 88:2
**changes** [1] - 85:9
**changing** [1] - 24:5
**chanting** [2] - 77:10,
77:12
**chaotic** [3] - 11:15,
67:17, 71:19
**characteristics** [5] -
12:24, 12:25, 69:4,
70:15, 75:21
**charge** [6] - 12:7,
14:24, 15:9, 15:23,
18:12, 71:3
**charged** [10] - 11:2,
15:18, 15:21, 28:20,
28:25, 29:2, 29:4,

29:5, 31:12, 70:24
**charges** [5] - 17:2,
17:8, 72:20, 85:23
**chat** [1] - 87:5
**chatter** [1] - 54:15
**cheering** [1] - 64:1
**Cheeto** [2] - 53:19,
54:17
**chemical** [1] - 73:10
**CHIEF** [1] - 1:8
**Chief** [1] - 87:15
**chilling** [1] - 74:9
**choice** [3] - 44:5, 49:3,
71:8
**choose** [1] - 88:21
**chose** [1] - 71:3
**circles** [1] - 49:11
**Circuit** [10] - 19:23,
20:7, 27:18, 39:10,
43:20, 43:21, 47:13,
52:7, 52:10, 82:5
**circuit** [3] - 43:4, 43:9,
49:13
**circulated** [1] - 73:13
**circumstance** [1] -
10:14
**circumstances** [7] -
69:3, 69:21, 70:8,
71:5, 75:15, 83:21,
85:10
**circumvent** [1] - 86:25
**citation** [2] - 19:2,
20:6
**cited** [1] - 47:12
**cites** [4] - 15:17,
19:22, 20:22, 48:14
**civic** [1] - 57:23
**claim** [2] - 77:2, 89:2
**clarity** [1] - 51:10
**Class** [22] - 15:2, 17:2,
24:6, 29:7, 41:16,
41:17, 41:21, 42:11,
42:20, 43:7, 44:5,
44:10, 45:15, 51:13,
51:17, 51:24, 70:19,
71:9, 71:14, 81:15,
81:20, 82:7
**classified** [1] - 71:4
**clean** [1] - 44:21
**clear** [16] - 20:8,
26:13, 27:17, 29:20,
33:16, 38:20, 46:10,
48:2, 49:20, 63:9,
70:4, 71:12, 72:22,
76:7, 79:4, 83:10
**clearer** [2] - 39:14,
39:19
**clearing** [1] - 17:11
**clearly** [3] - 32:10,
40:12, 78:21

**Clerk** [3] - 87:11,
87:24, 88:2
**clever** [1] - 70:4
**client** [2] - 8:4, 68:11
**clients** [4] - 59:20,
59:23, 60:13, 60:17
**climbing** [1] - 79:8
**close** [4] - 34:14,
34:15, 39:11, 67:5
**closely** [1] - 33:21
**cloud** [1] - 44:18
**clue** [1] - 76:20
**clues** [2] - 76:17,
78:12
**cluttered** [1] - 64:20
**Code** [1] - 15:10
**codefendant** [5] -
5:21, 17:21, 43:2,
69:23, 75:7
**codefendant's** [1] -
69:25
**codefendants** [2] -
14:22, 77:11
**codes** [1] - 54:21
**codified** [1] - 69:14
**coequal** [1] - 81:7
**cold** [1] - 68:1
**colleague** [1] - 26:25
**colleagues** [5] - 36:23,
41:5, 42:14, 42:17,
42:19
**collect** [1] - 34:10
**collection** [1] - 55:24
**college** [1] - 75:24
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 87:13
**combination** [1] - 42:8
**comfortable** [1] -
16:19
**coming** [1] - 57:6
**comma** [3] - 47:19,
47:20, 47:21
**commence** [1] - 85:15
**comments** [2] - 56:24,
76:21
**commit** [2] - 59:5,
84:14
**committed** [1] - 63:3
**committee** [1] - 60:15
**communication** [2] -
86:2, 87:7
**community** [8] -
36:21, 36:23, 55:12,
55:14, 56:20, 56:21,
60:5, 64:6
**compared** [1] - 31:15
**compelling** [1] - 16:12
**compensate** [1] -
30:24

**complete** [3] - 6:14, 63:9, 91:6

**completed** [2] - 54:7, 60:5

**completely** [2] - 63:23, 66:22

**completion** [1] - 88:9

**compliance** [6] - 36:24, 38:17, 44:16, 49:24, 82:13, 86:15

**comply** [2] - 68:20, 84:25

**components** [1] - 33:22

**computer** [7] - 1:25, 86:9, 86:13, 86:15, 86:18, 86:21

**computer-aided** [1] - 1:25

**computers** [5] - 85:25, 86:3, 86:17, 87:1, 87:2

**concede** [1] - 65:18

**conceded** [1] - 70:23

**concern** [2] - 16:8, 49:9

**concerned** [6] - 24:1, 39:4, 40:20, 49:1, 77:25, 80:15

**concerns** [3] - 41:11, 44:23, 56:4

**concludes** [1] - 90:23

**condition** [10] - 37:18, 37:19, 39:17, 45:6, 86:5, 86:7, 86:8, 86:15, 87:3, 88:12

**conditions** [4] - 84:9, 84:10, 84:13, 85:1

**conduct** [37] - 6:21, 12:1, 24:1, 24:7, 26:21, 26:23, 30:7, 32:21, 36:7, 41:19, 56:11, 56:15, 57:8, 57:14, 57:19, 57:25, 68:25, 69:8, 70:18, 71:6, 71:16, 72:17, 72:25, 75:16, 75:17, 76:14, 76:16, 76:19, 77:24, 78:22, 78:24, 79:21, 79:24, 84:11, 86:6, 86:16

**conducted** [2] - 86:10, 86:20

**conferences** [1] - 11:1

**confinement** [10] - 39:17, 39:22, 40:3, 40:8, 40:15, 40:18, 40:22, 40:24, 41:7, 45:6

**confirmed** [1] - 56:24

**confused** [2] - 15:14, 72:14

**Congress** [12] - 27:9, 30:21, 40:13, 48:2, 62:14, 68:18, 70:7, 73:16, 79:12, 79:15, 80:8, 83:13

**congressional** [3] - 15:3, 32:9, 71:1

**connection** [14] - 4:6, 5:5, 9:20, 10:8, 11:1, 11:2, 11:7, 31:11, 43:2, 43:23, 72:20, 72:21, 77:4, 89:5

**consequences** [3] - 16:18, 18:19, 71:8

**consider** [8] - 16:11, 23:23, 68:17, 69:3, 70:8, 70:14, 75:20, 83:3

**consideration** [3] - 83:17, 83:24, 84:2

**considerations** [2] - 79:19, 81:13

**considered** [7] - 16:10, 26:22, 40:18, 48:11, 54:5, 70:18, 91:9

**considering** [4] - 24:18, 41:15, 56:19, 68:14

**considers** [1] - 30:9

**consistent** [5] - 33:14, 39:9, 40:9, 40:13, 57:10

**consistently** [1] - 51:6

**conspiracy** [2] - 66:14, 78:22

**constant** [1] - 64:10

**constitutes** [1] - 91:4

**Constitution** [3] - 80:25, 81:9, 87:25

**constitutional** [1] - 73:22

**constitutionally** [2] - 12:19, 83:14

**constitutionally-mandated** [1] - 12:19

**construction** [1] - 46:17

**contacted** [1] - 58:10

**contained** [1] - 59:25

**contains** [2] - 86:9, 86:21

**content** [2] - 53:17, 78:17

**context** [2] - 14:18, 76:13

**contexts** [1] - 82:25

**continue** [2] - 33:20,
67:18

**continued** [1] - 18:23

**continuing** [3] - 32:2, 33:16, 66:12

**continuous** [3] - 40:24, 48:21, 48:22

**contract** [1] - 80:24

**contrary** [1] - 76:10

**contrast** [1] - 7:11

**contributed** [1] - 73:3

**control** [2] - 44:23, 61:3

**controlled** [2] - 84:15, 84:16

**conveying** [1] - 16:14

**convicted** [2] - 35:20, 35:24

**conviction** [6] - 29:23, 29:24, 69:13, 70:19, 88:25, 89:4

**cool** [1] - 54:16

**cooperative** [2] - 53:20, 54:20

**cops** [1] - 77:12

**correct** [23] - 8:1, 9:6, 15:6, 17:19, 25:11, 26:23, 27:3, 27:13, 28:2, 28:15, 28:23, 28:24, 29:1, 29:22, 34:17, 34:18, 39:8, 43:5, 44:8, 45:10, 50:25, 60:8, 90:6

**correcting** [1] - 69:22

**correction** [1] - 9:3

**cost** [6] - 27:22, 27:25, 30:18, 32:7, 89:6, 89:7

**costs** [12] - 27:14, 28:3, 30:12, 30:15, 31:6, 31:7, 32:3, 32:6, 32:8, 33:13, 33:17, 33:25

**counsel** [8] - 2:5, 6:24, 7:2, 7:7, 58:11, 58:20, 89:3

**count** [2] - 48:19, 75:14

**Count** [1] - 84:5

**countless** [1] - 73:1

**country** [8] - 12:21, 19:2, 66:5, 73:21, 74:8, 74:20, 81:12, 82:4

**country's** [1] - 76:4

**counts** [2] - 89:16, 89:18

**coup** [1] - 65:24

**couple** [2] - 34:20, 55:1

**course** [13] - 10:3,
16:6, 21:22, 29:25, 37:13, 37:17, 38:11, 43:13, 44:15, 63:18, 67:22, 69:12, 80:21

**courses** [1] - 75:24

**Court** [72] - 1:23, 1:24, 2:2, 2:12, 3:5, 3:6, 6:11, 7:9, 9:12, 10:1, 10:11, 10:15, 10:16, 10:21, 15:8, 15:24, 16:11, 20:14, 24:16, 25:4, 26:3, 28:22, 29:8, 31:22, 31:24, 32:5, 34:7, 37:13, 43:16, 48:10, 49:5, 52:23, 54:15, 55:11, 55:18, 56:2, 56:5, 59:11, 59:12, 64:24, 65:14, 69:15, 69:20, 70:16, 71:13, 76:17, 76:24, 77:23, 80:15, 81:23, 82:3, 82:14, 83:3, 84:3, 84:19, 84:22, 84:23, 85:2, 85:9, 87:12, 87:20, 87:24, 88:2, 88:7, 88:18, 88:22, 89:6, 91:19

**court** [19] - 3:6, 3:22, 3:25, 7:11, 20:4, 32:19, 32:23, 42:14, 52:4, 62:5, 68:7, 70:7, 70:14, 71:2, 82:7

**COURT** [135] - 1:1, 1:8, 2:9, 2:15, 2:18, 2:20, 2:23, 3:1, 3:7, 3:13, 4:11, 4:15, 4:18, 6:6, 6:12, 6:16, 7:19, 7:22, 8:3, 8:7, 8:13, 8:20, 8:22, 9:2, 9:5, 9:10, 9:13, 9:18, 9:24, 10:23, 12:9, 13:6, 14:12, 14:15, 14:21, 15:17, 16:3, 17:20, 17:24, 18:5, 18:11, 19:4, 20:17, 20:25, 21:21, 23:22, 25:9, 25:12, 26:10, 27:2, 27:6, 27:14, 27:22, 27:25, 28:3, 28:6, 28:9, 28:19, 29:3, 29:12, 29:19, 30:4, 30:20, 32:16, 34:15, 34:22, 36:20, 37:21, 38:2, 38:15, 38:24, 39:3, 39:21, 39:25, 40:2, 40:5, 40:7, 40:15, 41:14, 42:18, 42:25, 43:6, 44:2, 44:9, 44:25,

45:11, 46:8, 47:4, 47:17, 48:25, 49:20, 50:13, 50:15, 50:19, 50:22, 51:1, 51:21, 52:5, 52:14, 52:16, 52:19, 53:21, 53:23, 55:3, 55:7, 56:6, 56:10, 58:4, 58:8, 61:9, 61:15, 61:17, 62:4, 62:7, 62:24, 63:1, 66:8, 67:18, 68:3, 68:5, 68:10, 73:7, 78:12, 80:4, 80:14, 80:17, 82:24, 89:12, 89:14, 89:21, 89:25, 90:4, 90:14, 90:17, 90:21

**Court's** [5] - 5:24, 30:3, 69:24, 81:13, 89:20

**court-issued** [1] - 3:25

**COURTROOM** [1] - 2:2

**courts** [3] - 26:19, 33:15, 70:1

**coverage** [1] - 29:13

**covered** [2] - 28:17, 69:13

**COVID** [2] - 40:21, 44:23

**CPA** [1] - 87:16

**create** [1] - 55:18

**creating** [1] - 60:25

**creative** [1] - 53:16

**credentials** [1] - 4:1

**credit** [3] - 73:3, 85:23, 85:24

**cried** [1] - 58:22

**crime** [6] - 10:14, 18:3, 18:22, 36:14, 51:16, 84:14

**crimes** [2] - 68:25, 79:18

**Criminal** [2] - 1:2, 2:3

**criminal** [27] - 11:16, 12:1, 12:12, 12:23, 16:24, 17:1, 26:20, 26:21, 26:22, 38:3, 40:19, 41:18, 49:21, 50:2, 57:25, 68:24, 71:19, 72:16, 75:22, 76:16, 76:18, 77:24, 79:18, 79:20, 83:16, 85:13

**criminals** [1] - 83:16

**crippled** [1] - 63:19

**critical** [1] - 79:19

**critically** [1] - 80:22

**crowd** [4] - 17:12, 75:3, 77:5, 77:6

**crypt** [1] - 55:10
**culpability** [2] - 36:2, 78:25
**custodial** [1] - 75:19
**custody** [1] - 85:17
**cut** [1] - 59:9
**cuts** [1] - 45:21

# D

**D.C** [12] - 1:5, 15:9, 20:10, 47:13, 52:7, 52:10, 56:25, 57:4, 62:22, 67:8, 87:19, 87:25
**daily** [1] - 64:17
**damage** [10] - 17:4, 19:7, 21:5, 27:12, 30:11, 33:19, 36:15, 73:19, 73:23, 82:18
**damaged** [3] - 27:23, 36:5, 36:11
**damages** [1] - 30:7
**danger** [3] - 63:14, 66:6, 67:21
**dangerous** [3] - 11:15, 19:8, 71:19
**dark** [2] - 4:24, 44:18
**data** [2] - 86:2, 86:21
**date** [7] - 22:19, 22:22, 22:25, 32:20, 34:25, 35:1, 85:15
**Dated** [1] - 91:16
**days** [6] - 40:11, 54:19, 84:17, 88:1, 88:12, 88:22
**DC** [3] - 1:10, 1:14, 1:20
**deal** [4] - 22:12, 24:16, 41:17, 65:20
**dealing** [3] - 31:7, 46:12, 71:13
**deals** [1] - 48:17
**debate** [3] - 10:18, 62:16, 80:9
**decade** [2] - 52:2, 82:5
**decide** [1] - 7:12
**decided** [4] - 15:22, 35:18, 42:21, 48:11
**decision** [2] - 26:8, 26:9
**deemed** [1] - 4:2
**deep** [1] - 67:13
**default** [2] - 19:19, 83:20
**defend** [3] - 52:9, 52:13, 73:14
**Defendant** [1] - 1:5
**defendant** [38] - 5:18,

5:24, 6:1, 12:2, 17:4, 19:5, 21:23, 26:16, 33:7, 34:19, 36:5, 36:20, 36:25, 48:14, 50:3, 50:9, 50:11, 51:6, 53:1, 53:25, 56:23, 57:17, 69:11, 69:23, 70:7, 70:15, 72:2, 78:21, 79:4, 79:11, 79:19, 79:23, 82:17, 83:8, 83:16, 85:17, 88:11, 89:16
**DEFENDANT** [22] - 1:19, 7:18, 7:21, 8:21, 8:23, 9:17, 9:22, 61:20, 62:6, 62:9, 62:25, 63:2, 66:16, 67:19, 68:4, 68:8, 73:6, 78:11, 80:3, 80:5, 80:16, 82:22
**defendant's** [8] - 5:15, 14:22, 30:6, 74:1, 74:11, 78:15, 85:12, 88:9
**defendants** [30] - 11:1, 11:7, 12:15, 12:23, 19:14, 20:11, 21:3, 22:17, 23:2, 23:24, 24:3, 24:5, 24:10, 24:25, 25:13, 25:14, 26:20, 31:11, 34:14, 36:17, 50:1, 50:2, 50:7, 56:14, 57:22, 68:6, 69:6, 72:21, 83:11, 83:22
**defended** [2] - 42:16, 52:2
**defense** [3] - 6:6, 6:8, 89:12
**defense's** [2] - 47:4, 47:5
**define** [1] - 27:9
**defined** [6] - 19:8, 81:18, 85:25, 86:13, 86:17, 88:24
**degree** [2] - 57:3, 63:3
**degrees** [1] - 42:5
**delegitimize** [1] - 76:4
**deliberation** [1] - 52:12
**Delta** [1] - 29:2
**delve** [1] - 11:5
**demanded** [1] - 81:5
**demeanor** [2] - 53:6, 65:7
**democracy** [5] - 11:16, 12:19, 71:19, 73:24, 76:2
**democratic** [9] -

11:18, 11:24, 12:11, 16:17, 71:21, 71:25, 72:17, 74:13, 76:4
**democrats** [1] - 54:1
**demonstrated** [1] - 13:21
**demonstrating** [4] - 14:25, 15:19, 70:20, 72:6
**denial** [1] - 4:1
**denying** [1] - 78:2
**DEPARTMENT** [1] - 1:13
**department's** [1] - 68:16
**departs** [1] - 88:20
**departures** [1] - 20:1
**deployed** [1] - 77:12
**deployment** [1] - 27:15, 33:6
**depth** [2] - 24:17, 24:19
**DEPUTY** [1] - 2:2
**describe** [3] - 13:10, 71:18, 72:12
**described** [1] - 57:5
**describing** [1] - 42:6
**description** [1] - 57:9
**desks** [1] - 73:17
**despite** [5] - 12:3, 13:23, 39:5, 51:16, 76:10
**destruction** [2] - 14:3, 77:3
**detail** [1] - 33:4
**detention** [2] - 88:12, 88:14
**deter** [3] - 68:24, 79:17, 79:22
**determinations** [2] - 7:24, 8:9
**determine** [3] - 6:23, 69:15, 86:20
**determined** [1] - 84:19
**determiner** [5] - 45:19, 45:21, 46:15, 47:17, 47:18
**determines** [1] - 85:3
**determining** [1] - 81:9
**deterrence** [16] - 16:5, 16:6, 16:9, 16:12, 16:20, 16:25, 57:16, 76:18, 78:14, 79:22, 80:14, 80:17, 80:22
**deterring** [1] - 81:10
**Detroit** [1] - 1:17
**developed** [3] - 51:23, 51:25, 54:7
**developer** [1] - 64:23
**developing** [1] - 18:4

**device** [1] - 86:9
**devices** [3] - 86:2, 86:4
**died** [1] - 67:11
**diet** [1] - 41:18
**difference** [3] - 17:25, 18:1, 54:5
**differences** [3] - 24:2, 24:24, 83:6
**different** [20] - 6:21, 15:9, 15:12, 23:16, 34:1, 34:20, 45:18, 46:4, 46:9, 46:10, 46:23, 46:25, 47:3, 47:8, 47:9, 48:3, 48:6, 50:11, 54:3, 83:6
**difficult** [2] - 60:23, 74:23
**difficulties** [1] - 65:3
**digital** [1] - 87:6
**digressing** [1] - 65:4
**diploma** [1] - 75:23
**dire** [1] - 73:15
**direct** [1] - 63:9
**directions** [1] - 67:6
**directives** [1] - 70:13
**directly** [3] - 7:8, 61:18, 90:9
**disassembled** [1] - 91:10
**disavow** [1] - 63:2, 66:22
**disavowment** [1] - 63:10
**disbursement** [1] - 87:13
**disconnect** [1] - 12:10
**discourse** [1] - 66:22
**discretionary** [1] - 37:18
**discussed** [4] - 8:5, 49:12, 69:11, 69:18
**discussing** [1] - 55:13
**disgraceful** [1] - 64:2
**dismiss** [2] - 89:15, 89:24
**disorderliness** [1] - 72:16
**disorderly** [4] - 13:22, 72:7, 73:1, 75:12
**disparities** [3] - 23:24, 69:6, 83:4
**disposition** [2] - 20:2, 20:9
**disputing** [2] - 15:25, 16:1
**disregard** [2] - 11:22, 71:24
**disrupting** [1] - 75:13

**distinct** [1] - 48:21
**distinguish** [2] - 41:1, 63:5
**distinguished** [1] - 13:15
**distracting** [1] - 14:8
**distribute** [1] - 55:20
**distributor** [1] - 55:17
**district** [3] - 20:4, 41:10, 88:6
**District** [6] - 41:5, 84:23, 84:24, 87:12, 87:24
**DISTRICT** [3] - 1:1, 1:1, 1:8
**diversion** [1] - 15:15
**divide** [1] - 13:5
**docket** [2] - 6:13, 21:24
**docketed** [9] - 5:8, 5:10, 5:11, 5:13, 5:18, 5:22, 6:1, 14:23, 19:13
**docketing** [1] - 5:15
**Document** [1] - 45:12
**document** [2] - 88:15, 90:7
**documents** [4] - 5:3, 6:3, 6:7, 9:20
**DOJ** [1] - 1:16
**DOJ-USAO** [1] - 1:16
**done** [9] - 9:6, 17:4, 33:15, 34:8, 42:10, 43:15, 54:13, 54:23
**door** [4] - 17:14, 75:4, 77:7, 77:18
**doors** [6] - 16:22, 73:12, 73:18, 76:25, 77:16, 79:8
**down** [5] - 25:8, 62:4, 62:7, 62:24, 78:4
**downplay** [2] - 14:4, 57:25
**downward** [1] - 20:1
**dreams** [1] - 64:22
**drop** [1] - 31:17
**drug** [2] - 84:17, 84:18
**due** [5] - 4:8, 14:18, 51:15, 65:7, 85:13
**during** [7] - 15:13, 31:1, 40:19, 59:18, 69:12, 70:23, 82:12
**duty** [2] - 78:19, 83:14

# E

**e)(2)(D** [1] - 29:2
**E-filing** [1] - 5:15
**early** [12] - 20:2, 20:9,

20:11, 21:3, 21:7, 21:17, 21:23, 22:18, 23:7, 23:16, 23:17, 34:8
**early-plea** [1] - 23:7
**earned** [1] - 75:22
**easily** [2] - 4:23, 46:8
**easy** [1] - 68:6
**eat** [1] - 64:16
**ECF** [12] - 5:8, 5:10, 5:11, 5:12, 5:13, 5:16, 5:18, 5:20, 5:22, 5:25, 14:23, 19:13
**economic** [1] - 85:9
**education** [1] - 57:3
**educational** [1] - 59:8
**effect** [3] - 14:5, 14:6, 19:3
**effectively** [1] - 86:23
**efforts** [1] - 56:20
**Ehrke** [2] - 20:23, 22:25
**either** [7] - 9:25, 23:4, 36:13, 37:15, 45:4, 48:16, 52:4
**elected** [1] - 81:1
**election** [9] - 57:13, 66:13, 73:23, 74:7, 76:11, 80:19, 80:21, 80:24, 83:15
**elections** [2] - 76:4, 81:1
**electoral** [1] - 75:14
**electronic** [2] - 86:1, 87:7
**eligible** [1] - 26:23
**Elizabeth** [2] - 1:23, 91:18
**ELIZABETH** [1] - 91:3
**eloquently** [2] - 56:7, 56:10
**elsewhere** [3] - 49:13, 52:4
**Email** [4] - 1:11, 1:15, 1:18, 1:21
**emails** [1] - 87:6
**embrace** [1] - 76:3
**Emergency** [3] - 30:22, 31:15, 31:16
**employment** [2] - 8:12, 75:24
**encouraging** [1] - 14:8
**end** [4] - 15:16, 47:8, 47:14, 75:13
**ended** [1] - 59:9
**ends** [1] - 64:10
**enforcement** [12] - 27:15, 27:23, 28:6, 30:11, 30:13, 31:4,

31:8, 36:12, 73:14, 75:3, 77:5, 79:6
**engage** [6] - 19:7, 19:9, 21:4, 76:16, 77:23
**engaged** [3] - 13:16, 13:19, 72:5
**engaging** [2] - 72:24, 79:23
**enjoying** [1] - 76:1
**ensure** [8] - 34:10, 37:19, 44:14, 49:24, 50:4, 68:18, 70:9, 86:14
**ensures** [1] - 44:15
**ensuring** [1] - 38:16
**enter** [3] - 2:20, 14:10, 75:11
**entered** [9] - 29:9, 53:15, 62:20, 67:2, 72:3, 72:11, 75:3, 77:7, 88:25
**entering** [4] - 62:11, 62:18, 77:17, 89:3
**enters** [1] - 88:22
**entertainer** [1] - 64:22
**entertainment** [1] - 61:1
**entire** [2] - 48:8, 62:18
**entirely** [1] - 71:17
**entrepreneurial** [3] - 18:5, 18:7, 18:21
**entry** [1] - 4:1
**equal** [1] - 85:14
**equaled** [1] - 35:16
**equipment** [3] - 27:23, 90:9, 90:13
**equivalent** [1] - 15:9
**Eric** [1] - 5:21
**escorted** [1] - 15:4
**especially** [2] - 16:16, 61:4
**essentially** [7] - 15:16, 17:11, 21:17, 24:7, 35:7, 71:10, 71:11
**establish** [1] - 84:10
**estimate** [4] - 28:22, 29:9, 33:19, 34:7
**estimation** [1] - 34:8
**et** [2] - 36:19, 64:23
**evacuate** [1] - 33:8
**evacuated** [2] - 73:17
**event** [5] - 4:25, 12:23, 32:14, 43:24
**events** [4] - 27:10, 35:22, 36:3, 53:2
**everywhere** [2] - 43:21, 74:19
**eviction** [1] - 64:13
**evidence** [11] - 5:13,

9:19, 10:4, 25:2, 25:22, 25:25, 36:4, 36:9, 76:10, 78:2, 86:9
**evidenced** [1] - 57:12
**evolving** [2] - 24:4, 24:5
**ex** [1] - 65:19
**exactly** [1] - 54:22
**example** [1] - 24:24
**examples** [8] - 15:18, 15:21, 46:22
**except** [2] - 28:13, 28:21
**exception** [1] - 50:1
**excerpted** [1] - 13:23
**excerpts** [1] - 11:13
**excitement** [1] - 75:7
**excuse** [2] - 48:22, 50:19
**excused** [1] - 90:22
**excuses** [2] - 56:7, 56:11
**execute** [1] - 88:7
**exercise** [2] - 37:2, 81:2
**exert** [1] - 44:23
**Exhibit** [3] - 77:10, 77:14, 78:5
**exhibited** [1] - 53:1
**exist** [2] - 54:4, 74:19
**exists** [1] - 86:7
**expect** [1] - 52:8
**expectations** [1] - 84:11
**expense** [1] - 66:5
**experience** [2] - 66:11, 74:18
**experiences** [1] - 55:19
**explain** [8] - 7:9, 17:24, 18:15, 21:11, 31:18, 42:18, 59:14, 68:12
**explained** [1] - 38:19
**explaining** [1] - 6:18
**explains** [2] - 22:1, 43:12
**explanation** [2] - 26:12, 30:17
**explanations** [1] - 42:24
**exploring** [1] - 33:11
**expressed** [5] - 57:23, 60:13, 69:22, 79:25, 81:23
**extensively** [1] - 10:11
**extent** [2] - 28:13, 32:2
**extraordinarily** [1] - 12:7

**extreme** [1] - 62:10
**extremist** [2] - 64:20, 78:22
**exuberance** [1] - 53:7

**F**

**face** [1] - 62:17
**Facebook** [3] - 53:14, 67:9, 74:2
**facilitated** [1] - 75:13
**facilities** [1] - 40:21
**facing** [4] - 12:13, 17:8, 25:8, 34:19
**fact** [8] - 10:3, 16:9, 53:6, 53:18, 63:19, 63:25, 73:4, 76:15
**factor** [3] - 24:20, 24:21, 83:2
**factors** [9] - 13:16, 13:17, 19:17, 24:21, 68:17, 70:12, 75:20, 83:18, 83:25
**facts** [3] - 25:17, 25:19, 77:3
**factual** [8] - 6:25, 7:24, 8:8, 10:2, 10:17, 24:24, 30:9, 32:7
**failure** [1] - 76:22
**fair** [5] - 43:19, 49:10, 50:8, 62:2, 81:1
**Fairlamb** [1] - 35:2
**fairly** [5] - 10:10, 30:6, 30:18, 31:13, 31:19
**faith** [1] - 73:19
**fake** [1] - 78:2
**fall** [3] - 32:4, 32:11, 34:4
**fallen** [1] - 29:17
**falls** [1] - 29:13
**familiar** [1] - 15:11
**family** [1] - 65:12
**far** [5] - 15:7, 21:20, 59:19, 70:14, 71:6
**fast** [7] - 19:22, 19:24, 19:25, 20:8, 20:9, 20:18, 23:7
**fast-track** [7] - 19:22, 19:24, 19:25, 20:8, 20:9, 20:18, 23:7
**FBI** [5] - 53:11, 53:13, 54:20, 54:22, 60:14
**FCRR** [3] - 1:23, 91:3, 91:18
**fear** [1] - 63:19
**federal** [7] - 7:11, 15:23, 17:1, 17:5, 41:17, 71:13, 84:14

**federally** [1] - 15:23
**feeding** [1] - 59:16
**felonies** [2] - 42:11, 50:23
**felony** [3] - 17:8, 35:24, 71:14
**felt** [5] - 60:21, 65:3, 74:14, 78:3
**Feuer** [1] - 60:10
**few** [1] - 10:23
**fighting** [1] - 74:9
**figure** [2] - 31:23, 34:6
**figured** [2] - 35:10, 35:16
**file** [2] - 88:22, 89:7
**filed** [4] - 5:23, 43:2, 45:12, 56:3
**filing** [4] - 5:14, 5:15, 19:13, 48:15
**filings** [2] - 10:17, 37:12
**final** [1] - 34:6
**finally** [2] - 64:11, 67:25
**Financial** [1] - 87:15
**financial** [7] - 85:7, 85:11, 85:19, 85:20, 85:22, 87:23, 88:3
**findings** [1] - 10:3
**fine** [5] - 38:3, 38:7, 61:12, 87:21
**finished** [1] - 2:10
**first** [14] - 6:23, 7:7, 11:4, 20:21, 30:20, 32:1, 34:21, 35:2, 35:8, 38:9, 41:20, 43:4, 90:15
**First** [1] - 72:24
**fist** [1] - 75:8
**fits** [1] - 23:6
**flag** [2] - 75:9, 78:13
**flawed** [1] - 70:5
**flew** [1] - 62:17
**floor** [1] - 77:8
**Florida** [2] - 59:22, 60:4
**focus** [2] - 64:21, 73:8
**focused** [1] - 64:17
**fold** [1] - 34:4
**follow** [2] - 4:22, 58:25
**follow-ups** [1] - 58:25
**following** [4] - 32:25, 84:9, 84:25, 87:13
**follows** [1] - 85:14
**food** [5] - 55:15, 55:18, 55:19, 55:20, 55:21
**foods** [1] - 64:16
**footnote** [13] - 19:11, 19:15, 19:20, 21:1,

21:10, 21:11, 21:16, 21:19, 22:5, 22:16, 23:2, 23:10, 23:12
**FOR** [3] - 1:1, 1:9, 1:19
**forbid** [1] - 79:2
**force** [3] - 73:9, 81:5, 81:6
**forcing** [1] - 74:4
**Ford** [1] - 87:18
**foregoing** [1] - 91:4
**form** [2] - 37:14, 79:22
**formal** [1] - 19:25, 20:18, 90:5
**formed** [1] - 60:3
**former** [1] - 78:20
**Fort** [1] - 1:17
**forum** [1] - 59:11
**forums** [1] - 59:14
**forward** [4] - 2:5, 2:9, 34:1, 43:24
**four** [4] - 58:24, 62:16, 80:9, 84:19
**Fourth** [3] - 39:10, 43:20, 82:5
**fourth** [1] - 7:12
**FOX** [2] - 60:20, 60:23
**frankly** [2] - 41:3, 71:21
**free** [3] - 64:21, 80:25
**freedom** [1] - 64:25
**freedoms** [1] - 74:18
**friendly** [1] - 63:16
**front** [3] - 15:16, 46:3, 58:22
**fruits** [1] - 76:2
**full** [8] - 12:21, 38:8, 44:11, 46:6, 67:9, 85:21, 88:3, 91:5
**fully** [3] - 9:15, 41:11, 48:21
**fulsome** [1] - 49:4
**fulsomely** [1] - 49:14
**functioning** [1] - 86:23
**fundamental** [1] - 12:20
**fundamentally** [1] - 70:5
**funnel** [1] - 79:10
**future** [5] - 4:1, 16:15, 68:25, 79:24, 81:10

## G

**gained** [1] - 57:23
**Gallatin** [5] - 8:25, 55:17, 55:19, 55:23, 55:25
**game** [7] - 18:3, 53:18,

53:21, 53:23, 53:25, 54:2, 64:22
**games** [1] - 54:4
**Garner's** [1] - 47:13
**gas** [4] - 25:6, 67:14, 73:13, 77:12
**gaslighting** [1] - 78:3
**gather** [1] - 80:20
**general** [13] - 16:5, 16:12, 16:20, 16:25, 17:7, 23:21, 26:18, 28:9, 32:25, 48:16, 57:16, 69:13, 76:18
**General** [2] - 20:3, 20:10
**generally** [3] - 36:2, 36:24, 60:19
**gentleman's** [1] - 2:16
**genuine** [1] - 58:22
**giant** [1] - 74:15
**given** [8] - 6:10, 33:19, 36:4, 43:1, 43:20, 69:12, 76:15, 83:20
**glad** [1] - 66:6
**glass** [3] - 75:5, 77:7, 77:19
**gleeful** [1] - 64:1
**goals** [2] - 14:7, 64:18
**God** [2] - 64:14, 79:2
**Gonzalez** [2] - 19:24, 20:7
**goodbye** [1] - 65:19
**goodness** [2] - 52:20, 56:19
**GOVERNMENT** [1] - 1:9
**government** [103] - 5:10, 6:2, 6:4, 6:10, 6:24, 7:4, 7:7, 7:23, 10:9, 10:24, 11:9, 11:23, 12:3, 13:10, 13:14, 13:22, 14:16, 16:11, 16:19, 19:4, 19:11, 19:22, 20:7, 21:2, 21:7, 22:13, 22:17, 23:3, 24:8, 26:11, 26:16, 26:18, 26:21, 26:22, 27:4, 27:7, 28:21, 30:5, 31:13, 31:18, 32:17, 34:22, 34:24, 35:1, 37:4, 37:21, 38:4, 38:10, 38:15, 38:18, 38:24, 39:3, 41:23, 42:3, 42:9, 42:13, 42:15, 43:6, 43:15, 44:4, 45:2, 45:7, 45:24, 49:1, 49:6, 49:22, 49:23, 49:25, 51:3, 51:7, 51:11,

51:16, 52:1, 52:3, 52:6, 52:9, 57:15, 60:20, 61:25, 62:21, 69:11, 69:16, 70:23, 71:3, 71:10, 71:15, 71:17, 71:24, 72:1, 72:8, 72:9, 72:20, 81:22, 82:2, 82:10, 82:16, 82:25, 83:4, 83:19, 89:10, 89:15, 89:23, 90:2
**government's** [28] - 5:11, 5:13, 5:14, 5:21, 11:6, 11:12, 11:14, 13:7, 13:18, 16:4, 16:14, 18:12, 18:15, 19:10, 22:6, 23:7, 24:2, 24:10, 30:8, 30:17, 45:5, 45:25, 49:4, 51:21, 52:13, 71:8, 75:18, 83:20
**grant** [2] - 52:23, 55:11
**granted** [1] - 89:25
**grateful** [1] - 66:3
**grave** [4] - 11:17, 12:11, 71:20, 72:17
**gravity** [1] - 64:8
**great** [2] - 24:16, 66:12
**greater** [1] - 68:19
**greatest** [1] - 55:14
**grew** [1] - 74:16
**GRIFFITH** [1] - 1:4
**Griffith** [47] - 2:4, 3:4, 3:16, 5:20, 6:17, 8:7, 9:13, 13:2, 14:23, 17:9, 17:25, 22:9, 22:11, 22:14, 23:5, 23:9, 28:20, 36:9, 42:4, 45:14, 50:10, 53:4, 53:5, 53:20, 54:19, 55:13, 56:3, 60:17, 61:17, 62:5, 66:8, 68:5, 69:1, 69:4, 73:3, 73:5, 73:9, 74:6, 74:16, 74:21, 76:7, 78:7, 78:13, 79:24, 82:21, 84:4, 89:23
**Griffith's** [6] - 5:5, 18:2, 25:10, 33:18, 53:11, 56:11
**grocery** [1] - 55:16
**grounded** [1] - 65:5
**group** [2] - 26:1, 32:1
**grown** [1] - 66:7
**growth** [1] - 66:4
**Guard** [1] - 30:24

**guards** [1] - 47:15
**guess** [2] - 21:1, 46:20
**guideline** [3] - 20:1, 20:5, 88:21
**guidelines** [3] - 7:13, 7:14, 7:16
**guilty** [5] - 12:2, 23:25, 35:3, 69:7, 89:4
**guy** [1] - 77:20

## H

**H2-205B** [1] - 87:18
**half** [1] - 12:5
**hands** [7] - 29:20, 30:3, 44:3, 44:6, 71:11, 71:12, 73:11
**hard** [5] - 57:8, 57:18, 68:9, 76:1, 79:24
**harder** [1] - 47:21
**HARIRI** [1] - 1:16
**Hariri** [1] - 2:14
**hariri@usdoj.gov** [1] - 1:18
**harm** [3] - 19:6, 70:18, 82:18
**harmed** [1] - 17:14
**hate** [1] - 60:1
**headset** [1] - 4:9
**health** [2] - 41:11, 44:23
**healthy** [1] - 64:16
**hear** [5] - 7:6, 10:6, 25:6, 54:15, 55:5
**heard** [3] - 32:16, 67:14, 77:8
**hearing** [18] - 3:16, 3:20, 4:5, 4:8, 6:18, 6:20, 6:22, 7:6, 7:20, 9:25, 10:5, 15:4, 15:5, 41:6, 68:16, 69:12, 71:1
**hearings** [3] - 4:2, 5:1, 6:21
**HEATHER** [1] - 1:19
**heather** [1] - 3:4
**heavily** [1] - 81:13
**held** [9] - 3:17, 3:23, 4:23, 35:5, 36:12, 36:18, 50:10, 50:12, 73:24
**help** [4] - 11:9, 42:18, 55:20, 77:15
**helped** [1] - 74:3
**helpful** [1] - 31:22
**hereby** [2] - 84:4, 91:3
**hhsesq@aol.com** [1] - 1:21
**hiding** [1] - 73:17

**high** [2] - 57:3, 75:22
**higher** [2] - 17:6, 57:3
**highlight** [1] - 24:25
**highlights** [1] - 79:21
**himself** [1] - 60:18
**history** [11] - 11:17, 11:19, 12:12, 40:10, 69:4, 70:15, 71:20, 71:22, 75:21, 75:22, 75:24
**holds** [1] - 27:19
**home** [4] - 88:12, 88:13, 88:14, 88:15
**honest** [1] - 41:23
**honestly** [1] - 62:10
**Honor** [59] - 2:7, 2:19, 2:22, 3:3, 3:11, 4:8, 4:17, 6:5, 6:8, 7:18, 7:21, 8:2, 8:6, 8:15, 8:23, 9:4, 9:9, 9:17, 9:23, 10:10, 12:8, 12:14, 17:23, 20:12, 20:19, 21:13, 24:22, 25:21, 26:24, 27:3, 34:2, 36:1, 51:20, 52:8, 52:11, 52:18, 55:5, 58:3, 61:16, 61:20, 61:24, 64:3, 66:3, 66:16, 67:1, 67:7, 67:13, 67:19, 67:20, 68:4, 73:6, 78:11, 80:3, 80:16, 89:11, 89:13, 89:17, 89:22, 90:3
**Honor's** [1] - 43:14
**HONORABLE** [1] - 1:7
**hope** [1] - 64:24
**hopefully** [1] - 38:8
**hopes** [1] - 64:22
**horrible** [2] - 54:4, 61:7
**hostile** [3] - 11:20, 59:19, 71:23
**hotel** [1] - 53:2
**hour** [5] - 8:18, 8:19, 8:21, 8:22, 64:12
**hours** [5] - 8:17, 60:5, 62:16, 80:9
**House** [1] - 87:18
**house** [1] - 60:15
**HOWELL** [1] - 1:7
**huge** [1] - 64:9
**human** [1] - 58:2
**humiliated** [1] - 60:21
**hundred** [1] - 31:8
**hurt** [1] - 67:12

## I

**idea** [4] - 61:5, 61:7, 67:9, 67:13
**identifiable** [2] - 27:8, 27:10
**identifiably** [1] - 47:9
**identified** [2] - 30:21, 78:18
**identify** [1] - 33:17
**identifying** [1] - 39:19
**illegally** [1] - 62:21
**immediately** [4] - 53:1, 59:12, 87:23, 90:10
**importance** [2] - 16:13, 81:10
**important** [4] - 26:7, 76:17, 80:22, 83:2
**impose** [9] - 7:10, 16:13, 26:15, 68:13, 68:19, 81:9, 83:22
**imposed** [14] - 38:3, 38:4, 38:12, 42:19, 50:24, 52:5, 68:22, 70:9, 79:17, 83:25, 84:10, 88:18, 89:1, 89:8
**imposition** [1] - 87:21
**impression** [2] - 43:4, 63:17
**imprisonment** [3] - 49:7, 81:16, 88:19
**improperly** [1] - 16:16
**improving** [1] - 64:18
**impulsive** [7] - 54:11, 56:12, 57:8, 57:9, 57:19, 63:23, 77:9
**impulsivity** [1] - 53:8
**inappropriate** [1] - 63:23
**incarceration** [14] - 16:13, 37:5, 37:24, 39:1, 44:12, 44:21, 45:3, 45:5, 48:23, 51:8, 61:25, 82:1, 82:17, 83:5
**incidents** [1] - 15:14
**include** [5] - 27:11, 27:14, 30:23, 68:21, 84:13
**included** [2] - 19:1, 78:4
**includes** [1] - 88:6
**including** [2] - 3:23, 3:25
**income** [1] - 32:20
**incompatible** [1] - 5:15

**inconceivable** [1] - 74:25
**inconvenience** [5] - 63:18, 79:5, 79:9, 79:13, 79:16
**increase** [1] - 31:2
**incredibly** [1] - 63:23
**incur** [1] - 85:23
**incurred** [1] - 30:11
**indicated** [2] - 55:22, 77:21
**indicates** [1] - 14:24, 77:4
**indicating** [1] - 4:22
**indictment** [3] - 28:20, 84:5, 89:16
**individual** [5] - 12:22, 31:25, 35:17, 60:23, 70:15
**individually** [1] - 25:18
**individuals** [7] - 24:18, 35:10, 35:20, 35:24, 55:21, 56:18, 78:18
**indulgence** [1] - 89:20
**ineffective** [1] - 89:3
**inflammatory** [1] - 19:1
**influence** [1] - 16:16
**information** [11] - 5:19, 9:6, 9:10, 25:21, 34:10, 35:10, 56:3, 85:19, 85:20, 85:22, 89:2
**informed** [2] - 41:5, 56:16
**Ingraham** [6] - 58:7, 58:12, 58:13, 58:16, 58:24, 59:13
**initial** [2] - 54:22, 86:16
**injuries** [2] - 28:4, 77:3
**injury** [4] - 30:12, 36:5, 36:11, 36:16
**inquire** [2] - 10:15, 20:15
**insertion** [2] - 45:21, 46:14
**inserts** [1] - 47:17
**inside** [10] - 21:15, 35:11, 62:21, 63:11, 63:15, 67:4, 73:8, 73:16, 75:8, 79:10
**insisting** [1] - 51:8
**inspires** [1] - 65:4
**Instagram** [1] - 53:14
**install** [1] - 86:12
**installation** [3] -

86:22, 86:24, 86:25
**installments** [1] - 85:14
**instance** [1] - 26:6
**instant** [1] - 87:5
**instead** [1] - 64:18
**institutions** [2] - 11:23, 71:24
**intend** [1] - 16:16
**intended** [1] - 48:2
**intentional** [3] - 56:16, 57:11, 73:8
**intentionality** [1] - 78:23
**intentionally** [1] - 57:4
**interaction** [1] - 15:7
**interactive** [1] - 87:7
**interest** [2] - 85:3, 85:4
**interested** [1] - 55:23, 60:24, 60:25
**interesting** [3] - 4:18, 4:24, 51:2
**interfere** [1] - 74:12
**intermittent** [11] - 39:16, 39:22, 40:3, 40:8, 40:14, 40:15, 40:17, 40:22, 41:7, 45:6, 48:19
**internal** [1] - 52:11
**internet** [5] - 53:9, 53:12, 54:4, 78:19, 86:4
**interrupt** [5] - 15:4, 21:21, 50:20, 66:8, 70:25
**intervals** [1] - 40:18
**interview** [3] - 25:23, 59:9, 60:11
**interviewed** [4] - 59:17, 60:12, 60:14
**interviews** [1] - 63:7
**invested** [1] - 54:9
**investigate** [1] - 32:2
**investigation** [10] - 5:6, 7:1, 7:25, 8:5, 9:8, 10:1, 24:11, 24:17, 68:15, 88:5
**investigative** [1] - 35:15
**involve** [1] - 52:11
**involved** [6] - 15:15, 17:6, 20:20, 20:24, 32:9, 38:16
**involves** [1] - 53:25
**involving** [1] - 32:17
**issue** [4] - 26:11, 42:21, 48:11, 49:3
**issued** [2] - 3:25, 28:12

**issues** [2] - 11:6, 30:9
**items** [1] - 5:14
**itself** [3] - 12:17, 24:15, 32:15

## J

**JACK** [1] - 1:4
**Jack** [5] - 2:4, 3:4, 3:16, 54:8, 84:3
**Jafari** [1] - 2:14
**Jafari-Hariri** [1] - 2:14
**JAFARY** [1] - 1:16
**JAFARY-HARIRI** [1] - 1:16
**jail** [8] - 23:9, 23:13, 23:15, 24:8, 40:17, 40:23, 41:25, 83:16
**jails** [1] - 40:20
**James** [3] - 2:14, 2:17, 2:18
**JAMES** [1] - 1:12
**james.pearce@ usdoj.gov** [1] - 1:15
**Jamie** [1] - 2:13
**JAMIE** [1] - 1:9
**jamie.carter@usdoj. gov** [1] - 1:11
**January** [58] - 11:3, 11:8, 11:15, 12:1, 13:10, 13:19, 19:14, 20:11, 21:3, 24:7, 26:14, 27:10, 31:9, 31:11, 32:3, 32:10, 33:14, 34:4, 35:22, 38:25, 43:23, 50:1, 51:24, 53:12, 54:20, 56:11, 56:15, 56:25, 57:5, 57:15, 57:19, 57:22, 58:1, 63:22, 67:23, 71:6, 71:18, 72:15, 72:21, 72:23, 73:25, 74:2, 74:10, 74:12, 74:24, 76:6, 76:14, 76:16, 76:21, 77:21, 78:6, 78:24, 79:1, 79:21, 81:4, 83:9
**JD** [1] - 42:5
**Jesse** [4] - 2:4, 3:4, 3:16, 84:3
**JESSE** [1] - 1:4
**job** [4] - 8:16, 64:11, 75:25
**join** [1] - 83:11
**joined** [2] - 2:14, 29:15
**joint** [1] - 83:13
**judge** [6] - 4:3, 6:20,

16:9, 23:23, 79:20, 82:3
**Judge** [5] - 58:11, 58:14, 58:23, 61:11, 61:13
**JUDGE** [1] - 1:8
**judge's** [2] - 71:11, 71:12
**judges** [3] - 26:14, 41:17, 58:1
**judgment** [5] - 69:19, 84:3, 85:8, 85:16, 88:23
**July** [6] - 22:2, 30:23, 54:8, 54:12, 74:6
**jump** [1] - 45:1
**jumping** [1] - 79:7
**June** [2] - 22:23, 23:1
**jurisdiction** [1] - 84:22
**jurors** [1] - 4:19
**JUSTICE** [1] - 1:13
**justice** [1] - 40:19

## K

**Kathy** [1] - 87:16
**keep** [4] - 3:1, 4:23, 64:24, 77:6
**keeping** [1] - 40:20
**keeps** [1] - 65:5
**killed** [1] - 67:11
**kind** [5] - 24:23, 32:25, 34:12, 65:6, 79:23
**kinds** [4] - 19:17, 41:11, 47:3, 47:6
**knowledge** [2] - 25:19, 33:4
**known** [3] - 64:5, 65:10, 67:15
**knows** [1] - 52:11

## L

**lack** [6] - 18:17, 18:18, 18:23, 51:10, 59:10
**laid** [1] - 43:13
**Lamberth** [5] - 58:12, 58:14, 58:23, 61:11, 61:13
**lamenting** [1] - 76:22
**language** [12] - 11:12, 11:25, 12:4, 12:17, 15:13, 19:1, 36:1, 39:9, 46:3, 71:17, 72:12, 90:5
**larger** [6] - 12:23, 14:18, 18:21, 23:20, 24:14, 26:1

**last** [7] - 4:23, 5:23, 7:9, 45:13, 47:2, 48:1, 48:15
**lastly** [1] - 7:8
**Laura** [6] - 58:7, 58:12, 58:13, 58:16, 58:24, 59:13
**law** [21] - 11:21, 27:15, 27:20, 27:23, 28:6, 30:11, 30:13, 30:23, 31:4, 31:8, 33:15, 36:12, 40:11, 43:9, 68:23, 70:11, 73:14, 75:3, 75:18, 77:5, 79:6
**lawmakers** [1] - 74:4
**lay** [1] - 13:3
**leading** [1] - 14:1
**learn** [1] - 65:18
**learned** [9] - 58:18, 58:19, 65:15, 66:2, 66:3, 66:6, 66:9, 66:10, 66:15
**least** [5] - 27:18, 27:21, 29:17, 64:17, 84:18
**leave** [2] - 88:14, 88:15
**led** [2] - 76:5, 76:15
**leeway** [1] - 90:12
**left** [2] - 25:8, 54:6
**legal** [8] - 11:6, 30:9, 37:10, 39:22, 41:2, 41:10, 42:5, 44:18
**legality** [1] - 39:4
**legally** [5] - 33:12, 37:11, 39:20, 40:2, 40:8, 42:21, 43:16
**legislative** [1] - 40:10
**legitimate** [3] - 41:12, 81:2, 81:11
**lemming** [1] - 78:7
**length** [1] - 38:5
**less** [4] - 13:17, 27:17, 60:24, 85:6
**lessons** [7] - 65:15, 66:2, 66:3, 66:6, 66:9, 66:10, 66:15
**letter** [7] - 58:11, 59:12, 61:13, 61:22, 61:24, 76:24, 77:22
**letters** [1] - 6:1
**letting** [1] - 16:20
**level** [3] - 24:19, 67:9, 67:15
**levels** [1] - 17:6
**liability** [1] - 16:24
**liberties** [2] - 81:8, 81:12
**librarian** [4] - 59:21,

59:23, 60:2, 60:4
**libraries** [1] - 55:23
**lie** [1] - 66:13
**lies** [1] - 18:2
**life** [4] - 64:15, 65:1, 66:1, 76:2
**likely** [2] - 34:1, 34:4
**limited** [2] - 55:22, 69:16
**line** [5] - 3:18, 3:21, 17:13, 25:2, 25:7
**lines** [5] - 13:11, 73:11, 75:11, 83:12, 85:23
**lips** [1] - 4:22
**list** [1] - 47:14
**listed** [3] - 5:12, 19:18, 32:8
**listen** [1] - 3:19
**listening** [1] - 3:20
**listens** [1] - 54:15
**literacy** [1] - 57:23
**literally** [2] - 11:19, 71:23
**litigation** [1] - 44:1
**living** [1] - 74:22
**Lloyd** [9] - 20:23, 22:19, 25:13, 58:6, 59:23, 59:24, 60:15, 60:19, 61:7
**local** [2] - 31:4, 84:14
**location** [2] - 90:6, 90:8
**locked** [1] - 73:17
**logistical** [3] - 39:15, 40:25, 44:24
**lonely** [1] - 68:1
**look** [8] - 12:24, 21:24, 22:15, 33:25, 44:2, 45:11, 64:15, 76:19
**looked** [5] - 4:6, 5:2, 10:4, 42:21, 43:15
**looking** [8] - 13:2, 24:23, 30:20, 43:24, 49:15, 63:18, 87:10
**looks** [1] - 50:11
**lose** [2] - 47:25, 52:10
**losing** [2] - 32:20, 64:11
**loss** [3] - 31:19, 32:20, 87:14
**losses** [1] - 30:10
**lost** [1] - 33:9
**LOTH** [1] - 91:3
**Loth** [2] - 1:23, 91:18
**loudly** [1] - 4:16
**love** [2] - 65:1, 74:20
**low** [1] - 54:13
**lucky** [1] - 11:9

**M**

**ma'am** [6] - 9:22, 62:9, 62:25, 68:8, 82:22, 90:20
**machine** [1] - 1:25
**mail** [1] - 60:1
**mainstream** [1] - 78:2
**major** [1] - 16:7
**malcontents** [1] - 81:10
**manage** [1] - 79:14
**mandate** [1] - 81:2
**mandated** [3] - 12:19, 70:7, 83:14
**Mandatory** [2] - 28:11, 36:13
**mandatory** [3] - 37:18, 84:9, 84:13
**manipulated** [1] - 78:16
**manner** [2] - 86:11, 91:11
**March** [2] - 22:19, 22:22
**mark** [1] - 34:2
**mask** [5] - 3:1, 4:17, 4:20, 4:21, 4:24
**masking** [1] - 4:9
**materials** [1] - 4:5
**math** [2] - 31:10, 35:16
**matter** [11] - 2:2, 29:25, 33:15, 35:18, 35:21, 39:15, 40:25, 43:22, 48:12, 66:24, 73:20
**matured** [1] - 66:7
**maximum** [4] - 12:4, 34:24, 81:16, 88:19
**mean** [28] - 12:9, 15:17, 18:7, 21:22, 23:17, 24:9, 32:13, 38:22, 39:7, 39:12, 39:23, 40:6, 40:10, 41:3, 41:20, 43:13, 46:1, 46:19, 47:10, 47:22, 49:11, 49:15, 53:24, 56:7, 57:2, 73:16, 74:24, 78:8
**meaning** [2] - 42:4, 46:15
**means** [3] - 18:3, 24:1, 46:11
**meant** [2] - 23:12, 34:5
**media** [13] - 3:25, 59:16, 61:2, 61:4, 67:9, 78:1, 78:2,

78:6, 78:10, 78:17, 86:2, 87:5
**medical** [2] - 31:7, 88:16
**meet** [1] - 64:11
**member** [4] - 62:14, 80:8
**members** [8] - 13:18, 14:1, 73:16, 76:6, 77:5, 79:12, 79:15
**memo** [11] - 14:13, 14:15, 14:24, 16:4, 16:14, 22:6, 69:23, 69:25, 72:2, 72:9, 78:15
**memoranda** [2] - 5:17, 68:15
**memorandum** [5] - 5:9, 5:11, 5:22, 19:12, 38:1
**memos** [3] - 11:6, 14:22, 19:14
**mentioned** [6] - 22:15, 24:22, 33:3, 52:1, 75:23, 77:14
**mercy** [2] - 64:24, 65:13
**mere** [6] - 14:16, 14:18, 14:20, 72:24, 75:11, 75:12
**merely** [1] - 72:25
**message** [1] - 83:10
**messages** [1] - 87:5
**MI** [1] - 1:17
**Michele** [1] - 3:5
**mid** [1] - 33:20
**mid-May** [1] - 33:20
**Middle** [2] - 41:5, 84:24
**midnight** [3] - 5:23, 45:13, 51:9
**might** [5] - 42:18, 47:1, 56:2, 56:20, 85:10
**miles** [1] - 64:17
**military** [2] - 74:16, 74:22
**milling** [1] - 77:11
**million** [10] - 30:24, 30:25, 31:3, 31:6, 31:15, 31:23, 33:19, 34:2, 34:16, 35:12
**mind** [4] - 21:24, 61:10, 64:20, 78:23
**mindset** [8] - 56:25, 57:12, 57:14, 74:11, 76:15, 76:21, 78:13
**minimal** [2] - 17:1, 53:17
**minimized** [1] - 78:25

**minimizes** [1] - 78:23
**minor** [5] - 63:17, 79:5, 79:9, 79:13, 79:16
**minutes** [6] - 55:1, 55:4, 55:7, 55:10, 82:20, 82:24
**misdemeanor** [18] - 12:3, 15:2, 17:2, 17:8, 24:6, 35:20, 41:16, 41:22, 42:20, 43:8, 44:6, 44:10, 51:13, 70:20, 71:9, 81:15, 81:20, 82:7
**misdemeanors** [6] - 29:7, 41:18, 42:11, 45:15, 51:24, 71:14
**misquoted** [1] - 63:9
**missed** [1] - 5:4
**mistake** [1] - 63:11
**MITRA** [1] - 1:16
**Mitra** [1] - 2:14
**mitra.jafary** [1] - 1:18
**mitra.jafary-hariri@ usdoj.gov** [1] - 1:18
**MMS** [1] - 87:6
**mob** [17] - 13:19, 16:15, 56:22, 72:3, 73:1, 73:2, 73:13, 75:2, 75:10, 76:6, 76:23, 79:7, 79:10, 79:14, 80:20, 81:4, 83:11
**modi** [1] - 47:13
**modifier** [2] - 45:22, 45:23
**modifies** [3] - 45:18, 47:2, 48:8
**moment** [2] - 31:24, 80:1
**monetary** [1] - 85:13
**money** [3] - 30:21, 54:10, 54:11
**monitoring** [9] - 82:13, 86:13, 86:15, 86:19, 86:22, 86:23, 86:25, 90:6, 90:8
**monsters** [1] - 54:5
**month** [5] - 18:8, 40:16, 60:6, 60:7, 85:6
**monthly** [1] - 85:14
**months** [12] - 5:15, 17:18, 18:8, 22:14, 22:21, 22:24, 37:5, 39:25, 40:2, 64:10, 81:16, 84:4, 85:15
**months'** [2] - 82:17, 83:5
**Morgan** [3] - 20:23,

22:19, 25:13
**Morgan-Lloyd** [3] -
20:23, 22:19, 25:13
**morning** [7] - 2:12,
2:24, 2:25, 3:3, 3:11,
3:15, 6:10
**most** [7] - 7:11, 10:20,
16:12, 17:1, 21:17,
31:21, 65:10
**mostly** [1] - 83:8
**mother** [2] - 3:5, 56:1
**motion** [3] - 6:10,
89:15, 89:25
**motions** [1] - 70:3
**motivated** [1] - 57:14
**moves** [1] - 89:23
**moving** [1] - 34:1
**MR** [54] - 3:11, 27:3,
27:13, 27:17, 27:24,
28:1, 28:5, 28:8,
28:15, 28:24, 29:11,
29:13, 29:22, 30:19,
31:21, 32:22, 34:17,
35:1, 37:10, 37:23,
38:14, 38:20, 39:2,
39:7, 39:23, 40:1,
40:4, 40:6, 40:9,
40:25, 42:15, 42:23,
43:5, 43:11, 44:8,
44:20, 45:9, 46:1,
46:18, 47:5, 47:19,
49:10, 50:5, 50:14,
50:17, 50:21, 50:25,
51:20, 52:1, 52:8,
52:15, 90:8, 90:15,
90:20
**MS** [59] - 2:7, 2:12,
2:17, 2:19, 2:22,
2:25, 3:3, 4:8, 4:14,
4:17, 6:4, 6:8, 6:15,
8:2, 8:6, 8:10, 8:15,
8:25, 9:3, 9:9, 9:12,
10:10, 12:8, 12:14,
13:25, 14:14, 14:17,
15:7, 16:1, 17:3,
17:23, 17:25, 18:10,
18:17, 20:12, 20:19,
21:13, 23:11, 24:13,
25:11, 25:16, 26:24,
52:18, 52:22, 53:22,
54:3, 55:5, 55:9,
56:9, 58:3, 58:5,
58:10, 61:12, 61:16,
89:11, 89:13, 89:17,
89:22, 90:3
**muddled** [1] - 64:20
**muddled** [1] - 72:8
**multiple** [1] - 72:21
**multiples** [1] - 50:12
**musician** [1] - 64:22

**Mussolini** [2] - 53:19,
54:18
**must** [22] - 68:17,
69:2, 70:6, 70:7,
70:13, 70:18, 84:13,
84:15, 84:16, 84:17,
84:19, 85:5, 85:7,
85:9, 85:18, 85:23,
85:25, 86:3, 86:12,
86:15, 87:1, 88:22
**mutual** [1] - 31:4

**N**

**name** [3] - 2:16, 35:2,
87:14
**names** [1] - 2:6
**National** [1] - 30:24
**natural** [1] - 48:7
**nature** [6] - 10:14,
69:3, 69:21, 70:8,
71:5, 75:15
**necessarily** [7] -
20:20, 23:11, 24:19,
25:1, 34:6, 37:14,
38:21
**necessary** [4] - 4:2,
9:7, 31:2, 68:20
**need** [14] - 23:24,
33:8, 34:9, 68:21,
69:5, 69:8, 75:16,
76:17, 78:3, 78:14,
79:17, 79:21, 83:3,
87:17
**needed** [2] - 64:9, 65:6
**needs** [1] - 62:7
**negotiation** [1] - 21:23
**networks** [1] - 60:24
**never** [20] - 51:14,
53:12, 61:13, 62:10,
62:19, 62:20, 63:12,
64:7, 66:19, 66:21,
67:1, 67:16, 67:17,
67:21, 71:2, 80:5,
80:6, 80:11, 80:12
**nevertheless** [1] -
82:16
**new** [5] - 8:16, 43:8,
65:2, 85:23, 89:1
**New** [1] - 60:10
**newfound** [1] - 64:25
**news** [3] - 30:14,
30:16, 63:7
**News** [1] - 60:23
**next** [4] - 10:5, 47:12,
67:10, 90:16
**night** [5] - 5:23, 40:12,
45:13, 48:15, 51:9
**nights** [1] - 68:2

**nine** [2] - 13:4
**Ninth** [2] - 19:23, 20:7
**non** [1] - 50:7
**non-trustworthiness**
[1] - 50:7
**none** [4] - 38:18,
42:18, 56:16, 79:16
**nonetheless** [2] -
14:9, 17:20
**nonviolent** [3] - 15:3,
54:24, 70:25
**normal** [2] - 41:18,
44:15
**normally** [4] - 4:25,
71:13, 82:12, 88:13
**norms** [4] - 11:18,
12:11, 71:21, 72:18
**northwest** [1] - 25:5
**Northwest** [1] - 87:25
**not..** [1] - 56:9
**noted** [1] - 89:9
**notes** [1] - 91:5
**nothing** [4] - 41:25,
50:5, 76:8, 90:22
**notice** [1] - 5:14
**notify** [2] - 85:9, 88:2
**November** [2] - 53:5,
57:14
**null** [1] - 91:9
**number** [13] - 3:8,
10:25, 19:16, 32:8,
33:17, 33:22, 33:25,
35:13, 36:23, 55:3,
55:7, 56:24
**numbers** [1] - 73:7
**NW** [3] - 1:10, 1:13,
1:20

**O**

**object** [2] - 62:15,
73:10
**objection** [5] - 7:24,
8:8, 9:25, 18:20,
18:22
**objections** [3] - 6:24,
7:5, 89:8
**obligation** [2] - 85:21,
88:3
**obligations** [1] - 87:23
**observed** [1] - 77:4
**obsessed** [1] - 64:19
**obstruction** [1] - 35:3
**obviously** [1] - 35:10
**occupied** [2] - 11:19,
71:23
**occurred** [4] - 12:1,
16:1, 27:23, 61:14
**occurrence** [1] - 82:10

**occurring** [2] - 14:19,
76:19
**October** [2] - 1:4,
91:16
**OF** [4] - 1:1, 1:2, 1:7,
1:13
**offender** [1] - 70:1
**offenders** [1] - 15:5
**offense** [71] - 7:15,
11:16, 12:2, 12:7,
12:12, 12:13, 14:24,
15:2, 16:24, 17:2,
24:6, 28:19, 28:25,
30:7, 32:21, 38:13,
39:5, 41:17, 41:19,
41:21, 42:20, 43:7,
43:9, 44:10, 45:16,
45:18, 46:5, 46:7,
46:9, 46:10, 46:11,
46:12, 46:13, 46:24,
46:25, 47:3, 47:24,
47:25, 48:3, 48:4,
48:8, 48:24, 51:13,
51:17, 68:22, 68:24,
69:4, 69:9, 69:22,
70:1, 70:8, 70:10,
70:11, 70:17, 70:20,
70:24, 71:4, 71:5,
71:7, 71:10, 71:15,
71:19, 72:15, 75:15,
75:17, 81:15, 89:4
**offenses** [9] - 26:14,
28:12, 28:18, 42:12,
43:8, 49:8, 51:22,
71:14, 81:17
**offer** [6] - 22:3, 22:4,
22:9, 22:12, 23:19,
51:23
**offered** [5] - 22:1,
23:19, 24:10, 82:2,
82:8
**offering** [1] - 43:7
**offers** [2] - 23:4, 51:23
**Office** [5] - 15:22,
85:22, 87:15, 87:18,
88:6
**office** [11] - 7:1, 36:25,
37:2, 37:7, 38:7,
41:3, 44:15, 82:11,
85:21, 88:4, 88:9
**office's** [1] - 5:7
**Officer** [1] - 87:15
**officer** [17] - 2:5, 17:5,
17:9, 19:6, 21:5,
36:6, 36:12, 41:4,
82:15, 85:18, 85:24,
86:6, 86:12, 86:16,
87:9, 90:13
**officers** [7] - 25:2,
25:7, 28:7, 31:8,

36:18, 67:5, 79:9
**official** [1] - 91:19
**Official** [1] - 1:24
**officials** [1] - 81:1
**often** [2] - 15:2, 39:16
**Olson** [1] - 3:5
**one** [40] - 4:21, 6:9,
7:22, 8:11, 11:18,
14:21, 14:22, 16:7,
17:13, 17:15, 20:21,
24:20, 24:21, 24:24,
26:7, 26:8, 27:21,
28:21, 28:25, 29:4,
36:3, 37:12, 38:21,
40:13, 41:2, 42:19,
46:6, 46:20, 58:4,
62:13, 62:14, 71:21,
77:10, 78:17, 80:8,
84:13, 84:17
**online** [3] - 18:4, 87:4,
87:7
**open** [6] - 43:19,
43:21, 49:12, 59:24,
85:23, 89:15
**opened** [1] - 60:3
**opinion** [1] - 39:11
**opportunity** [6] - 7:2,
7:4, 11:5, 18:15,
61:18, 75:10
**opposed** [4] - 15:23,
47:18, 56:22, 57:10
**option** [2] - 44:19,
81:25
**options** [6] - 41:15,
41:21, 44:10, 44:12,
51:5, 71:12
**order** [6] - 26:20,
28:23, 37:13, 69:20,
88:7, 90:18
**Order** [1] - 3:22
**ordered** [4] - 36:21,
36:23, 84:6, 85:1
**ordering** [1] - 39:16
**orderly** [2] - 11:23,
71:25
**otherwise** [4] - 9:11,
28:17, 33:1, 36:16
**ourselves** [1] - 10:15
**outlet** [1] - 53:17
**outline** [1] - 61:22
**outnumbered** [1] -
63:20
**outside** [4] - 28:17,
32:11, 72:4, 76:25
**overarching** [2] -
23:18, 25:20
**overran** [1] - 16:21
**overtime** [1] - 64:10
**overwhelm** [1] - 75:10
**overwhelmed** [1] -

59:15
**overwhelming** [1] -
14:7
**owed** [4] - 31:14,
54:11, 69:10, 85:6
**own** [11] - 18:12,
33:24, 44:24, 48:20,
64:21, 67:8, 74:1,
74:14, 76:9, 78:9

## P

**p.m** [1] - 90:23
**packet** [1] - 59:24
**page** [4] - 8:15, 13:13,
16:15, 47:12
**pages** [1] - 61:10
**paid** [6] - 8:18, 29:10,
38:8, 60:6, 85:21,
88:3
**paints** [1] - 78:15
**panoply** [1] - 44:11
**papers** [3] - 5:1,
38:18, 39:6
**paraded** [1] - 13:21
**parading** [4] - 14:25,
15:18, 70:20, 72:6
**paragraph** [2] - 8:13,
8:15
**part** [16] - 10:5, 17:12,
20:25, 32:8, 34:13,
36:22, 41:24, 42:7,
44:17, 53:7, 56:22,
66:4, 75:2, 80:24,
81:4
**partially** [1] - 53:10
**participants** [3] -
11:20, 16:15, 71:23
**participate** [5] - 54:24,
58:25, 62:22, 74:25,
81:6
**participated** [3] -
12:23, 18:18, 63:24
**participating** [2] -
73:2, 77:1
**participation** [4] -
12:16, 12:25, 14:5,
35:22
**particular** [5] - 13:3,
17:17, 19:21, 20:23,
26:6
**particularized** [1] -
70:6
**particularly** [1] - 78:16
**parties** [6] - 10:6,
28:14, 28:16, 29:14,
30:2, 41:6
**partly** [1] - 66:5
**partners** [1] - 31:4

**parts** [1] - 72:13
**party** [3] - 73:20,
74:15, 91:11
**pass** [1] - 6:11
**passed** [2] - 32:9, 64:8
**past** [1] - 73:11
**patriot** [1] - 77:20
**patriotic** [1] - 78:19
**pawn** [2] - 78:17,
78:23
**pay** [12] - 26:20,
35:25, 36:21, 54:10,
64:13, 84:6, 85:3,
85:5, 85:7, 85:10,
85:12, 87:20
**payable** [1] - 87:23
**payment** [8] - 37:5,
37:13, 37:17, 38:10,
44:16, 50:4, 85:13,
85:14
**payments** [5] - 37:8,
49:25, 85:8, 85:16,
87:11
**pays** [1] - 64:12
**peaceful** [6] - 73:22,
74:13, 75:12, 76:23,
77:1, 80:23
**peacemaker** [1] -
65:12
**PEARCE** [51] - 1:12,
27:3, 27:13, 27:17,
27:24, 28:1, 28:5,
28:8, 28:15, 28:24,
29:11, 29:13, 29:22,
30:19, 31:21, 32:22,
34:17, 35:1, 37:10,
37:23, 38:14, 38:20,
39:2, 39:7, 39:23,
40:1, 40:4, 40:6,
40:9, 40:25, 42:15,
42:23, 43:5, 43:11,
44:8, 44:20, 45:9,
46:1, 46:18, 47:5,
47:19, 49:10, 50:5,
50:14, 50:17, 50:21,
50:25, 51:20, 52:1,
52:8, 52:15
**Pearce** [8] - 2:14,
2:17, 2:18, 2:20,
10:20, 27:2, 41:23,
51:19
**peculiar** [1] - 41:22
**penalties** [3] - 51:5,
85:4, 85:13
**penalty** [2] - 85:7,
85:11
**pending** [1] - 28:20
**Pennsylvania** [1] -
1:13
**people** [26] - 3:8, 4:15,

15:18, 17:11, 17:13,
17:15, 32:13, 33:8,
35:14, 40:22, 54:9,
62:13, 63:3, 65:25,
66:23, 67:6, 67:11,
67:12, 72:11, 73:15,
78:3, 78:6, 80:17,
86:3, 87:1
**per** [3] - 8:22, 35:17,
64:12
**percent** [1] - 63:2
**perception** [1] - 62:2
**perfect** [1] - 4:14
**perfectly** [1] - 42:23
**perform** [1] - 36:21
**perhaps** [3] - 27:9,
42:20, 50:9
**perimeter** [1] - 72:4
**period** [22] - 37:6,
42:1, 44:12, 44:13,
45:3, 45:4, 45:5,
49:7, 49:24, 50:3,
51:8, 52:24, 54:13,
57:25, 59:18, 82:9,
82:13, 83:1, 83:7,
85:15, 85:16, 88:19
**periodic** [2] - 84:18,
86:16
**permissible** [4] -
42:12, 43:17, 48:13,
48:23
**permission** [4] - 5:24,
69:24, 89:6, 90:11
**permitted** [1] - 55:18
**persist** [1] - 79:7
**person** [9] - 3:7, 3:17,
56:21, 57:1, 64:5,
65:10, 66:7, 67:20,
80:18
**person's** [1] - 12:24
**personal** [4] - 15:7,
30:13, 64:18, 66:4
**personality** [1] - 65:8
**personally** [9] - 19:6,
21:4, 54:24, 58:15,
59:3, 59:5, 63:24,
66:20, 81:6
**personnel** [2] - 30:12,
32:6
**persons** [1] - 3:19
**perspective** [1] -
40:23
**persuaded** [1] - 78:18
**petty** [40] - 7:15, 12:2,
12:7, 12:13, 14:24,
15:2, 16:24, 17:2,
24:6, 26:14, 28:12,
38:12, 39:4, 41:17,
41:21, 42:12, 42:20,
43:7, 44:5, 44:10,

45:16, 46:7, 46:9,
46:11, 46:12, 47:25,
48:3, 48:8, 48:23,
49:8, 51:12, 51:17,
51:22, 70:20, 71:4,
71:6, 71:9, 72:15,
81:15, 81:17
**phase** [1] - 35:8
**phone** [2] - 54:21
**photocopied** [1] -
91:10
**photos** [2] - 75:8, 87:6
**phrase** [7] - 45:16,
45:17, 45:19, 46:3,
46:23, 47:22, 48:8
**physical** [1] - 73:9
**physically** [4] - 19:6,
21:4, 82:18
**picketed** [1] - 13:21
**picketing** [4] - 14:25,
15:19, 70:21, 72:6
**pictures** [2] - 67:8,
67:16
**Pinterest** [1] - 53:15
**place** [3] - 23:20,
37:15, 67:6
**placement** [1] - 84:18
**places** [2] - 26:25,
55:15
**plain** [1] - 39:9
**plainly** [1] - 74:11
**plan** [4] - 43:6, 57:10,
62:18, 62:20
**planned** [1] - 62:10
**platform** [1] - 53:13
**plausible** [1] - 42:24
**play** [1] - 50:9
**played** [4] - 58:2,
58:12, 59:13, 60:7
**plea** [41] - 16:24,
18:24, 19:16, 20:11,
20:13, 20:21, 21:17,
21:23, 22:2, 22:3,
22:4, 22:9, 22:12,
22:19, 22:20, 22:22,
22:25, 23:4, 23:7,
23:19, 24:10, 24:14,
29:9, 29:15, 29:21,
30:1, 33:18, 34:22,
34:25, 35:3, 35:25,
41:24, 44:4, 44:5,
51:23, 53:15, 69:17,
69:18, 77:4, 84:20,
89:4
**plead** [1] - 28:22
**pleaded** [2] - 12:2,
35:3
**pleading** [1] - 21:22
**pleas** [5] - 10:25, 21:7,
21:15, 22:18, 23:20

**pled** [3] - 21:3, 21:16,
21:23
**plunged** [1] - 44:11
**plus** [1] - 40:12
**podium** [3] - 2:8, 2:10,
61:19
**point** [5] - 7:5, 19:15,
21:11, 21:12, 35:12
**pointed** [1] - 72:1
**points** [2] - 13:4, 62:1
**Police** [4] - 31:1,
63:15, 63:16, 79:14
**police** [11] - 13:11,
14:7, 16:21, 17:13,
19:6, 21:5, 67:5,
73:11, 75:11, 79:9,
83:11
**Police's** [1] - 31:4
**politely** [1] - 49:2
**political** [7] - 53:4,
53:13, 53:17, 56:16,
66:22, 73:20, 76:9
**politically** [1] - 56:17
**politics** [4] - 64:9,
64:19, 64:21, 65:6
**portion** [2] - 14:3, 26:1
**portions** [2] - 6:25,
10:2
**posed** [1] - 32:5
**poses** [2] - 32:7, 44:23
**position** [28] - 17:10,
18:12, 18:16, 24:5,
39:5, 39:7, 39:8,
39:10, 41:2, 42:3,
42:9, 42:13, 43:13,
49:5, 51:4, 51:11,
51:15, 51:21, 51:25,
52:2, 52:3, 52:7,
52:13, 81:23, 82:3,
82:4, 82:6
**positions** [2] - 43:25,
52:9
**positive** [4] - 45:22,
64:5, 65:10
**Posley** [4] - 39:11,
42:16, 48:11, 52:2
**possess** [1] - 84:15
**possibility** [2] - 33:5,
41:8
**possible** [3] - 33:12,
35:19, 46:21
**possibly** [2] - 34:2,
34:14
**post** [9] - 32:10,
33:14, 34:4, 45:22,
53:16, 53:17, 54:12,
66:12
**post-arrest** [1] - 66:12
**post-January** [3] -
32:10, 33:14, 34:4

**post-positive** [2] - 45:22
**posted** [5] - 53:3, 54:14, 74:2, 74:6, 77:25
**posting** [3] - 18:24, 18:25, 66:17
**posts** [1] - 19:1
**potential** [2] - 42:24, 43:25
**potentially** [1] - 37:18
**power** [5] - 12:20, 73:22, 74:14, 76:23, 80:23
**practical** [5] - 39:15, 40:25, 41:2, 41:11, 44:24
**practice** [1] - 82:6
**preceding** [1] - 45:19
**precisely** [2] - 32:7, 58:8
**prefer** [2] - 2:8, 4:20
**preferable** [1] - 40:24
**prepared** [2] - 7:1, 56:4
**preplanning** [1] - 19:9
**presence** [5] - 14:9, 18:4, 63:17, 65:22
**present** [2] - 25:1, 35:14
**PRESENT** [1] - 1:22
**presentations** [1] - 10:7
**presented** [8] - 42:3, 42:9, 42:13, 42:16, 43:16, 72:10, 72:22, 75:10
**presentence** [10] - 5:6, 6:25, 7:25, 8:5, 9:8, 10:1, 24:17, 68:15, 88:4, 88:8
**President** [5] - 73:16, 78:20, 79:13, 79:15, 83:13
**presidential** [5] - 57:13, 66:13, 76:11, 80:19, 83:15
**presiding** [1] - 4:3
**press** [2] - 33:12, 43:24
**pretty** [1] - 73:15
**prevent** [1] - 74:13
**prevented** [1] - 23:15
**prison** [4] - 42:7, 68:2, 82:8, 82:9
**Prisons** [1] - 85:17
**Pritchett** [1] - 47:11
**privilege** [2] - 74:17, 74:22
**privy** [1] - 30:14

**Probation** [3] - 1:22, 55:12, 88:6
**probation** [62] - 2:5, 3:12, 5:7, 7:1, 10:19, 19:5, 19:10, 19:17, 21:2, 22:16, 23:3, 23:8, 24:3, 36:25, 37:1, 37:2, 37:7, 37:15, 37:19, 38:5, 38:6, 38:7, 38:11, 38:16, 39:1, 39:17, 41:3, 41:4, 41:25, 42:7, 44:14, 44:15, 44:21, 45:7, 45:8, 48:23, 49:8, 49:24, 50:4, 51:7, 52:25, 55:12, 55:18, 68:16, 81:20, 81:25, 82:11, 82:15, 83:1, 83:8, 83:21, 84:5, 85:18, 85:21, 85:24, 86:6, 86:12, 86:16, 87:8, 88:4, 88:9, 88:12
**probationary** [11] - 19:18, 37:6, 37:22, 42:1, 45:4, 48:22, 57:25, 82:9, 82:12, 83:19, 83:23
**problem** [1] - 78:21
**problems** [1] - 44:24
**proceed** [2] - 6:18, 7:20
**proceeding** [1] - 90:23
**Proceedings** [1] - 1:25
**proceedings** [4] - 3:19, 3:23, 81:11, 91:6
**process** [8] - 11:24, 12:20, 16:17, 21:17, 21:24, 71:25, 73:22, 74:13
**produced** [1] - 1:25
**program** [6] - 19:22, 19:25, 20:2, 20:9, 20:18
**programs** [1] - 20:8
**prohibited** [3] - 3:24, 42:11, 86:21
**prohibitions** [1] - 3:24
**promised** [1] - 81:8
**promote** [6] - 18:3, 18:4, 68:23, 69:1, 75:17
**promoted** [1] - 53:25
**promotes** [1] - 70:10
**prompted** [1] - 57:15
**property** [12] - 14:3, 17:4, 27:11, 27:25, 28:1, 30:10, 36:5, 36:10, 36:11, 36:15,

36:19
**proposed** [1] - 49:6
**proposing** [1] - 49:6
**proposition** [1] - 27:21
**prosecutor** [2] - 25:17, 62:2
**prosecutors** [1] - 25:18
**prospective** [1] - 4:19
**protect** [5] - 30:25, 32:13, 68:25, 79:18, 81:12
**protected** [2] - 40:21, 72:24
**protecting** [1] - 79:6
**Protection** [2] - 28:10, 29:14
**protection** [6] - 29:18, 31:2, 32:10, 32:25, 33:14, 34:3
**protest** [3] - 72:25, 75:12, 77:1
**protesters** [5] - 15:3, 15:11, 15:12, 15:14, 70:25
**protests** [1] - 15:8
**proud** [1] - 78:25
**proudly** [1] - 74:3
**provide** [7] - 20:16, 26:19, 29:24, 30:2, 68:23, 69:8, 85:18
**provided** [5] - 25:4, 26:12, 31:5
**provides** [6] - 29:23, 32:23, 69:19, 70:11, 76:14, 76:17
**provision** [3] - 32:23, 32:24, 34:7
**provisions** [1] - 84:2
**PSR** [3] - 8:9, 8:13, 9:6
**public** [7] - 3:18, 3:21, 68:6, 68:8, 68:25, 72:13, 79:18
**publicly** [2] - 30:21, 63:6
**published** [1] - 30:14
**punishment** [3] - 13:15, 68:23, 70:11
**purpose** [1] - 20:25
**purposes** [5] - 16:7, 27:5, 68:20, 68:21, 88:16
**pursuant** [10] - 20:1, 69:2, 69:20, 81:18, 81:20, 84:1, 86:5, 86:6, 87:2, 88:17
**put** [1] - 73:11

67:16, 90:9, 90:13
**putting** [1] - 55:24
**puzzle** [1] - 19:21
**puzzled** [1] - 23:10
**puzzlement** [1] - 49:9

## Q

**qualify** [2] - 40:14, 45:6
**questionable** [1] - 42:22
**questioned** [1] - 61:14
**questioning** [1] - 72:1
**questions** [12] - 7:19, 10:16, 10:21, 10:23, 49:16, 56:2, 56:4, 58:13, 58:16, 58:25, 61:23, 70:24
**quickly** [1] - 25:21
**quip** [1] - 70:4
**quite** [5] - 40:11, 56:7, 56:10, 76:8, 82:10
**quote** [10] - 11:13, 11:22, 13:12, 13:15, 16:14, 30:6, 30:8, 45:21, 69:25, 76:11
**quoted** [3] - 33:17, 34:2, 36:1

## R

**raise** [1] - 78:13
**raised** [2] - 45:12, 75:8
**raises** [2] - 33:5, 48:20
**ramifications** [1] - 67:3
**range** [4] - 7:14, 12:15, 12:16, 88:21
**rarely** [2] - 4:15, 41:17
**rate** [1] - 85:6
**rather** [2] - 18:8, 23:14
**raw** [1] - 60:11
**reach** [2] - 28:16, 45:22
**reached** [4] - 29:16, 41:4, 59:23, 61:2
**read** [10] - 5:25, 8:4, 11:11, 46:5, 46:22, 48:7, 53:24, 58:21, 60:4, 61:21
**reading** [4] - 5:3, 46:2, 47:23, 57:24
**real** [1] - 81:22
**realize** [5] - 63:14, 63:19, 63:22, 64:9, 67:3

**realized** [1] - 60:22
**really** [10] - 16:7, 18:14, 21:10, 33:4, 38:18, 46:5, 51:11, 60:24, 64:11, 68:9
**reason** [8] - 15:22, 16:12, 23:7, 23:12, 24:11, 26:8, 41:10, 60:7
**reasonable** [3] - 86:7, 86:10, 86:11
**reasoning** [1] - 26:17
**reasons** [8] - 7:10, 26:7, 26:8, 34:3, 35:15, 37:25, 41:12, 44:22
**rebroadcasting** [1] - 3:22
**received** [4] - 5:6, 15:15, 21:16, 89:3
**recognition** [1] - 13:25
**recognize** [3] - 62:1, 73:4, 77:23
**recommend** [1] - 19:16
**recommendation** [8] - 5:7, 18:19, 37:11, 39:18, 52:24, 55:11, 68:16, 75:18
**recommendations** [5] - 13:1, 18:2, 18:13, 24:2, 83:21
**recommended** [19] - 7:14, 17:18, 18:8, 19:5, 19:10, 21:2, 22:17, 23:3, 23:8, 38:25, 39:1, 43:12, 45:5, 49:18, 82:8, 82:16, 83:1, 83:7
**recommending** [12] - 17:20, 23:9, 24:8, 37:4, 37:6, 37:21, 41:25, 45:2, 45:7, 49:7, 51:4, 83:5
**reconcile** [3] - 12:6, 74:24, 76:1
**record** [4] - 2:6, 6:13, 7:3, 89:9
**recorded** [1] - 26:4
**recording** [1] - 3:22
**records** [2] - 23:25, 69:7
**recourse** [1] - 80:20
**red** [1] - 78:13
**redistribution** [1] - 55:24
**reference** [1] - 19:24
**referenced** [1] - 21:15
**referencing** [1] - 12:17
**referred** [1] - 46:22

referring [2] - 8:14, 58:6
refers [2] - 19:22, 54:17
reflect [3] - 64:16, 68:22, 75:16
reflective [1] - 36:1
reflects [6] - 30:6, 30:18, 31:13, 31:19, 36:2, 70:10
Reform [1] - 84:1
refrain [1] - 84:16
regard [1] - 89:18
regarding [5] - 5:19, 10:16, 69:21, 75:21, 81:14
regardless [2] - 66:18, 66:20
regards [4] - 10:17, 20:22, 89:19, 89:23
registered [1] - 53:5
regretful [1] - 79:1
regular [1] - 37:17
rehabilitation [1] - 69:1
reimburse [1] - 31:3
relationship [1] - 60:3
release [11] - 37:1, 37:16, 38:5, 38:11, 44:14, 50:17, 50:24, 81:17, 82:12, 85:20, 88:4
released [1] - 37:15
relevant [2] - 68:17, 70:12
religious [1] - 88:16
remedy [1] - 32:19
remember [1] - 35:2
reminded [1] - 3:21
remorse [8] - 18:17, 18:23, 53:1, 57:23, 58:22, 59:10, 60:13, 79:25
remorseful [2] - 60:19, 62:3
remotely [2] - 3:19, 67:22
removal [1] - 3:25
removing [1] - 79:7
rent [1] - 64:13
repeat [1] - 71:17
repeated [2] - 56:12, 71:16
repeatedly [1] - 77:5
repeats [1] - 19:12
reply [1] - 46:2
report [10] - 5:6, 5:13, 7:1, 7:25, 8:5, 9:8, 10:1, 68:15, 88:5, 88:8

reported [1] - 1:25
reporter [1] - 62:5
Reporter [3] - 1:23, 1:24, 91:19
reports [5] - 24:17, 30:15, 30:16, 53:11, 56:19
represented [4] - 11:17, 24:20, 56:15, 72:17
representing [1] - 71:20
republic [1] - 64:1
reputation [2] - 73:23, 73:25
request [5] - 43:14, 49:3, 51:25, 61:25, 89:6
requested [1] - 85:19
requesting [2] - 4:9, 52:23
require [1] - 23:23
required [7] - 16:9, 32:18, 34:23, 35:25, 44:17, 51:8, 57:17
requires [1] - 7:9
requiring [1] - 41:23
residence [1] - 88:7
resides [1] - 20:4
resolve [4] - 7:5, 16:23, 71:3, 71:9
resolving [1] - 51:17
resources [2] - 14:8, 33:6
respect [4] - 44:3, 68:23, 70:10, 75:17
respond [1] - 31:8
responding [1] - 49:2
response [6] - 31:1, 31:5, 43:14, 45:25, 51:25, 61:24
responses [2] - 5:20, 46:20
responsibility [4] - 62:18, 65:14, 78:9, 81:7
responsible [2] - 36:11, 82:13
rest [2] - 42:5, 81:2
restaurants [2] - 55:15, 55:20
Restitution [3] - 28:11, 36:14, 87:11
restitution [69] - 10:18, 26:11, 26:12, 26:15, 26:19, 26:20, 26:23, 27:5, 27:11, 28:9, 28:23, 29:10, 29:20, 29:24, 30:5, 31:12, 31:13, 31:14,

31:19, 31:25, 32:4, 32:17, 32:21, 33:2, 33:5, 33:9, 33:15, 34:6, 34:19, 34:23, 34:24, 35:6, 35:8, 35:25, 36:6, 36:21, 37:6, 37:13, 37:17, 37:20, 38:4, 38:7, 38:10, 41:24, 44:3, 44:6, 44:17, 45:3, 49:22, 49:25, 50:4, 50:9, 50:10, 60:6, 69:8, 69:10, 69:13, 69:15, 69:19, 71:11, 82:11, 84:20, 85:1, 85:5, 85:20, 87:10
restitutionary [3] - 32:12, 33:24, 35:22
restricted [1] - 4:1
result [2] - 3:25, 53:8
resulting [1] - 30:7
results [1] - 73:15
return [1] - 88:8
returned [1] - 53:2
review [6] - 5:1, 7:3, 7:4, 25:16, 25:20, 52:12
reviewed [3] - 5:9, 5:17, 10:11
reviewing [1] - 4:5
rhetoric [3] - 12:7, 13:9, 13:23
ridiculous [1] - 62:12
rights [2] - 81:8, 81:12
riot [15] - 12:16, 12:17, 14:1, 14:2, 14:3, 14:7, 14:19, 15:13, 17:7, 17:15, 18:19, 23:21, 34:19, 75:13
rioters [5] - 13:10, 16:15, 16:20, 17:7, 72:23
ROBERT [1] - 1:22
Robert [1] - 3:12
role [2] - 30:6, 79:1
room [2] - 15:5, 65:10
Room [1] - 87:18
Rosales [2] - 19:24, 20:7
Rosales-Gonzalez [2] - 19:24, 20:7
RPR [3] - 1:23, 91:3, 91:18
rule [4] - 11:21, 47:2, 48:1, 48:16
run [2] - 20:13, 64:17
runs [1] - 12:21

S

safe [1] - 65:6
safeguard [1] - 81:8
safety [1] - 40:23
Saint [2] - 1:23, 91:18
SAINT [1] - 91:3
Saint-Loth [2] - 1:23, 91:18
SAINT-LOTH [1] - 91:3
sample [1] - 22:16
sanctions [2] - 3:25, 4:2
satisfied [1] - 9:15
saw [5] - 25:2, 25:25, 58:14, 67:13, 75:3
scaffolding [1] - 25:5
Scalia [1] - 47:12
scared [1] - 63:14
scene [1] - 32:6
schedule [2] - 37:8, 85:8
schizophrenic [1] - 13:8
school [3] - 57:3, 75:23, 80:19
scope [4] - 29:17, 32:4, 32:11, 33:2
scorching [3] - 13:9, 71:17, 72:12
screamed [1] - 71:3
seal [3] - 5:20, 6:9, 56:3
search [2] - 86:2, 86:6, 86:10
searches [4] - 86:5, 86:17, 86:20, 87:2
seated [3] - 7:17, 9:24, 89:14
second [4] - 7:6, 34:12, 47:11, 66:9
secret [1] - 41:16
section [1] - 10:17
Section [29] - 15:1, 15:20, 16:10, 23:22, 28:13, 29:5, 29:6, 29:15, 35:4, 45:17, 68:18, 69:2, 69:20, 70:12, 70:22, 81:18, 81:19, 81:21, 81:24, 83:2, 83:18, 84:2, 84:7, 84:21, 86:1, 86:14, 86:18, 88:17, 88:24
Sections [1] - 69:14
security [2] - 30:12, 72:3
Security [3] - 30:22,

31:16
see [12] - 3:8, 4:20, 9:11, 11:6, 17:10, 20:4, 25:7, 25:14, 58:17, 58:18, 59:3, 59:5
see-through [1] - 4:20
seeing [1] - 11:10
seek [1] - 52:12
seeking [2] - 33:5, 82:11
segue [1] - 34:12
self [1] - 18:3
self-promote [1] - 18:3
sell [1] - 53:18
Senate [2] - 62:14, 80:9
send [4] - 59:11, 61:10, 61:12, 87:15
sensation [1] - 60:25
sense [2] - 18:11, 23:20
sent [3] - 58:11, 59:23, 60:20
sentence [55] - 7:10, 7:11, 12:4, 16:13, 17:18, 17:19, 18:8, 18:14, 18:21, 19:18, 23:16, 36:22, 37:25, 38:17, 39:4, 42:3, 42:4, 42:6, 42:7, 42:10, 42:12, 42:19, 43:18, 44:17, 45:14, 46:11, 48:21, 48:22, 49:7, 51:12, 51:22, 52:5, 55:12, 68:12, 68:13, 68:19, 68:21, 68:24, 69:6, 70:1, 70:3, 70:9, 75:16, 75:19, 79:17, 79:22, 81:9, 83:19, 83:23, 83:25, 88:7, 88:18, 88:20, 89:1, 89:8
sentenced [2] - 24:6, 37:1, 57:24, 84:4
sentences [2] - 69:5, 81:14
SENTENCING [1] - 1:7
Sentencing [1] - 84:1
sentencing [68] - 3:16, 3:20, 4:5, 4:6, 5:1, 5:5, 5:7, 5:9, 5:17, 5:19, 5:21, 6:18, 6:20, 6:21, 6:22, 7:13, 7:16, 7:20, 9:21, 10:3, 11:4, 11:6, 12:13, 14:15, 14:22, 16:4, 16:7, 16:8, 16:10, 19:12,

19:14, 20:21, 22:6, 23:23, 23:24, 26:13, 36:24, 38:1, 41:6, 41:15, 41:21, 44:10, 44:12, 44:19, 51:3, 51:9, 52:24, 57:22, 68:14, 68:16, 68:20, 69:23, 70:6, 70:14, 70:17, 71:11, 71:12, 72:2, 72:9, 78:15, 79:20, 80:2, 83:4, 88:21, 89:5

**sentencings** [1] - 11:7
**separate** [1] - 36:6
**separately** [1] - 36:13
**series** [1] - 47:7
**serious** [4] - 13:17, 71:6, 77:2, 80:1
**seriously** [2] - 18:18, 65:9
**seriousness** [7] - 11:25, 14:5, 68:22, 70:10, 70:17, 75:17, 79:20
**served** [1] - 16:20
**service** [7] - 36:21, 36:23, 55:13, 55:15, 55:20, 56:20, 60:6
**services** [3] - 87:5, 88:16
**session** [1] - 83:13
**set** [9] - 2:11, 7:25, 8:9, 25:5, 37:25, 68:17, 80:24, 81:12, 83:18
**settled** [1] - 90:12
**several** [2] - 19:14, 60:13
**shall** [11] - 84:8, 84:25, 86:20, 87:11, 88:1, 88:4, 88:8, 88:11, 88:14, 88:15, 91:9
**Shaner** [15] - 3:1, 3:4, 4:7, 4:13, 4:18, 6:12, 8:4, 8:22, 9:11, 9:19, 52:17, 53:21, 56:6, 68:10, 70:2
**SHANER** [27] - 1:19, 3:3, 4:8, 4:14, 4:17, 6:8, 6:15, 8:6, 8:10, 8:15, 8:25, 9:3, 9:9, 9:12, 52:18, 52:22, 53:22, 54:3, 55:5, 55:9, 56:9, 58:3, 58:5, 58:10, 61:12, 61:16, 89:13
**share** [1] - 85:21
**sharing** [1] - 87:6
**sheer** [1] - 73:7

**sheet** [1] - 85:8
**Sherrill** [1] - 87:16
**shocked** [1] - 60:20
**shocking** [1] - 72:16
**short** [1] - 40:18
**shorthand** [2] - 1:25, 42:6
**shortly** [1] - 7:3
**shouting** [1] - 79:11
**show** [2] - 26:2, 73:1
**showed** [2] - 11:21, 74:18
**showing** [3] - 25:5, 75:8, 77:15
**shows** [1] - 77:17
**sic** [3] - 62:15, 63:10, 66:22
**side** [2] - 9:25, 39:12
**sides** [1] - 5:3
**sign** [1] - 90:17
**signatory** [1] - 91:11
**signed** [1] - 30:23
**significant** [2] - 16:8, 73:19
**similar** [6] - 23:25, 24:7, 66:17, 69:7
**similarly** [4] - 24:3, 24:12, 24:13, 83:22
**similarly-situated** [1] - 24:3
**simply** [5] - 10:13, 13:20, 56:12, 57:19, 72:15
**single** [4] - 34:18, 38:2, 38:21, 49:21
**sit** [1] - 44:3
**sites** [1] - 87:8
**situated** [4] - 24:3, 24:12, 24:13, 83:22
**situation** [8] - 17:3, 32:19, 44:11, 50:22, 51:3, 64:8, 66:19, 66:21
**situations** [1] - 45:4
**six** [2] - 64:17, 81:16
**slow** [2] - 62:4, 62:24
**smart** [1] - 61:5
**smashed** [1] - 73:12
**smile** [1] - 65:11
**smiled** [1] - 75:6
**smiling** [2] - 63:25, 77:15
**SMS** [1] - 87:5
**Snapchat** [1] - 53:14
**so..** [1] - 68:9
**social** [7] - 53:16, 59:16, 61:4, 67:8, 78:17, 80:24, 87:5
**society** [1] - 67:21

**software** [4] - 86:13, 86:22, 86:23, 86:25
**someone** [9] - 61:5, 64:5, 64:25, 65:4, 65:10, 65:11, 67:25, 77:15, 78:16
**sometimes** [1] - 4:21
**somewhat** [7] - 12:9, 27:17, 30:17, 33:10, 41:8, 46:15, 49:1
**somewhere** [1] - 35:13
**soon** [1] - 57:24
**sorry** [9] - 2:10, 40:1, 50:21, 53:22, 55:5, 56:9, 62:6, 62:25, 63:13
**sort** [18] - 2:11, 11:10, 15:16, 18:20, 24:4, 31:23, 33:24, 34:5, 35:4, 35:8, 35:16, 36:16, 37:11, 41:2, 41:6, 42:7, 47:11, 56:18
**sound** [1] - 62:12
**sounds** [1] - 75:25
**space** [1] - 65:6
**spared** [1] - 68:1
**sparse** [1] - 40:11
**speaking** [3] - 29:25, 68:7, 68:9
**speaks** [1] - 18:17
**special** [4] - 39:17, 84:6, 84:25, 88:11
**specific** [18] - 16:6, 20:15, 21:14, 23:18, 25:22, 25:23, 25:24, 32:22, 36:4, 36:7, 36:18, 36:19, 46:3, 57:16, 58:17, 58:19, 70:14, 76:18
**specifically** [3] - 10:18, 21:15, 69:3
**specifics** [1] - 20:13
**specious** [1] - 76:3
**speeds** [1] - 52:20
**spent** [1] - 16:5
**splintered** [1] - 77:18
**split** [13] - 39:4, 42:3, 42:4, 42:6, 42:10, 42:12, 42:19, 43:9, 45:14, 46:11, 51:12, 51:22, 52:5
**spoken** [1] - 60:10
**sprays** [1] - 73:10
**staff** [1] - 79:16
**staffers** [1] - 73:17
**stage** [1] - 7:12
**stages** [1] - 6:22
**stairs** [2] - 25:6, 77:11

**stairwell** [1] - 25:8
**stand** [7] - 3:7, 6:19, 9:14, 15:3, 61:19, 68:7, 68:11
**standard** [1] - 84:9
**standing** [1] - 70:16
**Standing** [1] - 3:22
**start** [2] - 22:18, 32:1
**started** [4] - 21:10, 46:20, 59:8, 67:25
**starting** [5] - 10:8, 18:12, 18:13, 64:15, 76:21
**state** [2] - 2:6, 83:25, 84:14
**statement** [5] - 26:4, 54:22, 70:4, 77:3, 77:22
**statements** [3] - 8:8, 66:12, 83:8
**states** [2] - 48:16, 69:25
**States** [5] - 2:3, 2:13, 19:23, 20:3, 72:14, 87:12
**STATES** [3] - 1:1, 1:2, 1:8
**States'** [1] - 52:24
**station** [1] - 63:7
**statue** [1] - 17:14
**status** [2] - 10:25, 71:7
**statute** [8] - 29:16, 29:23, 29:24, 35:5, 48:4, 48:5, 69:12, 70:19
**statutes** [3] - 26:19, 28:10, 69:14
**statutorily** [1] - 29:25
**statutory** [8] - 10:18, 30:1, 32:22, 32:24, 46:16, 48:13, 70:13, 88:19
**stay** [1] - 62:15
**staying** [1] - 54:25
**steady** [1] - 75:24
**steal** [1] - 74:4
**stenographic** [1] - 91:5
**step** [8] - 2:9, 6:23, 7:6, 7:9, 7:22, 27:2, 36:3, 64:9
**steps** [1] - 76:25
**stick** [2] - 52:6, 79:25
**still** [8] - 29:14, 37:13, 45:7, 46:19, 48:25, 66:14, 66:23, 76:9
**stole** [3] - 36:5, 36:10, 74:7
**stolen** [5] - 27:25, 28:1, 57:13, 66:13,

76:11
**stood** [1] - 76:25
**stop** [5] - 12:21, 74:4, 76:18, 76:23, 83:12
**storage** [1] - 86:2
**storm** [2] - 57:6, 74:3
**stormed** [1] - 74:12
**Street** [3] - 1:10, 1:17, 1:20
**stressing** [1] - 16:13
**strictly** [1] - 3:24
**strikes** [2] - 12:9, 57:1
**strong** [4] - 11:12, 11:25, 12:7, 72:12
**strongest** [1] - 63:3
**structure** [1] - 80:25
**structures** [1] - 81:11
**stupid** [2] - 55:1, 61:7
**stupidity** [1] - 59:10
**subcomponents** [1] - 33:24
**subject** [8] - 32:21, 35:21, 81:15, 81:19, 86:5, 86:18, 87:2, 88:11
**submit** [2] - 84:17, 85:25
**submitted** [6] - 5:18, 5:20, 9:20, 10:4, 38:18, 72:19
**substance** [2] - 84:15, 84:17
**successful** [4] - 79:2, 79:3, 80:6, 80:12
**suffered** [1] - 73:25
**sufficient** [3] - 16:25, 68:19, 79:22
**sufficiently** [1] - 70:9
**suggest** [2] - 56:18, 71:7
**suggesting** [2] - 21:7, 78:4
**suggestion** [1] - 23:7
**suggests** [1] - 66:13
**sunk** [1] - 64:8
**superhero** [1] - 54:6
**Superior** [2] - 15:8, 15:24
**supervised** [1] - 36:25, 37:1, 37:15, 37:16, 38:5, 38:11, 44:13, 50:17, 50:23, 81:17, 82:12
**supervising** [1] - 37:8
**supervision** [12] - 37:2, 37:14, 38:6, 44:13, 49:24, 50:3, 84:8, 84:10, 84:12, 84:18, 84:22, 86:8
**supervisor** [1] - 20:15

**supplement** [1] - 10:7
**Supplemental** [3] - 30:22, 31:16
**supplemental** [5] - 5:11, 5:19, 19:12, 37:12, 39:24
**support** [3] - 49:4, 53:6, 78:20
**supports** [1] - 51:11
**suppose** [1] - 37:10
**supposed** [3] - 12:6, 21:9, 77:9
**suspended** [1] - 85:16
**suspicion** [1] - 86:7
**sustained** [2] - 28:6, 30:12
**system** [1] - 40:20

**T**

**tasked** [1] - 79:6
**team** [1] - 11:9
**tear** [4] - 25:6, 67:14, 73:13, 77:12
**teen** [1] - 53:9
**teenagers** [1] - 55:25
**teleconference** [1] - 3:21
**telephone** [2] - 59:19, 59:21
**ten** [5] - 54:19, 55:10, 59:24, 82:20, 82:24
**tendencies** [1] - 18:5
**Tennessee** [7] - 9:1, 41:5, 55:17, 57:4, 84:24, 90:11, 90:13
**Tenth** [1] - 27:18
**term** [19] - 37:1, 37:5, 37:22, 38:11, 38:17, 38:25, 39:1, 39:22, 40:3, 40:8, 40:24, 44:21, 81:16, 81:25, 82:9, 82:17, 84:4
**termination** [1] - 88:10
**terms** [5] - 29:20, 36:24, 44:16, 46:16, 88:13
**territory** [1] - 33:11
**terror** [1] - 66:1
**terrorized** [1] - 73:18
**test** [1] - 84:17
**testify** [2] - 32:19, 32:24
**testing** [2] - 4:12
**tests** [1] - 84:19
**Texas** [1] - 56:1
**THE** [159] - 1:1, 1:7, 1:9, 1:19, 2:2, 2:9,

2:15, 2:18, 2:20, 2:23, 3:1, 3:7, 3:13, 4:11, 4:15, 4:18, 6:6, 6:12, 6:16, 7:18, 7:19, 7:21, 7:22, 8:3, 8:7, 8:13, 8:20, 8:21, 8:22, 8:23, 9:2, 9:5, 9:10, 9:13, 9:17, 9:18, 9:22, 9:24, 10:23, 12:9, 13:6, 14:12, 14:15, 14:21, 15:17, 16:3, 17:20, 17:24, 18:5, 18:11, 19:4, 20:17, 20:25, 21:21, 23:22, 25:9, 25:12, 26:10, 27:2, 27:6, 27:14, 27:22, 27:25, 28:3, 28:6, 28:9, 28:19, 29:3, 29:12, 29:19, 30:4, 30:20, 32:16, 34:15, 34:22, 36:20, 37:21, 38:2, 38:15, 38:24, 39:3, 39:21, 39:25, 40:2, 40:5, 40:7, 40:15, 41:14, 42:18, 42:25, 43:6, 44:2, 44:9, 44:25, 45:11, 46:8, 47:4, 47:17, 48:25, 49:20, 50:13, 50:15, 50:19, 50:22, 51:1, 51:21, 52:5, 52:14, 52:16, 52:19, 53:21, 53:23, 55:3, 55:7, 56:6, 56:10, 58:4, 58:8, 61:9, 61:15, 61:17, 61:20, 62:4, 62:6, 62:7, 62:9, 62:24, 62:25, 63:1, 63:2, 66:8, 66:16, 67:18, 67:19, 68:3, 68:4, 68:5, 68:8, 68:10, 73:6, 73:7, 78:11, 78:12, 80:3, 80:4, 80:5, 80:14, 80:16, 80:17, 82:22, 82:24, 89:12, 89:14, 89:21, 89:25, 90:4, 90:14, 90:17, 90:21
**theories** [3] - 76:3, 76:5, 78:22
**theory** [1] - 66:14
**thereafter** [1] - 84:19
**therefore** [4] - 16:8, 33:1, 85:4, 87:21
**thinking** [2] - 62:13, 77:1
**thinks** [1] - 61:5
**thousands** [1] - 65:23

**threat** [6] - 11:17, 12:11, 33:6, 33:7, 71:21, 72:17
**three** [17] - 6:22, 12:5, 17:18, 18:8, 20:23, 21:15, 22:13, 22:23, 23:1, 24:22, 31:3, 37:5, 39:25, 40:2, 82:17, 84:15
**three-month** [1] - 18:8
**throughout** [1] - 53:9
**ticket** [4] - 15:6, 15:16, 15:24, 71:1
**tied** [6] - 29:20, 30:3, 44:3, 44:6, 71:10, 71:12
**TikTok** [3] - 18:25, 53:16, 74:7
**timing** [1] - 24:14
**Title** [6] - 28:17, 28:25, 29:4, 29:5, 29:13, 43:8
**today** [4] - 77:22, 79:25, 90:1, 90:18
**today's** [1] - 23:13
**together** [6] - 25:21, 47:23, 55:24, 62:15, 68:1, 80:9
**tomorrow** [2] - 22:7, 45:1
**tomorrow's** [1] - 23:14
**ton** [1] - 48:10
**took** [10] - 22:3, 22:11, 22:18, 22:19, 22:22, 22:25, 23:3, 23:5, 65:18, 75:6
**top** [1] - 64:25
**tore** [1] - 16:21
**Torrens** [11] - 5:21, 18:1, 21:25, 22:1, 22:6, 22:10, 22:13, 23:4, 23:9, 25:9, 25:23
**Torrens'** [4] - 22:1, 43:3, 45:2, 69:23
**total** [4] - 31:14, 55:3, 55:7, 85:13
**totally** [3] - 16:19, 57:10, 64:4
**track** [7] - 19:22, 19:24, 19:25, 20:8, 20:9, 20:18, 23:7
**transcript** [5] - 1:25, 61:11, 91:5, 91:6, 91:10
**TRANSCRIPT** [1] - 1:7
**transcription** [1] - 1:25
**transfer** [4] - 12:20, 76:23, 81:5, 90:18

**transferred** [1] - 84:23
**transition** [3] - 73:22, 74:13, 80:23
**transmission** [1] - 40:21
**travel** [1] - 57:11
**traveling** [1] - 74:17
**treason** [1] - 79:12
**treatment** [2] - 88:8, 88:10
**trespass** [1] - 75:12
**trespassed** [1] - 13:12
**trespassers** [7] - 13:15, 13:16, 13:20, 72:5, 72:11, 72:24, 83:15
**trespassing** [7] - 14:12, 14:16, 14:17, 14:18, 14:20, 72:16
**trial** [2] - 2:10, 2:11
**tried** [5] - 13:3, 13:5, 54:8, 74:4, 77:6
**true** [4] - 14:14, 37:23, 91:4, 91:5
**truly** [5] - 62:1, 64:2, 65:9, 65:15, 67:3
**Trump** [5] - 53:6, 53:18, 54:6, 54:17, 78:20
**Trump's** [1] - 54:16
**trustworthiness** [2] - 50:6, 50:7
**trustworthy** [1] - 50:2
**truth** [1] - 60:25
**truthfully** [1] - 71:21
**try** [5] - 33:16, 54:10, 79:10, 79:14, 80:20
**trying** [11] - 14:4, 18:7, 18:11, 18:14, 33:25, 35:18, 40:14, 53:18, 73:14, 78:5, 88:14
**turn** [2] - 10:5, 26:10
**turned** [1] - 72:7
**turns** [1] - 83:17
**TV** [1] - 61:4
**Twitter** [1] - 53:14
**two** [24] - 5:25, 17:22, 18:9, 22:3, 22:10, 22:11, 22:13, 22:20, 23:5, 23:13, 26:18, 28:9, 30:25, 40:7, 40:13, 40:16, 42:8, 45:2, 46:20, 69:13, 76:21, 84:14, 84:18
**two-week** [1] - 45:2
**type** [1] - 73:10
**types** [2] - 69:5, 81:14
**typically** [7] - 19:25, 40:16, 40:18, 43:24, 47:7, 70:24, 90:8

**U**

**U.S** [9] - 1:13, 1:22, 15:22, 20:10, 55:12, 84:23, 85:22, 87:24, 88:6
**U.S.C** [23] - 15:1, 15:20, 16:10, 23:22, 28:13, 29:6, 68:18, 69:2, 69:14, 69:20, 70:21, 81:18, 81:20, 81:24, 84:2, 84:7, 84:21, 86:1, 86:14, 86:18, 88:17, 88:24
**ultimate** [1] - 18:1
**ultimately** [2] - 34:9, 35:20
**unable** [1] - 89:5
**unacceptable** [2] - 14:10, 64:4
**unannounced** [1] - 86:17
**unavailable** [1] - 89:1
**unbecoming** [1] - 64:4
**unchartered** [1] - 33:10
**unclear** [1] - 41:9
**under** [28] - 3:21, 5:20, 6:9, 7:14, 16:10, 20:1, 24:6, 28:12, 29:13, 29:15, 29:17, 30:1, 35:3, 35:25, 36:13, 36:15, 41:21, 45:22, 55:9, 56:3, 63:17, 64:1, 70:12, 73:17, 81:14, 81:24, 82:23, 88:12
**underneath** [1] - 25:5
**understandable** [1] - 47:23
**understood** [1] - 21:9
**undertake** [1] - 56:20
**undisputed** [1] - 10:2
**uneducated** [1] - 57:2
**unfold** [1] - 74:10
**uninformed** [1] - 57:20
**unit** [1] - 46:6
**UNITED** [3] - 1:1, 1:2, 1:8
**United** [8] - 2:3, 2:13, 19:23, 20:3, 52:24, 72:14, 87:12
**units** [1] - 27:16
**unlawful** [1] - 84:16
**unlawfully** [3] - 35:11, 35:14, 84:15
**unless** [2] - 9:11, 61:3
**unlike** [1] - 46:21

**unparalleled** [3] - 11:16, 12:12, 71:20
**unprecedented** [4] - 10:13, 12:18, 43:22, 43:23
**unpublished** [2] - 39:10, 43:20
**unquestionably** [1] - 48:12
**unreasonable** [1] - 75:19
**unsophisticated** [2] - 56:17, 57:2
**unwarranted** [3] - 23:24, 69:6, 83:3
**up** [22] - 2:11, 6:11, 13:5, 15:3, 18:24, 20:13, 27:2, 51:9, 56:4, 61:19, 64:15, 67:8, 67:11, 67:16, 68:7, 68:11, 73:24, 74:16, 75:13, 78:21, 80:24, 81:12
**upbeat** [1] - 65:7
**updating** [1] - 9:7
**ups** [1] - 58:25
**upset** [1] - 54:12
**upsetting** [1] - 60:16
**upward** [1] - 88:20
**upwards** [1] - 50:14
**urges** [1] - 16:11
**USAO** [1] - 1:16
**uses** [2] - 11:12, 71:18

**V**

**valid** [1] - 62:2
**vandalism** [5] - 54:25, 58:19, 59:3, 62:23, 63:25
**various** [1] - 30:9
**varying** [2] - 17:6, 24:23
**verified** [1] - 60:2
**versus** [1] - 2:3
**Vice** [4] - 73:16, 79:13, 79:15, 83:13
**Victim** [2] - 28:10, 29:14
**victim** [8] - 26:22, 27:5, 27:8, 27:9, 29:17, 32:18, 87:13
**Victims** [2] - 28:11, 36:13
**victims** [4] - 26:20, 34:9, 34:10, 69:8
**video** [16] - 5:13, 10:4, 18:3, 25:4, 25:22, 26:3, 54:4, 60:20,

72:19, 74:6, 77:10, 77:14, 77:17, 77:25, 78:5, 87:6
**videoconference** [1] - 3:23
**videos** [5] - 5:12, 18:25, 53:7, 73:1, 75:6
**videotapes** [1] - 17:21
**view** [5] - 13:18, 69:22, 72:22, 74:5, 87:4
**viewing** [1] - 13:23
**views** [2] - 14:16, 73:20
**violation** [7] - 3:24, 15:1, 15:20, 35:4, 70:21, 86:8, 86:9
**violence** [13] - 19:9, 36:14, 54:1, 58:18, 59:1, 59:6, 62:22, 63:4, 63:25, 66:21, 67:15, 73:3, 77:2
**violent** [5] - 14:2, 63:10, 67:20, 73:2, 80:11
**virus** [1] - 40:21
**voice** [1] - 54:16
**void** [1] - 91:9
**voluminous** [1] - 68:14
**vote** [5] - 4:19, 4:23, 53:5, 53:6, 75:14
**voted** [1] - 80:18
**vs** [1] - 1:3
**vulnerable** [2] - 56:17, 78:18
**VWPA** [1] - 36:15

**W**

**wages** [1] - 33:9
**waives** [2] - 85:4, 87:21
**Walmart** [1] - 55:16
**WALTERS** [5] - 1:22, 3:11, 90:8, 90:15, 90:20
**Walters** [2] - 3:12, 3:14
**wants** [4] - 20:14, 56:21, 59:11, 60:11
**wardens** [1] - 47:15
**warn** [2] - 86:3, 87:1
**warranted** [1] - 83:17
**Washington** [8] - 1:5, 1:10, 1:14, 1:20, 67:8, 78:20, 87:19, 87:25

**watched** [3] - 53:2, 72:19, 74:10
**watching** [1] - 65:25
**waving** [2] - 75:9, 77:15
**ways** [2] - 13:8, 34:21
**weapon** [1] - 19:8
**wear** [2] - 4:20, 4:21
**websites** [1] - 87:6
**week** [5] - 2:10, 8:17, 8:18, 45:2, 90:16
**weekend** [1] - 40:12
**weeks** [13] - 17:22, 18:9, 22:3, 22:10, 22:11, 22:13, 23:1, 23:5, 40:7, 40:13, 40:16, 76:22
**weigh** [1] - 12:25
**weighs** [1] - 81:13
**whole** [5] - 14:7, 27:19, 34:9, 34:11, 46:23
**wide** [2] - 12:15, 12:16
**wildly** [1] - 63:20
**Wilfong** [2] - 27:18, 33:3
**win** [1] - 80:19
**window** [2] - 17:14, 76:14
**windows** [3] - 16:22, 73:12, 78:12
**wing** [1] - 54:6
**wish** [2] - 7:8, 61:18
**Witness** [2] - 28:10, 29:14
**witness** [2] - 29:18, 77:2
**witnessed** [1] - 79:21
**woke** [1] - 67:10
**wonder** [4] - 49:4, 72:9, 72:13, 72:18
**word** [1] - 45:19
**words** [5] - 19:3, 74:1, 74:9, 74:14, 74:23
**world** [5] - 66:1, 73:24, 74:17, 74:19, 74:23
**worse** [1] - 53:3
**worth** [1] - 48:9
**would've** [1] - 42:15
**would-be** [1] - 16:15
**write** [1] - 61:24
**writing** [1] - 10:7
**wrote** [4] - 56:7, 56:10, 59:12, 61:22

**Y**

**Yapp** [2] - 8:24, 8:25

**years** [5] - 51:14, 53:9, 54:7, 55:16, 84:5
**years'** [1] - 81:19
**yells** [1] - 77:15
**York** [1] - 60:10
**you-all** [2] - 3:17, 11:9
**yourself** [1] - 78:8
**YouTube** [1] - 53:14

**Z**

**zero** [1] - 49:5